# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724 |
| CÉSAR CASTILLO, INC.;<br>FWK HOLDINGS, L.L.C.;<br>KPH HEALTHCARE SERVICES, INC., a/k/a KINNEY DRUGS, INC.; and<br>ROCHESTER DRUG CO-OPERATIVE, INC.; on behalf of themselves and all others similarly situated,<br><br>                                Plaintiffs,<br><br>v.<br><br>ACTAVIS HOLDCO U.S., INC.;<br>ACTAVIS PHARMA, INC.<br>ACTAVIS ELIZABETH, LLC<br>AKORN INC.;<br>ALVOGEN INC.;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS, LLC;<br>APOTEX CORP.;<br>ASCEND LABORATORIES, LLC;<br>AUROBINDO PHARMA USA, INC.;<br>BAUSCH HEALTH AMERICAS, INC.;<br>BAUSCH HEALTH US, LLC;<br>BRECKENRIDGE PHARMACEUTICAL, INC.;<br>CAMBER PHARMACEUTICALS INC.<br>CITRON PHARMA LLC;<br>DAVA PHARMACEUTICALS, LLC;<br>DR. REDDY'S LABORATORIES, INC.;<br>FOUGERA PHARMACEUTICALS INC.;<br>GENERICS BIDCO I LLC;<br>GLENMARK PHARMACEUTICALS, INC.;<br>GREENSTONE LLC;<br>G&W LABORATORIES, INC.;<br>HERITAGE PHARMACEUTICALS, INC.;<br>HIKMA LABS, INC.;<br>HIKMA PHARMACEUTICALS USA, INC.;<br>HI-TECH PHARMACAL CO, INC.;<br>IMPAX LABORATORIES, LLC;<br>JUBILANT CADISTA PHARMACEUTICALS INC.;<br>LANNETT COMPANY, INC.;<br>LUPIN PHARMACEUTICALS, INC.;<br>MALLINCKRODT INC.;<br>MAYNE PHARMA INC.;<br>MORTON GROVE PHARMACEUTICALS, INC.; | HON. CYNTHIA M. RUFE<br><br>JURY TRIAL DEMANDED<br><br>**DIRECT PURCHASER PLAINTIFFS' CLASS ACTION COMPLAINT**<br><br>PUBLIC VERSION |

MYLAN INC.;
MYLAN PHARMACEUTICALS INC.;
OCEANSIDE PHARMACEUTICALS, INC.;
PAR PHARMACEUTICAL, INC.;
PERRIGO NEW YORK, INC.;
PFIZER, INC.;
SANDOZ, INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA., INC.;
TELIGENT, INC.;
TEVA PHARMACEUTICALS USA, INC.;
TORRENT PHARMA INC.;
UPSHER-SMITH LABORATORIES, INC.;
VERSAPHARM, INC.;
WEST-WARD PHARMACEUTICALS INC.;
WOCKHARDT USA LLC, and
ZYDUS PHARMACEUTICALS (USA), INC.,

                  Defendants.

REDACTED – PUBLIC VERSION

TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................1

    A.    Each of the Generic Drugs is Part of An Overarching Fair Share Agreement Among Manufacturers in the Generic Drug Industry. ...............................................5

    B.    The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years. ........................................7

        1.    The Fair Share Agreement applied across multiple generic drugs at a time and was especially effective when new entrants came to market or when generic drug manufacturers decided to exit a market. ................................8

        2.    The conspirators monitored market share and disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities. ...........................................................................................10

    C.    The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors. ...........................11

    D.    Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement. ................................................................11

II.    JURISDICTION AND VENUE .........................................................................12

III.    PARTIES ............................................................................................................13

    A.    Plaintiffs ..............................................................................................................13

    B.    Defendants ...........................................................................................................14

        1.    Actavis .....................................................................................................14

        2.    Akorn .......................................................................................................15

        3.    Alvogen ....................................................................................................15

        4.    Amneal .....................................................................................................16

        5.    Apotex ......................................................................................................16

        6.    Ascend ......................................................................................................16

        7.    Aurobindo ................................................................................................17

        8.    Bausch .....................................................................................................17

        9.    Breckenridge ............................................................................................18

REDACTED – PUBLIC VERSION

10.    Cadista ........................................................................................ 18

11.    Camber ........................................................................................ 18

12.    Citron .......................................................................................... 18

13.    Dr. Reddy's .................................................................................. 19

14.    Glenmark ..................................................................................... 19

15.    Greenstone ................................................................................... 19

16.    G&W ........................................................................................... 20

17.    Heritage ....................................................................................... 20

18.    Impax .......................................................................................... 20

19.    Lannett ........................................................................................ 21

20.    Lupin ........................................................................................... 21

21.    Mallinckrodt ................................................................................ 21

22.    Mayne ......................................................................................... 21

23.    Mylan .......................................................................................... 22

24.    Par .............................................................................................. 22

25.    Perrigo ......................................................................................... 23

26.    Sandoz ......................................................................................... 23

27.    Sun .............................................................................................. 24

28.    Taro ............................................................................................ 24

29.    Teligent ....................................................................................... 24

30.    Teva ............................................................................................ 25

31.    Torrent ........................................................................................ 25

32.    Upsher-Smith ............................................................................... 25

33.    West-Ward ................................................................................... 26

34.    Wockhardt ................................................................................... 26

REDACTED – PUBLIC VERSION

|  |  | 35. | Zydus.......................................................................................27 |

|  | C. | Generic Manufacturer Co-Conspirators.................................................27 |

|  |  | 1. | Rising..........................................................................................27 |

|  |  | 2. | Unknown Generic Manufacturer Co-Conspirators.....................................27 |

| IV. | INTERSTATE TRADE AND COMMERCE .................................................28 |

| V. | FACTUAL ALLEGATIONS ...................................................................29 |

|  | A. | Competition Between Generic Drugs Historically Has Been Keen. .....................29 |

|  |  | 1. | Generic drugs should lead to lower prices...................................................29 |

|  |  | 2. | Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive...............31 |

|  | B. | Defendants and Their Generic Manufacturer Co-Conspirators Participated in an Overarching Fair Share Agreement to Thwart Competition in the Generic Drug Industry. ...................................................................................................35 |

|  |  | 1. | Fair Share Agreement Principle: Each manufacturer is entitled to a certain market share—no more and no less..........................................................39 |

|  |  | 2. | Fair Share Agreement Principle: Manufacturers should achieve their fair share of the market cooperatively—not competitively..............................42 |

|  |  | 3. | Fair Share Agreement Principle: Do not engage in price competition. .....43 |

|  |  | 4. | Fair Share Agreement Principle: When customers request a competitive bid, the manufacturer's response should be based on and consistent with the Fair Share Agreement—not customer's wants and needs or competitive interests. ..............................................................................44 |

|  |  | 5. | The Fair Share Agreement was facilitated by coziness among generic drug manufacturers..................................................................................45 |

|  | C. | Individual Drug Allegations .....................................................................49 |

|  |  | 1. | Adapalene ....................................................................................49 |

|  |  | 2. | Alclometasone Dipropionate .........................................................50 |

|  |  | 3. | Allopurinol....................................................................................54 |

|  |  | 4. | Amantadine HCL ..........................................................................57 |

REDACTED – PUBLIC VERSION

5.    Amiloride HCL/HCTZ.................................................................................59

6.    Amoxicillin/Clavulanate ..........................................................................61

7.    Amphetamine Salts (MAS)......................................................................62

8.    Atenolol Chlorthalidone..........................................................................68

9.    Atropine Sulfate .......................................................................................70

10.   Balsalazide Disodium ..............................................................................72

11.   Betamethasone Dipropionate .................................................................74

12.   Betamethasone Dipropionate Augmented ...........................................78

13.   Betamethasone Dipropionate Clotrimazole .........................................80

14.   Betamethasone Valerate..........................................................................83

15.   Bethanechol Chloride...............................................................................86

16.   Bromocriptine Mesylate..........................................................................87

17.   Budesonide................................................................................................90

18.   Buspirone HCL .........................................................................................92

19.   Butorphanol Tartrate...............................................................................93

20.   Capecitabine..............................................................................................96

21.   Captopril ...................................................................................................97

22.   Carbamazepine, Clotrimazole, and Warfarin Sodium ...............................99

23.   Carisoprodol............................................................................................113

24.   Cefdinir and Cefprozil ...........................................................................114

25.   Cefuroxime Axetil ..................................................................................115

26.   Celecoxib .................................................................................................118

27.   Cephalexin (Cefalexin) ..........................................................................119

28.   Chlorpromazine HCL.............................................................................123

29.   Cholestyramine .......................................................................................127

REDACTED – PUBLIC VERSION

30.     Ciclopirox ....................................................................................................130

31.     Cimetidine ....................................................................................................132

32.     Clarithromycin .............................................................................................134

33.     Clindamycin Phosphate ...............................................................................136

34.     Clonidine TTS ..............................................................................................140

35.     Desmopressin Acetate ..................................................................................143

36.     Dexmethylphenidate HCL ...........................................................................144

37.     Dextroamphetamine Sulfate.........................................................................146

38.     Diclofenac Potassium...................................................................................152

39.     Diltiazem HCL ..............................................................................................155

40.     Diphenoxylate Atropine HCL.......................................................................158

41.     Doxazosin Mesylate and Etodolac ..............................................................160

42.     Drospirenone and Ethinyl Estradiol............................................................170

43.     Enalapril Maleate ........................................................................................172

44.     Entecavir ......................................................................................................176

45.     Estradiol ......................................................................................................177

46.     Estradiol and Norethindrone Acetate..........................................................179

47.     Ethinyl Estradiol and Levonorgestrel .........................................................180

48.     Exemestane ..................................................................................................182

49.     Fenofibrate ...................................................................................................184

50.     Fluconazole ..................................................................................................186

51.     Fluocinolone Acetonide ...............................................................................191

52.     Fluoxetine HCL ............................................................................................193

53.     Fluticasone Propionate ................................................................................195

54.     Gabapentin ...................................................................................................197

REDACTED – PUBLIC VERSION

55.    Glimepiride ................................................................................................199

56.    Griseofulvin ...............................................................................................200

57.    Halobetasol Propionate ..............................................................................201

58.    Heloperidol .................................................................................................204

59.    Hydrocodone Acetaminophen .....................................................................207

60.    Hydrocortisone Valerate .............................................................................210

61.    Irbesartan ...................................................................................................212

62.    Isosorbide Dinitrate.....................................................................................213

63.    Ketoconazole...............................................................................................215

64.    Ketoprofen ..................................................................................................220

65.    Ketorolac Tromethamine .............................................................................222

66.    Labetalol HCL .............................................................................................224

67.    Lamivudine/Zidovudine................................................................................226

68.    Latanoprost .................................................................................................228

69.    Lidocaine HCL .............................................................................................230

70.    Loperamide HCL ..........................................................................................232

71.    Metformin ER (F) .........................................................................................234

72.    Methadone HCL............................................................................................237

73.    Methotrexate ...............................................................................................239

74.    Methylphenidate ..........................................................................................242

75.    Methylprednisolone ......................................................................................245

76.    Moexipril HCL and Moexipril HCL HCTZ .....................................................248

77.    Nadolol........................................................................................................250

78.    Naproxen Sodium ........................................................................................255

79.    Niacin...........................................................................................................258

REDACTED – PUBLIC VERSION

80.    Nitrofurantoin ........................................................................260

81.    Neomycin Polymyxin Hydrocortisone ...................................263

82.    Norethindrone/Ethinyl Estradiol............................................264

83.    Nortriptyline HCL..................................................................266

84.    Nystatin Triamcinolone .........................................................268

85.    Omega-3-Acid Ethyl Esters ...................................................269

86.    Oxaprozin ..............................................................................271

87.    Oxybutynin Chloride ..............................................................275

88.    Oxycodone Acetaminophen.....................................................277

89.    Oxycodone HCL .....................................................................280

90.    Paricalcitol ............................................................................284

91.    Permethrin .............................................................................286

92.    Perphenazine ..........................................................................288

93.    Phenytoin Sodium ..................................................................291

94.    Pilocarpine HCL .....................................................................295

95.    Piroxicam ...............................................................................297

96.    Potassium Chloride .................................................................299

97.    Prazosin HCL..........................................................................302

98.    Prednisolone Acetate ..............................................................308

99.    Prednisone..............................................................................310

100.   Raloxifene HCL ......................................................................314

101.   Ranitidine HCL .......................................................................317

102.   Silver Sulfadiazine .................................................................322

103.   Spironolactone HCTZ.............................................................323

104.   Tamoxifen Citrate ..................................................................325

REDACTED – PUBLIC VERSION

105. Temozolomide ...................................................................................330

106. Timolol Maleate..............................................................................332

107. Tizanidine HCL ...............................................................................335

108. Tobramycin......................................................................................339

109. Tobramycin Dexamethasone ...........................................................341

110. Tolmetin Sodium .............................................................................342

111. Tolterodine ......................................................................................344

112. Trazodone HCL ...............................................................................346

113. Triamcinolone Acetonide.................................................................348

114. Triamterene HCTZ ..........................................................................352

115. Trifluoperazine HCL........................................................................356

116. Valsartan HCTZ ..............................................................................359

D. Defendants' Anticompetitive Conduct Relating to the Other Named Generic
   Drugs Further Demonstrates Defendants' Overarching Fair Share Agreement ..361

E. The Existence of the Fair Share Agreement within the Generic Drug Industry and
   as to All of the Named Generic Drugs Is Supported by Other Factors................361

VI.    CLASS ACTION ALLEGATIONS ..............................................................362

VII.   ANTITRUST INJURY ...................................................................................364

VIII.  TOLLING OF THE STATUTE OF LIMITATIONS.....................................365

IX.    CLAIM FOR RELIEF ...................................................................................368

X.     PRAYER FOR RELIEF .................................................................................375

XI.    JURY TRIAL DEMANDED...........................................................................376

REDACTED – PUBLIC VERSION

**EXHIBITS**

| | |
|---|---|
| **EXHIBIT A** | DPP NAMED GENERIC DRUGS<br>IN MDL 2724 AS OF FEBRUARY 2020 |
| **EXHIBIT B** | TIMELINE OF DPP NAMED GENERIC DRUGS IN MDL 2724 |
| **EXHIBIT C** | HISTORY OF GOVERNMENT INVESTIGATIONS AND OTHER<br>PUBLIC REPORTS CONCERNING ANTICOMPETITIVE CONDUCT<br>IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT D** | LIST OF GENERIC DRUG MANUFACTURERS KNOWN TO HAVE<br>RECEIVED A DOJ SUBPOENA AND/OR CID RELATING TO<br>ANTICOMPETITIVE CONDUCT IN THE GENERIC DRUG<br>INDUSTRY |
| **EXHIBIT E** | TRADE ASSOCIATION CONTACTS<br>AS TO THE NAMED GENERIC DRUGS |
| **EXHIBIT F** | GENERIC PHARMACEUTICAL ASSOCIATION<br>BOARD OF DIRECTORS 2010 TO 2017 |
| **EXHIBIT G** | SUMMARY OF ECONOMIC FACTORS INDICATING COLLUSION<br>IN THE GENERIC DRUG INDUSTRY |
| **EXHIBIT H** | SAMPLE OF DEFENDANTS' INVESTOR COMMUNICATIONS |
| **EXHIBIT I** | SAMPLE TELEPHONE RECORD SUMMARY |

REDACTED – PUBLIC VERSION

## I.    INTRODUCTION

1.      In the pharmaceutical industry the entry of generic versions of branded drugs should result in aggressive price competition, which, in turn, dramatically reduces prices for drug wholesalers, retail pharmacies, consumers, and third-party payors.  Thus, traditionally, generic drugs have been a relative bargain in healthcare.  However, pricing dynamics in the generic drug industry have changed for a large number of drugs, leading to, among other things, many large and parallel price increases.

2.      Documentary evidence has confirmed that these changes were the result of long-running collusion among generic drug manufacturers to thwart the economic benefits of generic competition.  This collusion encompasses far more than one hundred drugs and involves nearly all of the significant generic drug manufacturers operating in the United States.  *See* Exhibit A (DPP Named Generic Drugs in MDL 2724 as of February 2020); Exhibit B (Timeline of DPP Named Generic Drugs in MDL 2724).  Pursuant to this overarching scheme (the "Fair Share Agreement"), generic drug manufacturers agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation.

3.      MDL 2724 encompasses claims that generic drug manufacturers engaged in an unlawful scheme or schemes to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocations of generic drugs.  In this Complaint, filed by Direct Purchaser Class Plaintiffs' (DPPs)[1] in this multidistrict litigation, the DPPs bring claims concerning two

---

[1] César Castillo, Inc., FWK Holdings, L.L.C., KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc., and Rochester Drug Co-Operative, Inc.

REDACTED – PUBLIC VERSION

categories of drugs, which are identified in Paragraphs 4 to 6 by the time at which they became

encompassed within this MDL

    4.      First, this Complaint concerns the below generic drugs: [2]

| | |
|---|---|
| Alclometasone Dipropionate | Isosorbide Dinitrate |
| Allopurinol | Latanoprost[†] |
| Amantadine HCL | Lidocaine HCL |
| Atenolol Chlorthalidone | Metformin ER (F) |
| Atropine Sulfate[†] | Methadone HCL |
| Balsalazide Disodium | Methylphenidate |
| Betamethasone Dipropionate | Methylprednisolone |
| Betamethasone Dipropionate Augmented | Naproxen Sodium |
| Betamethasone Dipropionate Clotrimazole | Neomycin Polymyxin Hydrocortisone[†] |
| Betamethasone Valerate | Nystatin Triamcinolone |
| Bromocriptine Mesylate | Oxycodone Acetaminophen |
| Butorphanol Tartrate | Oxycodone HCL[†] |
| Captopril | Permethrin |
| Carisoprodol[†] | Perphenazine |
| Cefuroxime Axetil | Phenytoin Sodium |
| Chlorpromazine HCL | Pilocarpine HCL |
| Cholestyramine | Potassium Chloride |
| Ciclopirox | Prednisolone Acetate |
| Clindamycin Phosphate | Prednisone |
| Diphenoxylate Atropine HCL | Silver Sulfadiazine[†] |
| Exemestane[†] | Spironolactone HCTZ |
| Fluocinolone Acetonide | Timolol Maleate |
| Fluticasone Propionate[†] | Tobramycin Dexamethasone[†] |
| Halobetasol Proprionate | Trazodone HCL[†] |
| Hydrocodone Acetaminophen[†] | Triamcinolone Acetonide |
| Hydrocortisone Valerate | Triamterene HCTZ |

    5.      Second, DPPs bring claims concerning the below generic drugs that the States

first sued on in their complaint filed in May 2019 (as amended at No. 2:19-cv-2407-CMR, ECF

106 (filed on Nov. 1, 2019)).[3]

---

  [2] Drugs marked with an "†" are identified for the first time in this MDL by DPPs' allegations in this Complaint.  The other drugs on this list were first identified in this MDL by End-Payer Plaintiffs' (EPPs) December 2019 complaint.

  [3] Text in parentheses denotes a known abbreviation or misspelling.

REDACTED – PUBLIC VERSION

| | |
|---|---|
| Adapalene | Griseofulvin |
| Amiloride HCL/HCTZ | Haloperidol |
| Amoxicillin/Clavulanate | Irbesartan |
| Amphetamine Salts (MAS) | Ketoconazole |
| Bethanechol Chloride | Ketoprofen |
| Budesonide | Ketorolac Tromethamine |
| Buspirone HCL | Labetalol HCL |
| Capecitabine | Lamivudine/Zidovudine |
| Carbamazepine | Loperamide HCL |
| Cefdinir | Methotrexate |
| Cefprozil | Moexipril HCL |
| Celecoxib | Moexipril HCL HCTZ |
| Cephalexin (Cefalexin) | Nadolol |
| Cimetidine | Niacin |
| Clarithromycin | Nitrofurantoin |
| Clonidine TTS | Norethindrone and Ethinyl Estradiol |
| Clotrimazole | Nortriptyline HCL |
| Desmopressin Acetate | Omega-3-Acid Ethyl Esters |
| Dexmethylphenidate HCL | Oxaprozin |
| Dextroamphetamine Sulfate (Dex Sulfate) | Oxybutynin Chloride |
| Diclofenac Potassium | Paricalcitol |
| Diltiazem HCL | Piroxicam |
| Doxazosin Mesylate | Prazosin HCL |
| Drospirenone and Ethinyl Estradiol | Raloxifene HCL |
| Enalapril Maleate | Ranitidine HCL |
| Entecavir | Tamoxifen Citrate |
| Estradiol | Temozolomide |
| Estradiol and Norethindrone Acetate | Tizanidine HCL |
| Ethinyl Estradiol and Levonorgestrel | Tobramycin |
| Etodolac | Tolmetin Sodium |
| Fenofibrate | Tolterodine |
| Fluconazole | Trifluoperazine HCL |
| Fluoxetine HCL | Valsartan HCTZ |
| Gabapentin | Warfarin Sodium |
| Glimepiride | |

6.      These generics drugs are in addition to of the drugs that DPPs previously filed

complaints on. *See* Exhibit A (DPP Named Generic Drugs in MDL 2724 as of February 2020);

7.      The drugs discussed above are referred to collectively as the Named Generic

Drugs. The Defendants who have manufactured or sold one or more of these Named Generic

Drugs are Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Actavis Elizabeth LLC (together,

Actavis); Akorn, Inc., Hi-Tech Pharmacal Co., Inc., and Versapharm, Inc. (together, Akorn);

Alvogen Inc. (Alvogen); Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC

REDACTED – PUBLIC VERSION

(together, Amneal); Apotex Corp. (Apotex); Aurobindo Pharma USA, Inc. (Aurobindo); Bausch Health Americas, Inc., Bausch Health US LLC, and Oceanside Pharmaceuticals, Inc. (together, Bausch); Breckenridge Pharmaceutical, Inc. (Breckenridge); Jubilant Cadista Pharmaceuticals Inc. (Cadista); Camber Pharmaceuticals Inc. (Camber); Citron Pharma LLC (Citron); Dr. Reddy's Laboratories, Inc. (Dr. Reddy's or DRL); Glenmark Pharmaceuticals, Inc. (Glenmark); Greenstone LLC and Pfizer, Inc. (together, Greenstone); G&W Laboratories, Inc. (G&W); Heritage Pharmaceuticals, Inc. (Heritage); Impax Laboratories, LLC (Impax); Lannett Company, Inc. (Lannett); Lupin Pharmaceuticals, Inc. (Lupin); Mallinckrodt Inc. (Mallinckrodt); Mayne Pharma USA, Inc. (Mayne); Mylan Inc. and Mylan Pharmaceuticals, Inc. (together, Mylan); Par Pharmaceutical, Inc., DAVA Pharmaceuticals, LLC, and Generics Bidco I, LLC (together, Par); Perrigo New York, Inc. (Perrigo); Sandoz, Inc. and Fougera Pharmaceuticals Inc. (together, Sandoz); Sun Pharmaceutical Industries, Inc. (Sun); Taro Pharmaceuticals USA., Inc. (Taro); Teligent, Inc. (Teligent); Teva Pharmaceuticals USA, Inc. (Teva); Torrent Pharma Inc. (Torrent); Upsher-Smith Laboratories, Inc. (Upsher-Smith), West-Ward Pharmaceuticals Inc., Hikma Labs, Inc., and Hikma Pharmaceuticals USA, Inc. (together, West-Ward), Wockhardt USA LLC and Morton Grove Pharmaceuticals, Inc. (together, Wockhardt), and Zydus Pharmaceuticals USA, Inc. (Zydus).  Each of the Defendants and their co-conspirators are generic drug manufacturers.

8.     The allegations herein are based on DPPs' personal knowledge of the matters relating to themselves and upon information and belief as to all other matters.  Parts of DPPs' allegations are based on information made public or made available in the MDL during ongoing government investigations into anticompetitive conduct in the generic drug industry.  Other parts of DPPs' allegations are based on investigation conducted by and under the supervision of DPPs'

REDACTED – PUBLIC VERSION

counsel.  Yet other parts of DPPs' allegations are based on documentary evidence disclosed in

the course of this multi-district litigation

**A.**     **Each of the Generic Drugs is Part of An Overarching Fair Share Agreement Among Manufacturers in the Generic Drug Industry.**

9.     MDL 2724 encompasses actions in which:

(a) plaintiffs assert claims for price fixing of generic drugs in violation of the Sherman Act and/or state antitrust laws on behalf of overlapping putative nationwide classes of direct or indirect purchasers of generic pharmaceuticals; (b) the average market price of the subject generic pharmaceutical is alleged to have increased between 2012 and the present; (c) defendants are alleged to have effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations, in particular meetings of the Generic Pharmaceutical Association; and (d) the allegations stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.[4]

10.     The DPPs' prior allegations of conspiratorial conduct and artificially inflated

prices have repeatedly been sustained.  In October 2018, the Court sustained allegations

concerning individual drugs (clobetasol, digoxin, divalproex, doxycycline, econazole, and

pravastatin)[5].  In August 2019, the Court sustained allegations of an overarching fair share

conspiracy among generic drug manufacturers.[6]  The Court held that DPPs plausibly alleged "a

single conspiracy with a common goal, facilitated by multiple schemes specific to various

individual generic drugs."[7] The Court further held that DPPs included sufficient detail as to the

"how, when, or where needed to make plausible a claim that Defendants' actions regarding the

---

[4] MDL Doc. No. 194; *see also* MDL Doc. Nos. 417, 425 (transferring state actions).  It is now apparent that the conduct began before 2012.

[5] *In re Generic Pharm. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404 (E.D. Pa. Oct. 16, 2018).

[6] *In re Generic Pharm. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509 (E.D. Pa. Aug. 15, 2019).

[7] *Id.* at 529.

REDACTED – PUBLIC VERSION

prices of individual generic drugs in their portfolios were beneficial to and reinforced a broader scheme regarding generic drug prices."[8]

11.     As further described herein, Defendants' and their generic manufacturer co-conspirators' anticompetitive conduct as to the Named Generic Drugs is part of an industry-wide, overarching "fair share" conspiracy (Fair Share Agreement) involving at least the Named Generic Drugs.  Under the Fair Share Agreement, generic drug manufacturers had no need to compete because each generic drug manufacturer was assured of receiving its fair share of the market for a particular generic drug by "playing nice in the sandbox." Pursuant to this overarching scheme, generic drug manufacturers agreed to suppress competition among themselves so that they could fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of far more than 100 generic drugs.

12.     The Fair Share Agreement is premised on the shared understanding that each manufacturer is entitled to a certain percentage of the market for a particular drug, primarily based on the number of manufactures in the market for that drug. The Fair Share Agreement dictates that each manufacturer should obtain its designated market share without engaging in price competition.  Conspirators expected incumbent manufacturers to cede the proper amount of market share to new entrants, and for new entrants to carefully target select customers sufficient to meet their fair share level but not exceeding that level.  This market share allocation scheme reflects a common understanding that higher prices and market equilibrium are preferable to active price competition to achieve higher sales volume and market share.  Stated differently, the goal of the Fair Share Agreement is for generic drug manufacturers to achieve artificially inflated prices because no generic manufacturer has incentive to compete for additional market share by

---

[8] *Id.* at 531.

REDACTED – PUBLIC VERSION

eroding price.  In Defendants' terminology "Quality Competitors" are those that best adhere to the Fair Share Agreement.

13.      "Playing nice in the sandbox" entailed, among other things, getting along with ostensible competitors and frequent communications to prevent disturbing their respective shares for particular drugs in the generic drug industry market, including communicating with them frequently about customers, new drug launches, prices, bids, and temporary shortages (which conspirators were expected to refrain from exploiting for long-term gain).  If everyone adhered to the Fair Share Agreement and regularly socialized to keep information flowing, then additional profits were guaranteed for each generic drug manufacturer without the hassle of free market competition.  This is what happened – at the expense of DPPs and the proposed Class.

**B.    The Generic Drug Industry's Closely-Knit and Highly Social Culture Enabled the Overarching Fair Share Agreement to Thrive for Years.**

14.      Playing nice in the sandbox was facilitated by generic manufacturers' employees, who frequently communicated and socialized both in-person at near constant trade association events, via telephone and texting, or via other electronic means (*e.g.*, email, social media platforms, LinkedIn, WhatsApp).  *See, e.g.*, Exhibit E (Trade Association Contacts as to the Named Generic Drugs); Exhibit F (Generic Pharmaceutical Association Board of Directors 2010 to 2017);[9] Exhibit I (Sample Telephone Record Summary).  In addition to in-person communications at trade association events, generic drug manufacturers' employees frequently met in less formal settings such as happy hours, events for women in the industry, dinners,

---

[9] Such trade associations include, but are not limited to, the Generic Pharmaceutical Association (GPhA) (now called the Association for Accessible Medicines), the Healthcare Distribution Management Association (HDMA) (now called the Healthcare Distribution Alliance), the Minnesota Multistate Contracting Alliance for Pharmacy (MMCAP), the National Association of Chain Drug Stores (NACDS), Efficient Collaborative Retail Marketing (ECRM), and the National Pharmacy Forum (NPF).

REDACTED – PUBLIC VERSION

lunches, golf outings, holiday parties, gambling events, etc.  Impromptu gatherings were readily scheduled because many generic pharmaceutical manufacturers are headquartered in relatively close geographic proximity throughout the Mid-Atlantic region.

15.      In addition to the numerous opportunities for interaction, many generic drug manufacturer employees and executives (including, for example, so called National Account Managers (NAMs) moved from generic drug manufacturer to generic drug manufacturer while preserving former co-worker contacts, and thus furthered the interwoven, cooperative generic drug industry culture.

16.      The coziness and chattiness among generic drug manufacturer employees facilitated "playing nice in the sandbox" and allowed for the overarching fair share conspiracy to blossom.  Open communications with ostensible competitors were merely part of the "toolkit" by which employees were successful in their jobs and achieved higher profits for their employers.

17.      Because generic drug manufacturers and their employees are repeat players who routinely encounter the same ostensible competitors, their Fair Share Agreement – to eschew price competition and allocate markets and customers – became the "rules of the road" that govern their overarching conspiracy.

   **1.      The Fair Share Agreement applied across multiple generic drugs at a time
   and was especially effective when new entrants came to market or when
   generic drug manufacturers decided to exit a market.**

18.      The anticompetitive conduct was often applied across multiple drugs.  For instance, a Defendant might strategize as to how to implement the Fair Share Agreement with respect to another Defendant generally and assessed whether other generics manufacturers were "responsible" Quality Competitors who adhered to the principles of the Fair Share Agreement.  *See, e.g.*, Teva's Competitor Rankings.  Reflecting this broad approach, Defendants' conspiratorial communications often involved several generic drugs.

REDACTED – PUBLIC VERSION

19.     Generic drug manufacturers were generally aware of other manufacturers' entire portfolios of generic drugs, as well as pending and/or approved Abbreviated New Drug Applications (ANDAs),[10] and, thus, were ostensible competitors on many drugs (even those which they did not manufacture or sell at any particular point in time).  As such, achieving a fair share as to one generic drug could involve horse trading across other generic drugs.  For instance, generic drug manufacturers might give up customers on one generic drug as a quid pro quo for customers from other generic drug manufacturers on a different generic drug (*i.e.*, "walking away" from business).

20.     This understanding regarding fair share was particularly effective when a new generic drug manufacturer entered the market for a drug – a time when, in a competitive market, prices should go down.  But under the Fair Share Agreement, a generic drug manufacturer set to launch a generic drug would often approach or be approached by existing generic drug manufacturers prior to market entry to discuss price, market share, and allocation of customers.  Likewise, the incumbent manufacturers would conduct internal analyses to identify customers they would concede to the new entrant so that the new entrant could obtain its fair share without engaging in price competition.  This allowed a fair share understanding to be reached prior to the new generic manufacturer entering the market and enabled artificially inflated prices to be maintained.

21.     The Fair Share Agreement allowed generic drug manufacturers to enjoy high profits without the threat of competition.  And as the industry grew more comfortable with the Fair Share Agreement, generic drug manufacturers became bolder and would, at times,

---

[10] As discussed further below, to obtain marketing approval for a generic drug, an ANDA must be filed with the U.S. Food and Drug Administration's Center for Drug Evaluation and Research, Office of Generic Drugs.

REDACTED – PUBLIC VERSION

substantially raise generic drug prices. Although such large price increases would be risky in a competitive market where customers could simply buy from lower priced rivals, the conspirators knew that competition would not be forthcoming pursuant to their overarching Fair Share Agreement. The conspirators reached an understanding that their industry compatriots would not violate the rules of the road; that is, to maintain artificially inflated prices by allocating generic drugs and customers and avoid price competition.

> **2.    The conspirators monitored market share and disciplined conduct inconsistent with the Fair Share Agreement and took steps to conceal their activities.**

22.    The manufacturer conspirators periodically rebalanced market share by allocating customers. For instance, if it was determined that Generic Drug Manufacturer A had less than its fair share of the market, then, pursuant to the overarching Fair Share Agreement, Generic Manufacturer B would "walk away" from a customer or customers by informing them of a significant price increase. Generic Drug Manufacturer A would then submit a bid at an amount slightly less than Generic Drug Manufacturer B. Generic Drug Manufacturer A and Generic Drug Manufacturer B would continue to engage in such conduct with different customers until they reached their agreed-upon fair share.

23.    Rebalancing of market share could also occur prior to a new entrant launching a drug. Indeed, the Fair Share Agreement was particularly effective when new entrants came on the market for a particular drug and often there were communications in advance of such entry.

24.    Generic drug manufacturers knew that their conduct was illegal, and they took extensive measures to conceal their activities even, in some instances, intentionally destroying evidence of their incriminating communications. For instance, conspirators warned their employees not to keep any written or electronic record of their collusive contacts with purported competitors.

C.   **The Existence of the Fair Share Agreement within the Generic Drug Industry and as to the Named Generic Drugs Is Supported by Other Factors.**

25.   In addition to the data analysis and conspiracy evidence set forth herein, other factors support the existence of the Fair Share Agreement among generic drug manufacturers as to the Named Generic Drugs:

1) the ongoing investigations by the States and DOJ of pervasive and industry-wide collusion among many generic pharmaceutical manufacturers, as well as other public reports indicating collusion;[11]

2) frequent communications and meetings among generic drug manufacturers' employees including the Defendants here;[12]

3) factors showing that the generic pharmaceutical industry is susceptible to collusion;[13] and

4) investor communications reflecting, among other things, that Defendants' profits increased during the relevant time period, frequently as a result of price increases.[14]

D.   **Direct Purchasers Paid More Than They Would Have for the Named Generic Drugs But-For the Fair Share Agreement.**

26.   This Complaint provides specific allegations regarding illegal agreement and collusion as to specific Named Generic Drugs, but these Named Generic Drugs are each part of a larger overarching conspiracy as described in other DPP and State MDL complaints.

27.   As a result of Defendants' and their generic manufacturer co-conspirators' efforts to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of the

_____

[11] Exhibit C (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); Exhibit D (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry).

[12] Exhibit E (Trade Association Contacts as to the Named Generic Drugs); Exhibit F (Generic Pharmaceutical Association Board of Directors 2010 to 2017); Exhibit I (Sample Telephone Record Summary).

[13] Exhibit G (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

[14] Exhibit H (Sample of Defendants' Investor Communications).

REDACTED – PUBLIC VERSION

Named Generic Drugs, direct purchasers paid, and continue to pay, supracompetitive prices for the Named Generic Drugs.

28.     DPPs, on behalf of themselves and members of the proposed Class, seek damages caused by Defendants' and their generic manufacturer co-conspirators' violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, as to the Named Generic Drugs.

## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action as it arises under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

30.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d), because, during the Class Period, Defendants transacted business throughout the United States, including in this District, Defendants resided, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

31.     During the Class Period, Defendants sold and distributed generic drugs in a continuous and uninterrupted flow of interstate commerce, which included sales of the Named Generic Drugs in the United States, including in this District. Defendants' conduct had a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

32.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) participated in the selling and distribution of the Named Generic Drugs throughout the United States, including in this District; (c) had and maintained substantial contacts within the United States, including in this District; and/or (d) was engaged in an unlawful conspiracy to artificially

- 12 -

inflate prices that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

## III.   PARTIES

### A.   Plaintiffs

33.     Plaintiff César Castillo, Inc. (CCI) is a Puerto Rico corporation with its principal

place of business in Rio Piedras, Puerto Rico.  During the Class Period, CCI purchased one or

more of the Named Generic Drugs directly from one or more Defendants.  As a result of

Defendants' antitrust conspiracy, CCI paid supracompetitive prices for these purchases and was

injured by the illegal conduct alleged herein.

34.     Plaintiff FWK Holdings, LLC (FWK) is an Illinois corporation with its principal

place of business in Glen Ellyn, Illinois.  FWK is the assignee of antitrust claims possessed by

Frank W. Kerr Company (Kerr) and brings this action as successor-in-interest to Kerr's claims

arising from its purchase of one or more of the Named Generic Drugs directly from one or more

Defendants.  As a result of Defendants' antitrust conspiracy, FWK, through assignor Kerr, paid

supracompetitive prices for these purchases and was injured by the illegal conduct alleged

herein.

35.     Plaintiff KPH Healthcare Services, Inc. a/k/a Kinney Drugs, Inc. (KPH) is a New

York corporation with its principal place of business in Gouverneur, New York.  KPH operates

retail and online pharmacies in the Northeast under the name Kinney Drugs, Inc.  During the

Class Period, KPH purchased one or more of the Named Generic Drugs directly from one or

more Defendants.  As a result of Defendants' antitrust conspiracy, KPH paid supracompetitive

prices for these purchases and was injured by the illegal conduct alleged herein.

36.     Plaintiff Rochester Drug Co-Operative, Inc. (RDC) is a New York corporation

with its principal place of business in Rochester, New York.  During the Class Period, RDC

REDACTED – PUBLIC VERSION

purchased one or more of the Named Generic Drugs directly from one or more Defendants. As a result of Defendants' antitrust conspiracy, RDC paid supracompetitive prices for these purchases and was injured by the illegal conduct alleged herein.

**B.      Defendants**

**1.      Actavis**

37.      Defendant Actavis Holdco U.S., Inc. (Actavis Holdco) is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceuticals USA, Inc. acquired the Actavis Generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Actavis Pharma, Inc. and Actavis Elizabeth LLC (a research, development and manufacturing entity for Actavis generic operations), among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a Delaware corporation with its principal place of business in North Wales, Pennsylvania. Teva Pharmaceuticals USA, Inc. is a wholly-owned subsidiary of Teva Pharmaceuticals Industries Ltd., an Israeli entity.

38.      Defendant Actavis Pharma, Inc. is Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products acquired from Allergan plc.  It manufactures, markets, and/or distributes generic drugs.

39.      Actavis Elizabeth LLC is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a research, development and manufacturing entity for Actavis generic operations.

REDACTED – PUBLIC VERSION

40.     Unless addressed individually, Actavis Holdco, Actavis Pharma, Inc., and Actavis Elizabeth LLC are collectively referred to herein as "Actavis." During the Class Period, Actavis sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**2.     Akorn**

41.     Defendant Akorn Inc. is a Louisiana corporation with its principal place of business in Lake Forest, Illinois. It is the parent company of Hi-Tech Pharmacal Co., Inc.

42.     Defendant Hi-Tech Pharmacal Co., Inc. (Hi-Tech) is a Delaware corporation with its principal place of business in Amityville, New York. It is a wholly-owned subsidiary of Akorn, Inc. Akorn Inc. acquired and integrated Hi-Tech into its operations in April 2014.

43.     Defendant Versapharm, Inc. (Versapharm) is a wholly-owned subsidiary of Akorn Inc.

44.     Unless addressed individually, Akorn Inc., Hi-Tech, and Versapharm are collectively referred to herein as "Akorn." During the Class Period, Akorn sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**3.     Alvogen**

45.     Defendant Alvogen Inc. is a privately-held Delaware corporation with its principal place of business in Pine Brook, New Jersey. During the Class Period, Alvogen sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED – PUBLIC VERSION

### 4. Amneal

46.     Defendant Amneal Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. In May 2018, Impax completed a merger with Amneal Pharmaceuticals, Inc. to become the fifth largest generics business in the United States.

47.     Defendant Amneal Pharmaceuticals, LLC is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

48.     Unless addressed individually, Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals LLC are together referred to as "Amneal." During the Class Period, Amneal sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 5. Apotex

49.     Defendant Apotex Corp. is a Delaware corporation with its principal place of business in Weston, Florida. During the Class Period, Apotex sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 6. Ascend

50.     Defendant Ascend Laboratories, LLC is a New Jersey company with is principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Alkem Labs, an Indian pharmaceutical company. During the Class Period, Ascend sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and

REDACTED – PUBLIC VERSION

engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 7.    Aurobindo

51.    Defendant Aurobindo Pharma USA, Inc. is a Delaware corporation with its principal place of business in Dayton, New Jersey.  During the Class Period, Aurobindo sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 8.    Bausch

52.    Defendant Bausch Health Americas, Inc. (formerly Valeant Pharmaceuticals International, Inc.) is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

53.    Defendant Bausch Health US, LLC (formerly Valeant Pharmaceuticals North America LLC) is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.

54.    Defendant Oceanside Pharmaceuticals, Inc. is a wholly-owned subsidiary of Bausch Health Americas, Inc.  It is a Delaware corporation with its principal place of business in Bridgewater, New Jersey.

55.    Unless addressed individually, Bausch Health Americas, Inc., Bausch Health US, LLC, and Oceanside Pharmaceuticals, Inc. are collectively referred to herein as "Bausch." During the Class Period, Bausch sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED – PUBLIC VERSION

### 9.     Breckenridge

56.     Defendant Breckenridge Pharmaceutical, Inc. is a Delaware corporation with its headquarters in Boca Raton, Florida.  During the Class Period, Breckenridge sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 10.     Cadista

57.     Defendant Jubilant Cadista Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in Salisbury, Maryland.  It is a wholly-owned subsidiary of Jubilant Life Sciences Company, an Indian pharmaceutical company.  During the Class Period, Cadista sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 11.     Camber

58.     Defendant Camber Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Piscataway, New Jersey.  Camber is a wholly-owned subsidiary of Hetero Drugs, an Indian pharmaceutical company.  During the Class Period, Camber sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 12.     Citron

59.     Defendant Citron Pharma, LLC is a New Jersey corporation with its principal place of business in East Brunswick, New Jersey.  During the Class Period, Citron sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the

REDACTED – PUBLIC VERSION

United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 13.   Dr. Reddy's

60.     Defendant Dr. Reddy's Laboratories is a Delaware corporation with its principal place of business in Princeton, New Jersey.  It is a wholly-owned subsidiary of Dr. Reddy's Laboratories Ltd., an Indian pharmaceutical company.  During the Class Period, Dr. Reddy's sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 14.   Glenmark

61.     Defendant Glenmark Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Mahwah, New Jersey.  During the Class Period, Glenmark sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 15.   Greenstone

62.     Defendant Greenstone LLC is a limited liability company with its principal place of business in North Peapack, New Jersey. Greenstone is a wholly-owned subsidiary of Defendant Pfizer, Inc., and operated as the generic drug division of Pfizer, Inc. during the Class Period.

63.     Defendant Pfizer, Inc. is a Delaware corporation with its principal place of business in New York, New York.  Pfizer is the parent company of Defendant Greenstone.

64.     Unless addressed individually, Greenstone and Pfizer are referred to together as "Greenstone."  During the Class Period, Greenstone sold one or more of the Named Generic

REDACTED – PUBLIC VERSION

Drugs directly to purchasers in this District and throughout the United States and engaged in

unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**16.    G&W**

65.    Defendant G&W Laboratories, Inc. is a New Jersey corporation with its principal

place of business in South Plainfield, New Jersey.  During the Class Period, G&W sold one or

more of the Named Generic Drugs directly to purchasers in this District and throughout the

United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman

Act as alleged herein.

**17.    Heritage**

66.    Defendant Heritage Pharmaceuticals, Inc. (Heritage) is a Delaware corporation

with its principal place of business in East Brunswick, New Jersey.  Heritage is a subsidiary of

Emcure Pharmaceuticals Ltd. (Emcure).  During the Class Period, Heritage sold one or more of

the Named Generic Drugs directly to purchasers in this District and throughout the United States

and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged

herein.

**18.    Impax**

67.    Defendant Impax Laboratories, LLC is a Delaware limited liability company that

is the successor entity of Impax Laboratories, Inc.  In 1999, Global Pharmaceutical Corporation

merged with Impax Pharmaceuticals, Inc.  In September 2014, Impax acquired Corepharma.  In

May 2018, Impax completed a merger with Amneal to become the fifth largest generics business

in the United States.  Impax is now a wholly-owned subsidiary of Amneal.  During the Class

Period, Impax sold one or more of the Named Generic Drugs directly to purchasers in this

District and throughout the United States and engaged in unlawful conduct in violation of

Sections 1 and 3 of the Sherman Act as alleged herein.

### 19.   Lannett

68.    Defendant Lannett Company, Inc. is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  During the Class Period, Lannett sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 20.   Lupin

69.    Defendant Lupin Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Baltimore, Maryland.  It is a wholly-owned subsidiary of Lupin Ltd., an Indian pharmaceutical company.  During the Class Period, Lupin sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 21.   Mallinckrodt

70.    Defendant Mallinckrodt Inc. is a Delaware corporation with its principal place of business in Webster Groves, Missouri. As a result of a tax inversion acquisition, as of 2013 it is a wholly owned subsidiary of Mallinckrodt plc, which is based in the United Kingdom.  During the Class Period, Mallinckrodt sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 22.   Mayne

71.    Defendant Mayne Pharma Inc. is a Delaware corporation with its principal place of business in Raleigh, North Carolina.  During the Class Period, Mayne sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and

REDACTED – PUBLIC VERSION

engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 23.    Mylan

72.    Defendant Mylan Inc. is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania.

73.    Defendant Mylan Pharmaceuticals Inc. is a West Virginia corporation with its principal place of business in Morgantown, West Virginia.

74.    Mylan Inc. and Mylan Pharmaceuticals Inc. are wholly-owned subsidiaries of Mylan N.V., a Dutch pharmaceutical company.  Unless addressed individually, Defendants Mylan Inc. and Mylan Pharmaceuticals Inc. are referred to together as "Mylan."  During the Class Period, Mylan sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

### 24.    Par

75.    Defendant Par Pharmaceutical, Inc. is a New York corporation with its principal place of business in Chestnut Ridge, New York.

76.    Defendant Generics Bidco I, LLC is a Delaware company with its principal place of business in Huntsville, Alabama.  Generics Bidco formerly conducted business as Qualitest Pharmaceuticals.

77.    Defendant DAVA Pharmaceuticals, LLC is a Delaware company with its principal place of business in Fort Lee, New Jersey.

78.    Par Pharmaceutical, Inc., Generics Bidco I, LLC, and DAVA Pharmaceuticals, LLC are wholly-owned subsidiaries of Endo International plc, an Irish corporation with its principal place of business located in Dublin, Ireland and its U.S. headquarters in Malvern,

REDACTED – PUBLIC VERSION

Pennsylvania. Unless addressed individually, Par Pharmaceutical, Inc., Generics Bidco I, LLC, and DAVA Pharmaceuticals, LLC are collectively referred to as "Par."

79.     During the Class Period, Par sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**25.     Perrigo**

80.     Defendant Perrigo New York, Inc. is a Delaware corporation with its executive offices in Allegan, Michigan and its primary business location in the Bronx, New York. During the Class Period, Perrigo sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**26.     Sandoz**

81.     Defendant Sandoz, Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.

82.     Defendant Fougera Pharmaceuticals Inc. is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc,

83.     Unless addressed individually, Sandoz Inc. and Fougera Pharmaceuticals Inc. are referred to together as "Sandoz." During the Class Period, Sandoz sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

27.   **Sun**

84.     Defendant Sun Pharmaceutical Industries, Inc. (Sun) is a Michigan corporation

with its principal place of business in Cranbury, New Jersey.  In late 2012, Sun acquired URL

Pharma, Inc. (URL) with its principal place of business in Philadelphia, Pennsylvania.  URL is a

wholly-owned subsidiary of Sun.  Sun as a group includes multiple wholly-owned subsidiaries,

also including Mutual Pharmaceutical Company, Inc. (Mutual).  Additionally, Sun does business

under the name Caraco Pharmaceutical Laboratories (Caraco), a company Sun acquired in 1997.

Further, in 2010, Sun Pharmaceutical Industries, Inc.'s Indian-parent company Sun

Pharmaceutical Industries Ltd. acquired a controlling stake in Taro Pharmaceutical Industries,

Ltd.  During the Class Period, Sun sold one or more of the Named Generic Drugs directly to

purchasers in this District and throughout the United States and engaged in unlawful conduct in

violation of Sections 1 and 3 of the Sherman Act as alleged herein.

28.   **Taro**

85.     Defendant Taro Pharmaceuticals USA, Inc. is a New York corporation with its

principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro

Pharmaceutical Industries, Ltd., an Israeli pharmaceutical company.  As noted above, in 2010

Sun Pharmaceutical Industries Ltd. acquired a controlling stake in Taro Pharmaceutical

Industries, Ltd.  During the Class Period, Taro sold one or more of the Named Generic Drugs

directly to purchasers in this District and throughout the United States and engaged in unlawful

conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

29.   **Teligent**

86.     Defendant Teligent, Inc., formerly known as IGI Laboratories, Inc., is a Delaware

corporation with its principal place of business in Buena, New Jersey. During the Class Period,

Teligent sold one or more of the Named Generic Drugs directly to purchasers in this District and

REDACTED – PUBLIC VERSION

throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**30.   Teva**

87.     Defendant Teva Pharmaceuticals USA, Inc. is a Pennsylvania corporation with its principal place of business in North Wales, Pennsylvania.  During the Class Period, Teva sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**31.   Torrent**

88.     Defendant Torrent Pharma Inc. is a Delaware corporation with its principal place of business in Basking Ridge, New Jersey.  Torrent is a wholly-owned subsidiary of Torrent Pharmaceuticals Ltd., an Indian pharmaceutical company.  During the Class Period, Torrent sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**32.   Upsher-Smith**

89.     Defendant Upsher-Smith Laboratories, LLC is a Minnesota limited liability company with its principal place of business in Maple Grove, Minnesota.  It is a wholly owned by Sawai Pharmaceutical Co., Ltd., a Japanese pharmaceutical company.  Sawai acquired Upsher-Smith in June 2017.

90.     During the Class Period, Upsher-Smith sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

REDACTED – PUBLIC VERSION

**33.   West-Ward**

91.    Defendant West-Ward Pharmaceuticals Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

92.    Defendant Hikma Pharmaceuticals USA Inc. is a Delaware corporation with its principal place of business in Eatontown, New Jersey.

93.    Defendant Hikma Labs Inc., formerly known as Roxane Laboratories, Inc., is a Nevada corporation with its principal place of business in Eatontown, New Jersey.

94.    West-Ward Pharmaceuticals Inc., Hikma Pharmaceuticals USA Inc., and Hikma Labs Inc. are subsidiaries of Hikma Pharmaceuticals PLC, a London-based pharmaceutical company.

95.    Unless addressed individually, West-Ward Pharmaceuticals Inc., Hikma Pharmaceuticals USA Inc., and Hikma Labs Inc. are referred to together as "West-Ward." During the Class Period, West-Ward sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**34.   Wockhardt**

96.    Defendant Wockhardt, USA LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

97.    Defendant Morton Grove Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Morton Grove, Illinois.

98.    Unless addressed individually, Defendants Wockhardt USA LLC and Morton Grove Pharmaceuticals, Inc. are referred to together as "Wockhardt." During the Class Period, Wockhardt sold one or more of the Named Generic Drugs directly to purchasers in this District

REDACTED – PUBLIC VERSION

and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**35.    Zydus**

99.    Defendant Zydus is a New Jersey corporation with its principal place of business in Pennington, New Jersey.  It is a subsidiary of Cadila Healthcare, an Indian pharmaceutical company.  During the Class Period, Zydus sold one or more of the Named Generic Drugs directly to purchasers in this District and throughout the United States and engaged in unlawful conduct in violation of Sections 1 and 3 of the Sherman Act as alleged herein.

**C.    Generic Manufacturer Co-Conspirators**

**1.    Rising**

100.    Rising Pharmaceuticals Inc. (Rising) is a Delaware corporation with its principal place of business in East Brunswick, New Jersey.  Rising is a wholly-owned subsidiary of Aceto Corp., which filed for bankruptcy in 2019.  On December 3, 2019, the Department of Justice announced that Rising entered into a deferred prosecution agreement relating to price-fixing and that Rising has agreed to cooperate with the ongoing investigation into anticompetitive conduct in the generic pharmaceutical industry.

**2.    Unknown Generic Manufacturer Co-Conspirators**

101.    Various other generic drug manufacturer persons, firms, entities, and corporations, not named as Defendants herein, have participated as co-conspirators in the violations alleged herein, and have aided, abetted, and performed acts and made statements in furtherance of the conspiracy.

102.    The true names and capacities of additional generic manufacturer co-conspirators, whether individual, corporate, associate, or representative, are presently unknown to Plaintiffs.

REDACTED – PUBLIC VERSION

Plaintiffs may amend this Complaint to allege the true names and capacities of additional co-conspirators as they are discovered.

103.    The wrongful acts alleged to have been done by any one Defendant or generic manufacturer co-conspirator were authorized, ordered, or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management, direction, or control of such Defendant's or generic manufacturer co-conspirator's affairs.

## IV.    INTERSTATE TRADE AND COMMERCE

104.    Defendants are among the leading manufacturers and suppliers of the Named Generic Drugs sold in the United States.

105.    The Named Generic Drugs are produced by, or on behalf of Defendants, or their affiliates, in the United States or overseas.

106.    During the Class Period, Defendants, directly or through one or more of their affiliates, sold the Named Generic Drugs throughout the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this District.

107.    The activities of Defendants and their generic manufacturer co-conspirators were within the flow of, intended to, and had a substantial effect on interstate commerce in the United States.

108.    Defendants' and their generic manufacturer co-conspirators' conduct, including the marketing and sale of the generic drugs in question, took place within, has had, and was intended to have, a direct, substantial, and reasonably foreseeable anticompetitive effect upon interstate commerce within the United States.

109.    The combination and conspiracy alleged herein has directly and substantially affected interstate commerce, in that Defendants deprived DPPs of the benefits of free and open competition in the purchase of the Named Generic Drugs within the United States.

REDACTED – PUBLIC VERSION

110.    The agreement and conspiracy between Defendants and their generic manufacturer co-conspirators to fix, maintain, and stabilize prices, rig bids, and engage in market and customer allocation of generic drugs, and their actual inflating, fixing, raising, maintaining, or artificially stabilizing the prices of generic drugs, including the Named Generic Drugs, were intended to have, and had, a direct, substantial, and reasonably foreseeable effect on interstate commerce within the United States.

## V.    FACTUAL ALLEGATIONS

**A.    Competition Between Generic Drugs Historically Has Been Keen.**

**1.    Generic drugs should lead to lower prices.**

111.    Generic drugs provide a lower-cost but bioequivalent alternative to brand drugs. Before any generic drug can be marketed, the FDA requires rigorous testing to ensure it has the same strength, quality, safety, and performance as the brand.  By law, generics must have the same amount of active ingredient and must be "therapeutically equivalent" to the brand, meaning they must meet exacting bioequivalence testing specifications so patients can expect "equal effect and no difference when [generics are] substituted for the brand name product."[15]

112.    To encourage the production and sale of generic drugs, the Drug Price Competition and Patent Term Restoration Act of 1984 (the Hatch-Waxman Act) simplified the regulatory hurdles that generic drug manufacturers must clear before marketing and selling generic drugs.  Instead of filing a lengthy and costly New Drug Application, the Hatch-Waxman Act allows generic drug manufacturers to obtain FDA approval in an expedited fashion.

113.    To obtain marketing approval for a generic drug, an ANDA must be filed with the FDA's Center for Drug Evaluation and Research, Office of Generic Drugs; "abbreviated"

---

[15] FDA, *Drugs@FDA Glossary of Terms*, *available at* https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms..

REDACTED – PUBLIC VERSION

because so long as the ANDA includes data showing bioequivalence to the brand, the ANDA sponsor can reference efficacy data supporting approval of the brand (described in the regulations as the "Reference Listed Drug" or "RLD" for short) instead of repeating all the same clinical trials. Upon the FDA's determination that bioequivalence to the brand has been established, the ANDA will be approved and may be marketed in the United States as substitutable with the RLD.

114. Although equivalent from a safety and efficacy standpoint, generic versions of brand name drugs are priced significantly below their brand counterparts, and because of this, they rapidly gain market share from the brand beginning immediately following launch. Indeed, in every state, pharmacists are permitted (and in many states required) to substitute a generic product for a brand product barring a note from a doctor that the brand product must be dispensed as written.

115. It is well established in economic literature that competition by generic products should result in lower prices for drug purchasers. In the period before generic entry, a brand drug commands 100% of the market share for that drug and the brand manufacturer can set the price largely free from normal competitive market forces. But once the first lower-priced generic enters, a brand drug rapidly loses sales due to automatic pharmacy substitution, and generics capture as much as 80% of the market or more within months of launch. And as more generics become available, generic prices only decline further due to competition among generics. These cost reductions to drug purchasers were the very legislative purpose behind the abbreviated regulatory pathway for generic approval under the Hatch-Waxman Act.

116. Generic competition, under lawful and competitive circumstances, reduces drug costs by driving down the prices of both generic versions of the brand drug and often the brand

REDACTED – PUBLIC VERSION

drug itself, and every year generic drugs should result in hundreds of billions of dollars in savings to direct purchasers, consumers, and insurers.

117.   A Federal Trade Commission study found that in a "mature generic market, generic prices are, on average, 85% lower than the pre-entry branded drug prices."[16] A mature generic market has several generic competitors. Because each generic is readily substitutable for another generic of the same brand drug, pricing is the main differentiating feature and the basis for competition among manufacturers.[17] Over time, generics' pricing should near the generic manufacturers' marginal costs.

118.   Generic competition usually enables purchasers to purchase generic versions of the brand drug at a substantially lower price than the brand drug. Generic competition to a single blockbuster brand drug can result in billions of dollars in savings to direct purchasers, consumers, insurers, local, state, and federal governments, and others.

> **2.    Prescription drug prices in the United States are governed by institutional safeguards, which are intended to keep drug prices competitive.**

119.   Ordinarily, the price for a consumer product is set by the retailer based on the amount the typical consumer is willing to pay. But because of the unique features of the

---

[16] Federal Trade Commission, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions*, at 8 (Jan. 2010), *available at* https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay-offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf.

[17] *See, e.g.*, Federal Trade Commission, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact*, at 17 (Aug. 2011) ("[G]eneric drugs are commodity products marketed to wholesalers and drugstores primarily on the basis of price."), *available at* https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; U.S. Cong. Budget Office, *How Increased Competition from Generic Drugs Has Affected Proceed and Returns in the Pharmaceutical Industry* (July 1998), *available at* https://www.cbo.gov/sites/default/files/105th-congress-1997-1998/reports/pharm.pdf.

REDACTED – PUBLIC VERSION

prescription drug marketplace, prescription drug pricing for most consumers is not determined

between the retailer and the consumer. Rather, because most consumers' prescription drug

purchases are reimbursed by public or private health plans, consumer pricing for prescription

drugs is often set in reference to reimbursement agreements between these prescription drug

payers, *i.e.*, health plans and their prescription benefit managers, and the pharmacies that

dispense drugs to the payers' insured customers.

120.    Generic manufacturers typically report a Wholesale Acquisition Cost (WAC) for

their drugs. WAC prices represent the manufacturer's benchmark or reported list price. The

WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or

other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for

volume sales. Manufacturers generally provide their WACs to purchasers or report them to

publishers that compile that information for the market.

121.    Generic drug manufacturers may charge different amounts for an equally

interchangeable, *i.e.*, therapeutically equivalent, multisource drug. But manufacturers are usually

constrained in their ability to price generic drugs by the Maximum Allowable Cost (MAC).[18]

MAC is a contractually based payment model that, in the private sector, is commonly established

by a pharmacy benefits manager (PBM), who manages an insurance plan, and that is paid to the

---

[18] To define therapeutic categories, MAC pricing typically relies on the FDA's Orange Book, which lists approved prescription drugs and their therapeutic equivalents. An "A"-rated drug is one that the FDA considers to be therapeutically equivalent to other pharmaceutically equivalent products. *See* U.S. FDA Website, Orange Book Preface, *available at* https://www.fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm#tecode.

REDACTED – PUBLIC VERSION

pharmacies within the plan's network.[19]  A MAC price sets the upper limit that a pharmacy will be paid by the PBM for procuring and dispensing a particular generic medication.

122.    While PBMs usually do not disclose publicly which drugs they subject to MAC pricing, what the MAC price is, or what factors they apply to set MAC prices, it is believed that PBMs rely on a wide variety of market-wide pricing information or plan-specific data.[20]  In recent years, 79% of employer prescription drug plans and 45 state Medicaid programs have been using MAC prices to control the cost of generic drugs.[21]

123.    MAC prices give pharmacies an incentive to procure and dispense the lowest-priced drug product available for a particular multisource drug. If a generic drug is subject to MAC pricing, a pharmacy purchasing a higher-priced generic product will make less profit or potentially even lose money when it dispenses a higher-priced product.[22]

124.    MAC pricing is neither uniform nor transparent, and it may be subject to frequent changes.  Whether a generic manufacturer's products are even subject to MAC pricing, or how that MAC pricing is set for any particular generic drug, is not easy for the manufacturers to decipher.  PBMs typically exercise control over the selection of generic drugs that will be

---

[19] Academy of Managed Care Pharmacy, *Where We Stand, Maximum Allowable Cost (MAC) Pricing* (Dec. 2013), *available at* https://www.amcp.org/policy-advocacy/policy-advocacy-focus-areas/where-we-stand-position-statements/maximum-allowable-cost-mac-pricing.  For the purposes of this Complaint, MAC prices refer solely to prices that limit a pharmacy's reimbursement for generic drugs, not the amounts PBMs charge to the insurance plans, which may also be referred to as a MAC price. *See* National Community Pharmacists Association, *The Need for Legislation Regarding "Maximum Allowable Cost" (MAC) Reimbursement*, *available at* http://www.ncpa.co/pdf/leg/mac-one-pager.pdf.

[20] *See supra* Academy of Managed Care Pharmacy article.

[21] Express Scripts, Adam Kautzner, Chief Pharma Trade Relations Officer, *MAC Pricing Keeps Generics Affordable* (Apr. 6, 2019), *available at* https://www.express-scripts.com/corporate/articles/mac-pricing-keeps-generics-affordable.

[22] *See supra* Academy of Managed Care Pharmacy article.

REDACTED – PUBLIC VERSION

subjected to MAC pricing, and they fiercely guard the secrecy of their MAC price lists.[23]

Industry groups, like the Academy of Managed Care Pharmacy, actively oppose government

regulation of MAC pricing and any efforts to disclose MAC prices or the methods of calculating

them.[24]

125.   By setting a ceiling for reimbursement of any particular generic drug at the

pharmacy level, MAC prices indirectly affect the price at which generic drug manufacturers may

sell their products to direct purchasers. Because many generic drugs are subject to MAC pricing,

generic drug manufacturers have an incentive to price their generic drug products competitively

to maintain demand by pharmacies.

126.   MAC pricing can penalize the generic drug manufacturer that raises price on its

own when its competitors do not. A unilateral price increase in a competitive generic drug

market that is subject to MAC pricing is likely to send buyers to a lower-priced alternative.

127.   MAC pricing has little effect, however, if generic drug manufacturers collectively

increase their prices for a multi-source drug. First, PBMs generally permit pharmacies – who

may be contractually obligated to dispense an unprofitable prescription – to challenge MAC

prices under a MAC appeals process.[25] If the price of a generic drug has been increased by a

majority of generic drug manufacturers, then these MAC appeals may be successful in getting

the PBM to increase the MAC price allowed. Second, PBMs typically have a policy of revising

---

[23] *See supra* National Community Pharmacists Association article.
[24] *See supra* Academy of Managed Care Pharmacy article.
[25] *Id.*

REDACTED – PUBLIC VERSION

MAC prices under certain contingencies.[26]  One large PBM, Express Scripts, for example, states

that its MAC price list is frequently updated to reflect "the current market dynamics."[27]

128.    MAC pricing provides yet another reason that Defendants' stark increases in the

price of the generic drugs in question are indicative of coordinated pricing activity.  Knowing

that they hold an overwhelming majority share of the market for these drugs, Defendants had the

capacity to dictate the market price and to influence the MAC prices set by PBMs, but only if

they acted collectively.  Absent collusion, individual Defendants and generic manufacturer co-

conspirators could not have increased their prices to the high levels they did (or maintain high

prices in the face of a competitor's significantly lower price) without incurring the loss of a

significant volume of sales.

**B.    Defendants and Their Generic Manufacturer Co-Conspirators Participated in an Overarching Fair Share Agreement to Thwart Competition in the Generic Drug Industry.**

129.    During at least the Class Period, generic drug manufacturers – including

Defendants and their generic manufacturer co-conspirators – conspired, combined, and

contracted with one another pursuant to the Fair Share Agreement to fix, stabilize, and raise

prices, rig bids, and engage in market and customer allocation of generic drugs, including the

Named Generic Drugs.

130.    This Fair Share Agreement had the effect of maintaining artificially inflated

pricing for the Named Generic Drugs, and creating an appearance of competition when in fact

none existed.  It also had the intended and actual effect of causing DPPs and the other members

---

[26] *Id.*

[27] *See supra* Express Scripts article.

of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices.

131.   Each of Defendants' conspiratorial actions described herein sought to further this Fair Share Agreement by achieving either or both of its two main goals:

a.   Defendants and their generic manufacturer co-conspirators sought to avoid competition within the generic drug industry, instead maintaining the stability of the relative market shares for particular drugs assigned to each competitor.

b.   Without the threat of competition, Defendants and their generic manufacturer co-conspirators sometimes dramatically raised prices on a generic drug or drugs. Defendants' agreements also artificially inflated pricing even where dramatic price increases were not observed as might be the case where a *quid pro quo* market or customer allocation had taken place.

132.   Defendants and their generic manufacturer co-conspirators communicated their respective priorities and goals in order to divide generic drugs among each other. Once appropriate share was set, Defendants and their generic manufacturer co-conspirators would jointly evaluate customer bids and contracts with an eye towards maintaining these ratios.

133.   Defendants and their generic manufacturer co-conspirators repeatedly engaged in decision-making that was against their financial self-interest absent a conspiratorial agreement, turning down or walking away from potentially profitable business opportunities in order to uphold their Fair Share Agreement and allow other Defendants or generic manufacturer co-conspirators to gain or maintain predetermined market share.

134.   Generic drug manufacturers – including Defendants and their generic manufacturer co-conspirators – also planned and executed coordinated price increases. Before

REDACTED – PUBLIC VERSION

raising prices for their customers, generic manufacturers would communicate and agree on a price increase strategy. Typically, this involved – pursuant to the Fair Share Agreement – one manufacturer taking the lead with the price increase, and the other manufacturers matching by increasing their pricing in step with the leader (knowing that their ostensible competitors would not undercut the elevated pricing).

135.    There was an understanding between all Defendants and their generic manufacturer co-conspirators that it was permissible to initiate and maintain collusive communications at any time in order to effectuate the goals of this Fair Share Agreement and more effectively manipulate the generic drug industry. This behavior was repeated again and again in the individual generic drug examples described herein and in previous MDL Complaints.

136.    In its ruling on the motions to dismiss the first set of Overarching Complaints alleging a Fair Share Agreement, the Court found:

> The allegations in Plaintiffs' Overarching Complaints plausibly allege that Defendants engaged in a conspiracy regarding the broader market for generic drugs, and not just the market for any individual drug. The connective tissue Plaintiffs have alleged in the Overarching Complaints gives credence to a claim that Defendants engaged in 'behavior that would probably not result from chance, coincidence, independent response to common stimuli, or mere interdependence unaided by an advance understanding among the parties.' Plaintiffs make plausible claims that the alleged individual drug conspiracies were connected by common goals, methods, or actors so as to form a broader overarching conspiracy.[28]

---

[28] *Generic Pharm. Pricing*, 394 F. Supp. 3d at 526-27 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, n.4 (2007)).

REDACTED – PUBLIC VERSION

137.   The already strong plausibility of the existence of an overarching Fair Share conspiracy has been significantly enhanced through documentary investigation and data analysis that has taken place since the filing of previous Complaints.

138.   As discussed in further detail below, Defendants' records demonstrate a consistent, agreed-upon approach—the Fair Share Agreement—to avoid competition, allocate and stabilize market shares, and achieve and maintain artificially inflated prices. ███████

139.   ████████████████   the Fair Share Agreement was comprised of several "core principles," including, but not limited to: (1) each manufacturer is entitled to a certain share of sales; (2) manufacturers should obtain their allocated market share cooperatively—not

competitively; (3) do not engage in price competition; higher prices are more important than additional sales or market share; and (4) responses to customer's requests for bids should be consistent with the Fair Share Agreement.  As discussed below, these principles of the Fair Share Agreement are repeated across Defendant companies and applied to the various generic drugs with remarkable consistency.

### 1. Fair Share Agreement Principle: Each manufacturer is entitled to a certain market share—no more and no less.

140.    The Fair Share Agreement proceeds from the shared understanding that each manufacturer is entitled to a certain share of the market for a particular drug based primarily on the number of manufacturers in the market. This guiding tenet was ingrained in Defendants' sales executives, as reflected, for example, by the following documents:





141.    Defendants subscribed to data services, such as IMS, which provided them with detailed market information that enabled them to understand their market share and the market share of their purported competitors.



142.

REDACTED – PUBLIC VERSION



143.    In fact, the understanding that each manufacturer was entitled to a certain market

share was so ingrained that Defendants actually based their business planning on it. For instance:



REDACTED – PUBLIC VERSION

2.   **Fair Share Agreement Principle: Manufacturers should achieve their fair share of the market cooperatively—not competitively.**

144.    In a competitive market, an established manufacturer would be expected to aggressively defend its customers and market share from a new entrant.  Not so under the Fair Share Agreement.  The Fair Share Agreement dictates that the established manufacturers should cede customers to the new entrant so that the new entrant could obtain its rightful share.  Meanwhile, the new entrant was expected to carefully target both customers and competing manufacturers in order to ensure that all manufacturers arrived at the expected share of the market with minimal market disruption.  The ultimate goal was to attain a market share equilibrium where no manufacturer was jockeying for additional market share.  For instance:



REDACTED – PUBLIC VERSION

**3.     Fair Share Agreement Principle: Do not engage in price competition.**

145.     In a typical market, a new entrant would price its product below the prevailing market price in order to gain market share.  Here, no such price competition was required.  New entrants knew that they would be allocated a certain market share, and they also knew that their fellow market participants would expect them not to undercut the current market prices as a condition of receiving an allocated share of the market.  In other words, under the Fair Share Agreement, new entrants were actively disincentivized from engaging in price competition.

146.     In addition to avoiding price competition, Defendants conspired to impose coordinated price increases.  As discussed below, Defendants communicated and agreed upon a price increase strategy.  Pursuant to the Fair Share Agreement, one manufacturer would lead the price increase, and the other manufacturers would raise prices in step with the leader.  All of the manufacturers were secure in the knowledge that their ostensible competitors would not undercut their elevated prices.  Indeed, Defendants were very careful to indicate to their fellow manufacturers that they were on board with price increases.  For instance:

- 

- 

- 

REDACTED – PUBLIC VERSION



**4.**     **Fair Share Agreement Principle: When customers request a competitive bid, the manufacturer's response should be based on and consistent with the Fair Share Agreement—not customer's wants and needs or competitive interests.**

147.     Consistent with the Fair Share principles discussed above, when a Defendant received a request for a competitive bid from a customer, it first considered how its response would impact the agreed-upon market share allocations.  It also considered how a competitive bid could potentially erode the inflated prices and upset purported competitors.  For instance:



148.    These core principles supported Defendants' overarching goals to maintain established market share ratios and artificially inflated prices.  Adherence to these agreed-upon principles required Defendants to repeatedly engage in behavior that was contrary to the independent self-interest absent a conspiracy, including ceding market share to new entrants and declining to pursue profitable business opportunities.  Defendants were willing to take these actions because they understood that their purported competitors were also "playing nice in the sandbox" or being "responsible."

### 5.    The Fair Share Agreement was facilitated by coziness among generic drug manufacturers.

149.    Indeed, the fact that the Fair Share Agreement spanned numerous drugs also incentivized Defendants to take actions against their independent self-interest.  For instance, a Defendant in the position of the established manufacturer for one drug might be required to give up market share to a new entrant.  But, the same Defendant might enter the market for another drug and thus would be the beneficiary of market share ceded by the established suppliers.

150.    The Fair Share Agreement had the effect of maintaining artificially inflated pricing for the Named Generic Drugs, and creating an appearance of competition when in fact none existed.  It also had the intended and actual effect of causing Direct Purchaser Class Plaintiffs and the other members of the proposed Class to pay artificially inflated prices above prices that would exist if a competitive market had determined prices.

151.    Defendants were aware that the Fair Share Agreement was illegal, and they took substantial steps to conceal their conspiratorial conduct, including by cautioning against discussing price increases for the Named Generic Drugs in emails, text messages and other communications – both internal to and between various Defendants.  Instead, Defendants opted to speak by telephone when an in-person meeting was not practical, and they met and discussed

REDACTED – PUBLIC VERSION

their plans at industry events and other venues when possible.  For instance, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

152.     Out of fear of detection, Defendants and their generic manufacturer co-
conspirators intentionally destroyed many communications.

153.     In formulating and effectuating the combination and conspiracy, Defendants and
their generic manufacturer co-conspirators engaged in numerous anticompetitive activities,
including, among other things:

(a)     Participating, directing, authorizing, or consenting to the participation of
subordinate employees in meetings, conversations, and communications with
generic manufacturer co-conspirators to discuss the sale and pricing of at least the
generic drugs identified in this Complaint;

(b)     Participating, directing, authorizing, or consenting to the participation of
subordinate employees in meetings, conversations, and communications with
generic manufacturer co-conspirators to engage in market and customer allocation
or bid rigging for at least the generic drugs identified in this Complaint;

(c)     Agreeing during those meetings, conversations, and communications to engage in
market and customer allocation or bid rigging for at least the generic drugs
identified in this Complaint;

(d)     Agreeing during those meetings, conversations, and communications not to
compete against each other for certain customers regarding at least the generic
drugs identified in this Complaint;

(e)     Submitting bids, withholding bids, and issuing price proposals in accordance with
the agreements reached;

(f)     Selling at least the generic drugs identified in this Complaint in the United States
at collusive and noncompetitive prices; and

REDACTED – PUBLIC VERSION

(g)     Accepting payment for at least the generic drugs identified in this Complaint sold in the United States at collusive and noncompetitive prices.

154.    The linchpin of the Fair Share Agreement was frequent communications among purported competitors. These communications were made via telephone, text message, email, and through messaging platforms such as LinkedIn or WhatsApp. The inter-competitor communications sometimes took place between very high-level executives. More often, however, the conspiratorial communications involved National Account Managers and employees at comparable positions. However, very senior executives sometimes directed their subordinates to reach out to competitors and to report back.

155.    The substance of these inter-competitor communications varied depending on the particular issues presented by a drug. For example, if the conspirators believed they could increase prices for a particular drug, collusive communications focused on a future price increase. If a new market for a generic drug was opening up due to the expiration of a patent, conspiratorial communication sometimes consisted of a discussion of market share allocation.

156.    Consistent with the overarching Fair Share Agreement, a single communication between conspirators would often span multiple drugs. Additional individual drug allegations are set forth below demonstrating how the Fair Share Agreement was applied across multiple drugs at a time. Further, Defendants' agreements on one drug were interrelated with agreements concerning other drugs.

157.    Keeping the existence of these communications secret was of paramount importance. Senior level executives repeatedly directed their subordinates not to leave any written documentation of their communications with competitors.

158.     In addition to the inter-competitor communications at the heart of the Fair Share
Agreement, Defendants also worked internally to ensure the execution of the Fair Share
Agreement.

159.     The effectiveness of the Fair Share Agreement was facilitated by certain
characteristics of the generic drug industry.

160.     First, the generic drug industry is a tight-knit community.  For instance, many
generic drug manufacturer employees and executives (including, for example, so called National
Account Managers or "NAMs" as well as certain senior executives) moved from generic drug
manufacturer to generic drug manufacturer while preserving former co-worker contacts, and thus
furthered the interwoven, cooperative culture of the generic drug industry.  Some examples
include: Rajiv Malik worked at Ranbaxy (now Defendant Sun) and Defendant Sandoz before
working at Defendant Mylan; Dan Lukasiewicz worked at Defendants Aurobindo and Zydus
before working at Defendant Heritage; Susan Knoblauch worked at Defendant Sun before
leaving to work as a NAM at Citron; Jan Bell worked at Defendant G&W before working at
Defendant Mylan; Joseph Papa left Defendant Perrigo to become Chairman and CEO of
Defendant Valeant; Carole Ben-Maimon worked in different roles at Defendants Impax, Par, and
Teva; and Bhaskar Chaudhuri was the General Manager of the Dermatology Division at
Defendant Mylan before later becoming President of Defendant Valeant and a member of MDL
Defendant Teligent's board of directors.

161.     Second, there are myriad opportunities in the generic drug industry for employees
of various generic drug manufacturers to interact with one another.  As shown in Exhibit E,
numerous trade association meetings and industry events were held during the time period where
collusion was taking place.

- 48 -

162.    The casual nature by which this combination and conspiracy was executed further illustrates its pervasive, comprehensive nature.  For instance, the allegations below highlight at least several examples where a Defendant was invited into an ongoing price increase scheme merely upon expressing its intention to enter the market for that drug.  In these situations, the other Defendants were not concerned about involving an additional party, because that party had already expressed, both impliedly and through overt communication, its willingness to participate in the Fair Share Agreement.

163.    Further, the regularity of Defendants and their generic manufacturer co-conspirators' illegal communications, contacts, and meetings at trade associations and elsewhere demonstrates that they were complicit in the overarching Fair Share Agreement.

164.    Defendants' Fair Share Agreement began at least as early as the summer of 2009.  Over time, and with the success of Defendants' collusive efforts, the Fair Share Agreement expanded to encompass more generic drugs.  Exhibit B (Timeline of Known Collusive Conduct for Drugs Named by DPPs).

## C.    Individual Drug Allegations

### 1.    Adapalene

165.    Adapalene is a medication used to treat acne.  It is available in a Gel formulation.

166.    It has been available in the United States in a generic form for many years.

167.    The market for Adapalene is mature.  At all relevant times, there have been multiple manufacturers of Adapalene.

168.    During the relevant time frame, Defendants Glenmark, Taro, and Teva were the primary manufacturers of Adapalene.

- 49 -

REDACTED – PUBLIC VERSION

169.    In May 2013, Teva, Taro and Glenmark wanted to fix, raise or stabilize the prices of Adapalene. Accordingly, the manufacturers engaged in a series of direct telephone communications to put their plan into action.

170.    For example, Teva's Patel communicated multiple times with multiple contacts at Glenmark during May of 2013 to discuss prices of Adapalene and other drugs. Patel also spoke with Taro's Aprahamian in May to coordinate Adapalene prices.

171.    The ability of Glenmark, Taro, and Teva to reach agreements on Adapalene was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

172.    The coordination by Glenmark, Taro, and Teva is consistent with the Fair Share Agreement.

173.    The agreement between Defendants Glenmark, Taro, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Adapalene Gel.

## 2.    Alclometasone Dipropionate

174.    Alclometasone Dipropionate is a commonly prescribed corticosteroid used to treat a variety of skin conditions (*e.g.*, eczema, dermatitis, allergies, rash). It has been on the market for decades and is available in several forms, including Ointment (0.05%) and Cream (0.05%).

175.    The market for Alclometasone Dipropionate is mature. At all relevant times, there have been multiple manufacturers. Defendants Glenmark, Sandoz, and Taro dominated sales of Alclometasone Dipropionate in the relevant period.

REDACTED – PUBLIC VERSION

176.

, as illustrated below:



REDACTED – PUBLIC VERSION



177.    Defendants' WAC pricing also rose in a coordinated fashion.  Taro and Sandoz announced new pricing on May 1, 2013 and May 10, 2013 respectively, which doubled and tripled their prior WAC prices for Alclometasone Dipropionate Cream.  Glenmark announced new WACs on May 16, 2013.  Weeks later, on June 10, 2013, Glenmark introduced WAC prices for Alclometasone Dipropionate Ointment that far exceeded its co-Defendants' existing WAC prices.  This was a price it would not have risked without knowledge that Taro would essentially match Glenmark's price two days later with a WAC price that more than tripled Taro's prior WAC price for Alclometasone Dipropionate Ointment.

178.    ███████████████████████████████████████████
███████████

REDACTED – PUBLIC VERSION

179.   ███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

180.   Documentary evidence confirms that these parallel price increases were the result

of collusion among generic drug manufacturers including Glenmark, Sandoz, and Taro.

Defendant Teva identified Glenmark, Sandoz, and Taro as "quality" competitors, *i.e.*,

competitors willing to coordinate price increases under the Fair Share Agreement.  Defendants'

coordination included raising Alclometasone Dipropionate prices.

181.   For example, documents show that Taro planned a "█████" increase in the price

of at least the Alclometasone Dipropionate Cream in mid-2012.  When it was announced on May

1, 2013, Sandoz internally described Taro's increase as "████" and noted that Taro represented

only a quarter of the market at that time.  Given its minority share, Taro would not have risked

this ████████████ without assurances.  As reflected in an internal email between Sandoz

executives on May 9, 2013, competitors viewed Sandoz "█████████████████████████

███████████████████████████████████."  In addition, Defendants'

frequent communication by telephone and text facilitated their price coordination.  For example,

Taro's Aprahamian exchanged 190 phone calls and texts with Sandoz's C.B. between March 19,

2013 and August 8, 2016, and eleven times with Glenmark's employee M.B., beginning on May

7, 2013, approximately a week before Glenmark matched Taro's WAC price for Alclometasone

Dipropionate Cream.  A Sandoz executive, who had advance knowledge of Taro's June 12, 2013

WAC increase for Alclometasone Dipropionate, remarked approvingly: "█████████████████

█████."

REDACTED – PUBLIC VERSION

182.     The ability of Glenmark, Sandoz, and Taro to reach agreement regarding Alclometasone Dipropionate Ointment and Cream was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

183.     

For example, on May 26, 2013, to avoid taking more than its fair share of the market, Taro's Aprahamian instructed Taro's employees ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On May 29, 2013, Sandoz's Kellum informed its customers that it would ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

184.     The agreement between Defendants Glenmark, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Alclometasone Dipropionate Ointment (0.05%) and Cream (0.05%).

**3.     Allopurinol**

185.     Allopurinol is a xanthine oxidase inhibitor used to treat gout and certain kinds of kidney stones.  It is available in, for example, Tablet and Injection formulations.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Allopurinol has been designated as an essential medicine by the World Health Organization.

186.     The market for Allopurinol is mature.  At all relevant times, there have been multiple manufacturers of Allopurinol.

187.    Defendants Actavis, Dr. Reddy's, Mylan, and Par dominate sales of Allopurinol Tablets (100 and 300 mg).



188.

REDACTED – PUBLIC VERSION



189.   The GAO noted that Allopurinol had an "extraordinary price increase" in the years 2014-2015.

190.   ██████████████████████████████████████████████

Under the Fair Share Agreement, Actavis, Dr. Reddy's, Mylan, Par, and Sun did not attempt to undercut competitors' prices in order to gain additional market share.  For example, in March 2015, J.P. of Dr. Reddy's was discussing Allopurinol with a colleague at Dr. Reddy's, Kate Neely.  J.P. said, "████████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████." Later in the email chain, J.P. and Neely decided not to pursue additional business on Allopurinol, based on the "████████████████" and not wanting to "████████████."

191.   The ability of Actavis, Dr. Reddy's, Mylan, and Par to reach agreements on Allopurinol was aided by the prevalence of trade association meetings and conferences where the

REDACTED – PUBLIC VERSION

parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

192.   ████████████████████████████████████████████████████

████████████████████████

193.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

194.   The agreement between Defendants Actavis, Dr. Reddy's, Mylan, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Allopurinol Tablets (100 and 300 mg).

### 4.   Amantadine HCL

195.   Amantadine Hydrochloride (HCL) is a drug used to treat Parkinson's disease.  It has been available in the United States for decades in a generic form.

196.   The market for Amantadine HCL is mature.  At all relevant times, there have been multiple manufacturers of Amantadine HCL.

197.   Defendants Lannett, Sandoz, and Upsher-Smith dominate sales of Amantadine HCL Capsules (100 mg).  ████████████████████████████████████████

████████████████████████████████████████████████████

198.   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

REDACTED – PUBLIC VERSION



199.    The GAO noted that Amantadine HCL had an "extraordinary price increase" in the years 2012-2013.

200.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓

201.    The ability of Lannett, Sandoz, and Upsher-Smith to reach agreement regarding Amantadine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

202.    ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓

203.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

204.    The agreement between Defendants Lannett, Sandoz, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amantadine HCL Capsules (100 mg).

**5.    Amiloride HCL/HCTZ**

205.    Amiloride HCL/HCTZ is a medication used to treat high blood pressure.  It is available in Tablet formulation.

206.    It has been available in the United States in a generic form for many years.

207.    The market for Amiloride HCL/HCTZ is mature.  At all relevant times, there have been multiple manufacturers of Amiloride HCL/HCTZ.

208.    During the relevant time frame, Defendants Mylan and Teva were the primary manufacturers of Amiloride HCL/HCTZ.

209.    For years, the prices of Amiloride HCL/HCTZ were relatively low and stable. However, in the spring of 2011 prices began to rise in parallel.

REDACTED – PUBLIC VERSION



210.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

211.    Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other.

212.    Teva's Rekenthaler communicated consistently with Mylan at least as early as April 2010, and continued thereafter with Mylan's J.K. (VP and Executive Director of Sales), B.P. (Senior VP of Sales) and Nesta over the following months and years.

213.    In the spring and summer of 2013, Teva wanted to raise its Amiloride prices again. Accordingly, Teva's Kevin Green and Jim Nesta spoke numerous times via telephone to coordinate and agree to the price increase. They spoke at least on May 7, 8, 9, 10 and July 10, 11, 23 and August 1, 2, 6, 8 in 2013.

REDACTED – PUBLIC VERSION

214.    In 2014, Teva was eager to impose yet another price increase, and again coordinated with Mylan to do so. This time, Teva's Rekenthaler communicated with Mylan's Nesta. They spoke by phone at least on May 9, 20 and 27, 2014

215.    The coordination by Mylan and Teva is consistent with the Fair Share Agreement.

216.    The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amiloride HCL/HCTZ Tablets.

6.    **Amoxicillin/Clavulanate**

217.    Amoxicillin/Clavulanate is a medication used to treat bacterial infections.  It is available in a Tablet formulation.

218.    It has been available in the United States in a generic form for many years.

219.    The market for Amoxicillin/Clavulanate is mature.  At all relevant times, there have been multiple manufacturers of Amoxicillin/Clavulanate.

220.    During the relevant time frame, Defendants Sandoz and Teva were the primary manufacturers of Amoxicillin/Clavulanate.

221.    In late summer and early fall of 2014, Teva and Sandoz orchestrated price increases on Amoxicillin/Clavulanate chewable tablets. Throughout this period, Teva and Sandoz were in regular contact. Teva's Patel spoke with the Associate Director of Pricing at Sandoz multiple times to fix the prices of Amoxicillin/Clavulanate and other drugs.

222.    For example, on October 10, 2014, the day that Sandoz followed Teva's price increase for Amoxicillin/Potassium Clavulanate, Patel of Teva spoke to the Associate Director of Pricing at Sandoz.

REDACTED – PUBLIC VERSION

223.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

224.    The ability of Sandoz and Teva to reach agreements on Amoxicillin/Clavulanate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

225.    The coordination by Sandoz and Teva is consistent with the Fair Share Agreement.

226.    The agreement between Defendants Sandoz and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amoxicillin/Clavulanate.

### 7.    Amphetamine Salts (MAS)

227.    Amphetamine Salts (amphetamine/dextroamphetamine), also known by the brand name Adderall, are a commonly prescribed medication for the treatment of attention deficit hyperactivity disorder that have been available in the United States for decades.  They are available in the United States in several dosage strengths, including IR and ER versions of Tablets (5, 10, 20, 30 mg) and Capsules (5, 10, 15, 20, 25, 30 mg),

228.    The market for Amphetamine Salts tablets is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva dominated sales of Amphetamine Salts in the relevant period.  Defendants Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva were the primary manufacturers of Tablets. Defendants Actavis, Impax, and Teva were the primary manufacturers of Capsules.

REDACTED – PUBLIC VERSION

229.



REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



230.    The GAO found that Amphetamine Salts had "extraordinary price increases" in 2011-2012.

231.    ████████████████████████████████████████████████████████████

232.    The ability of Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva to reach agreement regarding Amphetamine Salts was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

233.    ████████████████████████████████████████████████████████████
████████████████████████████████████

234.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

235.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers.

236.    At least as early as the summer of 2011, Defendants became aware of the potential for coordinating price increases on Amphetamine Salts. Teva raised its WAC prices as much as three times its existing prices on August 17, 2011. Sandoz matched Teva's prices a week later, effectively doubling its prior WAC prices. Teva's Kevin Green had multiple contacts at Sandoz at this time to facilitate the price coordination. Impax, who had no WAC prices, benefitted from its co-Defendants' price increases.

237.    By March 2014, Teva became aware that Aurobindo had immediate plans to enter the market. In preparation for its entry on March 4, 2014, Teva undertook a " ███████████ ██████████████████████████████." On March 18, 2014, Teva's J.P. shared with her colleagues that Aurobindo's market share target for the impending launch was 10% and that it was prepared to undercut price. On March 18, 2014, the day of the email, Rekenthaler and R.C., a senior executive at Aurobindo, had a thirty-minute telephone conversation. The next day Aurobindo introduced WAC prices that matched Teva and Sandoz's WACs. Following Aurobindo's price announcement, Rekenthaler and R.C. spoke again seven times on March 20, 2014. These communications facilitated Defendants' agreement that Aurobindo enter the market at the existing supracompetitive prices in exchange for its expected share.

238.    The next morning, Patel sent a calendar invite to Rekenthaler and to K.G. scheduling a meeting to discuss " ██████████████████████████." In the next several days, Teva internally debated whether it would concede contracts to make way for Aurobindo.

239.    Teva characterized Amphetamine Salts Tablets in June 2014 as having three

"███████████████████████" and calculated that it had ████ of Amphetamine Salts

Tablets sales, while "████████████████████" Impax (then Corepharma) and Sandoz

had ██████████, respectively.  In furtherance of the conspiracy, Defendants continued to

maintain high prices by declining to bid on customer's supply contracts, *e.g.*, Econdisc.  Rather

than offering a competitive price to maintain its market share, Teva conceded multiple supply

contracts.  To facilitate this process, Defendants' shared "██████████████████████."  For

example, in contemplating a bid in May 2014, Teva considered Aurobindo and Impax's

Amphetamine Salts Tablets prices to determine whether it was worth "████████████████

██████████████."

240.    Following such concessions, Teva estimated in July 2014, that it lost about ████

market share.  Later that year, Teva also declined to bid on one of Impax's major customers

because Teva concluded that it did not "████████████████████████████████

████████████████████████████" on Amphetamine Salts Tablets.

241.    Similarly, in March 2016, in response to a request for proposal from Red Oak,

Teva recalculated market share for Amphetamine Salts Tablets and concluded that ████████

████████████████████████████████████."

242.    As to Capsules, in April 2012, a large customer contacted Teva to request a price

reduction because a new competitor had expressed an interest in "all or some" of its MAS-XR

business.  When Teva learned the new competitor was Actavis, which was expecting approval

for the drug soon, Teva deferred its decision in pricing until Actavis entered the market.

243.    In June 2012, Actavis obtained FDA approval for Amphetamine Salts Capsules.

Teva and Actavis immediately began coordinating regarding market share.

REDACTED – PUBLIC VERSION

244.     That evening, Rekenthaler instructed Teva employees to find out Actavis's plans, including shipping details and inventory levels.  The next morning, T.S., a National Account Manager at Teva, confirmed that she had spoken to a contact at Actavis.  She conveyed to Rekenthaler what she had learned.

245.     The ability of Actavis Impax, and Teva to reach agreement Amphetamine Salts Capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

246.     The agreement(s) between Defendants Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Amphetamine Salts Tablets and Capsules

**8.     Atenolol Chlorthalidone**

247.     Atenolol Chlorthalidone is a combination beta blocker and water pill used to treat high blood pressure.  It has been available in the United States for decades in a generic form.

248.     The market for Atenolol Chlorthalidone is mature.  At all relevant times, there have been multiple manufacturers of Atenolol Chlorthalidone.

249.     Defendants Actavis and Mylan dominate sales of Atenolol Chlorthalidone Tablets (50-25 and 100-25 mg).  ███████████████████████████████████████

███████████████████████████████████████████████

250.     ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION

251.    The GAO noted that the Atenolol Chlorthalidone had "extraordinary price increases" in the years 2014-2015.

252.    ███████████████████████████████████████

253.    The ability of Actavis and Mylan to reach agreement regarding Atenolol Chlorthalidone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

254.    ████████████████████████████████████████████
████████████████

255.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

256.    The agreement between Defendants Actavis and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atenolol Chlorthalidone Tablets (100-25mg tablets and 50-25mg).

**9.    Atropine Sulfate**

257.    Atropine Sulfate is an anticholinergic and is available as, for example, a 1% Ophthalmic Solution for use in eye examinations to dilate the pupil and to treat certain eye conditions.  It has been available in the United States for over a decade in a generic form.

258.    The market for Atropine Sulfate Ophthalmic Solution is mature.  At all relevant times, there have been multiple manufacturers.

259.    Defendants Bausch and Sandoz dominated the sales of Atropine Sulfate with close to an 80/20 split at all relevant times.

- 70 -

260. ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████



261.     The GAO noted that Atropine Sulfate had "extraordinary price increases" in the

years 2010-2011.

262. ████████████████████████████████

263.     The ability of Bausch and Sandoz to reach agreements on Atropine Sulfate

Ophthalmic Solution was aided by the prevalence of trade association meetings and conferences

where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to

the Named Generic Drugs).

264. ████████████████████████████████████

██████████████████

REDACTED – PUBLIC VERSION

265.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

266.     The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Atropine Sulfate Ophthalmic Solution (1%).

**10.     Balsalazide Disodium**

267.     Balsalazide Disodium is an aminosalicylate medication used to treat ulcerative colitis.  It has been available in the United States for over a decade in a generic form.

268.     The market for Balsalazide Disodium is mature.  At all relevant times, there have been multiple manufacturers of Balsalazide Disodium.

269.     Defendants Apotex and West-Ward dominate sales of Balsalazide Disodium Capsules (750 mg).  ██████████████████████████████████████████
████████████████████████████████████████

270.     ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

REDACTED – PUBLIC VERSION



271.      ███████████████████████████████████████████████
████████

272.      The ability of Apotex and West-Ward to reach agreement regarding Balsalazide Disodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

273.      ███████████████████████████████████████████████
██████████████████

274.      No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

275.     The agreement between Defendants Apotex and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Balsalazide Disodium Capsules (750 mg).

### 11.     Betamethasone Dipropionate

276.     Betamethasone Dipropionate is a corticosteroid used to treat a variety of skin conditions.  It has been available in the United States for over a decade in a generic form.  It is available in ointment, cream, lotion, and jelly formulations.  Due to, among other things, its clinical efficacy and safety, betamethasone has been designated as an essential medicine by the World Health Organization.

277.     The market for Betamethasone Dipropionate is mature.  At all relevant times, there have been multiple manufacturers of Betamethasone Dipropionate.

278.     Defendants Actavis, Perrigo, Sandoz, and Taro dominate sales of Betamethasone Dipropionate Ointment (0.05%), Cream (0.05%), and Lotion (0.05%).

279.     ███████████████████████████████████████
███████████████████████████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



280.    The GAO noted that Betamethasone Dipropionate had an "extraordinary price increase" in the years 2011-2012.

281.    Documentary evidence confirms that these parallel price increases were the result of collusion among Actavis, Perrigo, Sandoz, and Taro.

282.    By late 2010, Actavis had increased its price on Betamethasone Dipropionate Cream, knowing that its competitors would mirror the increase.  On December 10, 2010, W.K. of Sandoz wrote to a colleague, "███████████████████████████████████████ ██████████████████," including Betamethasone Dipropionate Cream. "████████████ ███████" ████████████████████████████████████████████████ ████████████████████████████████████████

283.    ████████████████████████████████████████ Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not

REDACTED – PUBLIC VERSION

worry about their ostensible competitors cutting prices to gain market share.  They also did not

attempt to undercut their ostensible competitors' prices in order to gain additional market share.

284.    For example, a Sandoz "███████████" from November 2013 indicates that

Sandoz would not be pursuing more market share on Betamethasone Dipropionate Cream due to

the Fair Share Agreement.  The spreadsheet shows the relative market shares of each competitor

on betamethasone dipropionate cream, as well as the implications for market share acquisition:

"████████████████████████████████████████████████████

██████." Along similar lines, a Sandoz presentation entitled "████████████████

██████" from November 2013 advises that Sandoz pursue the following strategy for

Betamethasone Dipropionate in order to maximize fourth quarter sales: "██████████████

████████████████████████████."

285.    Likewise, a Sandoz presentation entitled "████████████████" from May

2014 describes the market approach to Betamethasone Dipropionate Cream in the following

manner: "████████████████████████████."  Similarly, on May 22,

2015, D.S. of Taro wrote to A.L. of Taro about opportunities to pick up market share on items

including Betamethasone Dipropionate Cream.  D.S. wrote, "██████████████████

████████████████████████████████████████████████

██████."  These ostensible competitors were unwilling to compete for additional market share

due to their obligations under the Fair Share Agreement.

286.    The same was true for Betamethasone Dipropionate Lotion and Ointment.  For

example, the market for Betamethasone Dipropionate Lotion ████████████████████

████████████████████.  A Sandoz presentation entitled "████████████████

██████████████████████" indicates that the target for Betamethasone

Dipropionate Lotion was to "████████████████████████"

287.     The ability of Actavis, Perrigo, Sandoz, and Taro to reach agreement regarding

Betamethasone Dipropionate was aided by the prevalence of trade association meetings and

conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association

Contacts as to the Named Generic Drugs).

288.     The coordinated price increases among Actavis, Perrigo, Sandoz, and Taro are

consistent with the Fair Share Agreement.

289.     No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

290.     The agreement between Defendants Actavis, Perrigo, Sandoz, and Taro was part

of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise

prices, rig bids, and engage in market and customer allocation for generic drugs, including

Betamethasone Dipropionate Ointment (0.05%), Cream (0.05%), and Lotion (0.05%).

**12.     Betamethasone Dipropionate Augmented**

291.     Betamethasone Dipropionate Augmented is a corticosteroid used to treat a variety

of skin conditions.  It has been available in the United States for over a decade in a generic form.

Betamethasone Dipropionate Augmented is a more potent version of Betamethasone

Dipropionate.  It is available in multiple formulations including Lotion (0.05%).  Due to, among

other things, its clinical efficacy and safety, betamethasone has been designated as an essential

medicine by the World Health Organization.

292.     The market for Betamethasone Dipropionate Augmented is mature.  At all

relevant times, there have been multiple manufacturers of betamethasone dipropionate.

REDACTED – PUBLIC VERSION

293.     Defendants Sandoz and Taro dominate sales of Betamethasone Dipropionate
Augmented Lotion. █████████████████████████████████████

███████████████████████████████████████

294.     ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████



295.     █████████████████████████████████████████████

████████ Because of the ongoing understanding of the Fair Share Agreement between the
companies, they did not worry about their ostensible competitor cutting prices to gain market
share.  They also did not attempt to undercut their ostensible competitor's prices in order to gain

- 79 -

additional market share. For example, a Sandoz spreadsheet from August 2012 detailing the expected response to a Cardinal Request for Proposal (RFP) indicates that Sandoz did not intend to bid on Betamethasone Dipropionate Augmented Lotion because "███████████████." In another example, in April 2013, several months after the dramatic price increases, Publix requested a bid from Sandoz on Betamethasone Dipropionate Augmented due to the Taro price increase. A Senior Sales Executive at Sandoz forwarded the request to several colleagues. C.P. of Sandoz responded, "█████████████████████████████████████"

296.    The ability of Sandoz and Taro to reach agreement regarding Betamethasone Dipropionate Augmented was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

297.    ████████████████████████████████████ ████████

298.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

299.    The agreement between Defendants Sandoz and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Dipropionate Augmented Lotion (0.05%).

**13.   Betamethasone Dipropionate Clotrimazole**

300.    Betamethasone Dipropionate Clotrimazole is a combination medication used to treat inflamed fungal skin infections. This product contains two medications: clotrimazole is an azole antifungal that prevents the growth of fungus and betamethasone is a corticosteroid that works by reducing the swelling, redness, and itching that occurs in a skin infection.

- 80 -

301.    Betamethasone Dipropionate Clotrimazole has been available in the United States for over a decade in a generic form.  It is available in, for example, cream and lotion formulations.  Due to, among other things, their clinical efficacy and safety, the component drugs of Betamethasone Dipropionate Clotrimazole have both been designated as essential medicines by the World Health Organization.

302.    The market for Betamethasone Dipropionate Clotrimazole is mature.  At all relevant times, there have been multiple manufacturers of Betamethasone Dipropionate Clotrimazole.

303.    Defendants Actavis, Sandoz, and Taro dominate sales of Betamethasone Dipropionate Clotrimazole Cream (0.05% ) and Lotion (0.05%).  For much of the relevant time period, ███████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████████████████████████

304.    ████████████████████████████████████████
████████████████████████████████████████████

REDACTED – PUBLIC VERSION



305.    The GAO noted that Betamethasone Dipropionate Clotrimazole had an

"extraordinary price increase" in the years 2011-2012.

REDACTED – PUBLIC VERSION

306.    ███████████████████████████████████████████████

████████████████ Because of the ongoing understanding of the Fair Share Agreement between

the companies, they did not worry about their ostensible competitor cutting prices to gain market

share.  They also did not attempt to undercut their ostensible competitor's prices in order to gain

additional market share.  For example, a Sandoz presentation from June 2014 titled "██████

████████████████████████████████" described Sandoz's market approach with

respect to clotrimazole-betamethasone: "████████████████████████████████

████████████████████."

307.    The ability of Actavis, Sandoz and Taro to reach agreement regarding

Betamethasone Dipropionate Clotrimazole was aided by the prevalence of trade association

meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade

Association Contacts as to the Named Generic Drugs).

308.    The coordinated price increases by Actavis, Sandoz, and Taro are consistent with

the Fair Share Agreement.

309.    No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

310.    The agreement between Defendants Actavis, Sandoz, and Taro was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Betamethasone

Dipropionate Clotrimazole Cream (0.05%) and Lotion (0.05%).

**14.    Betamethasone Valerate**

311.    Betamethasone Valerate is a corticosteroid used to treat a variety of skin

conditions.  It has been available in the United States for decades in a generic form.  It is

available in. for example, Ointment and Cream formulations.  Due to, among other things, its

REDACTED – PUBLIC VERSION

clinical efficacy and safety, betamethasone has been designated as an essential medicine by the World Health Organization.

312.     The market for Betamethasone Valerate is mature.  At all relevant times, there have been multiple manufacturers of Betamethasone Valerate.

313.     Defendants Actavis, Sandoz, and Taro dominate sales of Betamethasone Valerate Ointment (0.1%) and Cream (0.1%).  For much of the relevant time period, Actavis, Sandoz, and Taro had roughly equal shares of the market for Betamethasone Valerate Cream.  Defendants Actavis and Sandoz dominate sales of Betamethasone Valerate Ointment.

314.



REDACTED – PUBLIC VERSION



315.     The GAO noted that Betamethasone Valerate had "extraordinary price increases" in the years 2011-2012 and 2012-2013.

316.     Documentary evidence confirms that these parallel price increases were the result of collusion among Actavis, Sandoz, and Taro.

317.     By late 2010, Actavis had increased its prices on Betamethasone Valerate Cream and Ointment, knowing that its competitors would mirror the increase.  On December 10, 2010, W.K. of Sandoz wrote to a colleague, "████████████████████████████████████ ████████████████████," including Betamethasone Valerate Cream and Ointment. "████████████████████." ████████████████████████████████████ ████████████████████████████████████████

318.     ████████████████████████████████████

████████ Because of the ongoing understanding of the Fair Share Agreement between the

REDACTED -- PUBLIC VERSION

companies, they did not worry about their ostensible competitor cutting prices to gain market share. They also did not attempt to undercut their ostensible competitor's prices in order to gain additional market share. For example, in February 2013, Armando Kellum of Sandoz wrote to C.P., also of Sandoz: "███████████████████████████████████████████ ███████████████████████████████████████████." The email chain indicated that their market share goal was ████.

319.    The ability of Actavis, Sandoz and Taro to reach agreement regarding Betamethasone Valerate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

320.    ████████████████████████████████████████████ ██████████████████████

321.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

322.    The agreement between Defendants Actavis, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Betamethasone Valerate Cream (0.1%) and Ointment (0.1%).

**15.    Bethanechol Chloride**

323.    Bethanechol Chloride is a medication used to treat bladder problems. It has been available in the United States in a generic form for many years.

324.    The market for Bethanechol Chloride is mature. At all relevant times, there have been multiple manufacturers of Bethanechol Chloride.

REDACTED – PUBLIC VERSION

325.     During the relevant time frame, Defendants Amneal, Teva, and Upsher-Smith were the primary manufacturers of Bethanechol Chloride Tablets.

326.     Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Bethanechol Chloride beginning at least as early as the fall of 2014.

327.     In the fall of 2014, Amneal, Teva, and Upsher-Smith ███████████████████. Amneal announced a list (WAC) price increase in early November, and Teva followed the list price increase.  Teva's price increase spreadsheet identified the reason for the increase as "Follow Competitor – Amneal." Prior to Teva's increase, Teva's Patel had a 51 minute phone call with an executive at Amneal.

328.     During this period, Amneal, Teva, and Upsher-Smith also met at trade conferences and communicated directly in furtherance of their agreement on Bethanechol Chloride and the Fair Share agreement.

329.     ███████████████████████████████████████████
████████████████████████

330.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

331.     The agreement between Defendants Amneal, Teva, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Bethanechol Chloride Tablets.

**16.     Bromocriptine Mesylate**

332.     Bromocriptine Mesylate is a dopamine promoter used to treat menstrual problems, growth hormone overproduction, Parkinson's disease, and pituitary tumors.  It is

available in, for example, a tablet formulation.  It has been available in the United States for over a decade in a generic form.

333.     The market for Bromocriptine Mesylate is mature.  At all relevant times, there have been multiple manufacturers of bromocriptine mesylate.

334.     Defendants Mylan, Perrigo, and Sandoz dominate sales of Bromocriptine Mesylate Tablets (2.5 mg). ███████████████████████████████████████████████████ ███████████████████████████████████████████

335.     ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████

REDACTED -- PUBLIC VERSION



336. ████████████████████████████████████████████
██████

337.    Under the Fair Share Agreement, Mylan, Perrigo, and Sandoz did not attempt to undercut competitors' prices in order to gain additional market share.  By way of example, an internal Sandoz planning document from June 2013 indicates that Sandoz did not want more share on Bromocriptine Mesylate because they "████████████" and thought that they had a "████████." Another internal Sandoz planning document from October 2014 indicated that Sandoz and Perrigo had "████████████" on Bromocriptine Mesylate Tablets.

338.    The ability of Mylan, Perrigo, and Sandoz to reach agreement regarding Bromocriptine Mesylate was aided by the prevalence of trade association meetings and

REDACTED – PUBLIC VERSION

conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

339. ███████████████████████████████████████████████
███████████████████████

340. No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

341. The agreement between Defendants Mylan, Perrigo, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Bromocriptine Mesylate Tablets (2.5 mg).

### 17. Budesonide

342. Budesonide is a steroid. It is available in Inhalation and Capsule formulations.

343. It has been available in the United States in a generic form for many years.

344. The market for Budesonide is mature. At all relevant times, there have been multiple manufacturers of Budesonide.

345. During the relevant time frame, Defendants Actavis, Mylan, Par, Sandoz, and Teva were the primary manufacturers of Budesonide.

346. As of February 2013, Teva was the only company in the market for generic Budesonide Inhalation. Teva knew, however, that there was a good chance that Actavis would soon be entering the market, followed by others. In anticipation of needing to cede market share to the new entrants, Teva pre-emptively decided to raise prices, so that when it eventually ceded share it would not lose as much dollar revenue.

347. Teva raised the list price for its Budesonide Inhalation.

REDACTED – PUBLIC VERSION

348.    On April 1, 2013, Actavis won a legal challenge that would enable it to enter the market. That day, Teva's Rekenthaler called A.B., his counterpart at Actavis – a senior sales and marketing executive – and they spoke for two (2) minutes.

349.    The next day, April 2, 2013, Rekenthaler spoke to A.B of Actavis two more times. Actavis then immediately began shipping the product. Instead of offering better prices to win over customers, Actavis entered the market with the same list (WAC) price as Teva.

350.    At some point thereafter, further legal action from the brand manufacturer delayed Actavis (or any other manufacturer) from fully entering the market until February 2015. As Actavis was (again) preparing to ramp up sales of Budesonide, Teva's Rekenthaler and Falkin of Actavis were communicating by phone to coordinate Actavis's entry into the market and the ceding of market share to Actavis by Teva.

351.    A few months later, Sandoz was the next to enter the market. The same pattern held. Rather than compete for customers with better prices, Sandoz announced identical WAC prices to those of Teva and Actavis. Owing to their Fair Share agreement, Sandoz was able to gain market share as Teva ceded customers to it.

352.    Teva was preparing to enter the market for Budesonide Capsules in the spring of 2014. At the time, Par and Mylan were the only other manufacturers in the market.

353.    Just as Teva had done in anticipation of Actavis's entry into the Budesonide Inhalation, shortly before Teva entered with Budesonide Capsules, Par increased the price of the drug.

354.    As Teva was preparing to enter the market, and as Par was raising prices, all three manufacturers were communicating with each other by phone. Teva's Rekenthaler was in touch

REDACTED – PUBLIC VERSION

with a senior national account executive at Par and with Nesta at Mylan. Meanwhile, another account executive at Par was in touch with a counterpart at Mylan.

355.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

356.    The ability of Actavis, Mylan, Par, Sandoz, and Teva to reach agreements on Budesonide was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

357.    The coordination by Actavis, Mylan, Par, Sandoz, and Teva is consistent with the Fair Share Agreement.

358.    The agreement between Defendants Actavis, Mylan, Par, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Budesonide Inhalation and Capsules.

### 18.    Buspirone HCL

359.    Buspirone HCL, also known by the brand name Buspar, among others, is a medication used to treat anxiety disorders or to relieve the symptoms of anxiety.  It has been available in the United States in a generic form for many years.

360.    The market for Buspirone HCL is mature.  At all relevant times, there have been multiple manufacturers of Buspirone HCL.

361.    During the relevant time frame, Defendants Teva, Mylan and Actavis (Watson) were the primary manufacturers of Buspirone HCL Tablets.

REDACTED – PUBLIC VERSION

362.     Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Buspirone HCL beginning at least as early as the summer of 2012.

363.     ███████████████████████████████████████ Before this price increase, Teva coordinated with its competitors.  In the weeks leading up to the price increase, Teva's Green spoke to Nesta of Mylan on July 23, 24, 25, 26, 30, and 31, 2012.  In addition, Teva's Rekenthaler spoke to A.S., VP of Sales at Actavis (Watson), twice on July 11, 2012.

364.     The ability of Teva, Mylan and Actavis (Watson) to reach agreements on Buspirone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

365.     ███████████████████████████████████████████
████████████████████

366.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

367.     The agreement between Defendants Teva, Mylan and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Buspirone HCL Tablets.

**19.     Butorphanol Tartrate**

368.     Butorphanol Tartrate is a narcotic pain reliever used to treat moderate to severe pain.  It is available in a Nasal Spray formulation.  It has been available in the United States for decades in a generic form.

REDACTED – PUBLIC VERSION

369.    The market for Butorphanol Tartrate is mature.  At all relevant times, there have been multiple manufacturers of Butorphanol Tartrate.

370.    Defendants Apotex, Mylan, and West-Ward dominate sales of Butorphanol Tartrate.  During much of the relevant time period, Mylan and West-Ward divided the market in roughly a 40/60 split.  Apotex briefly left the market around the time of the price increase, but when it reentered the market, it regained about 20% market share, leading to a 20/20/60 split between Apotex, Mylan, and West-Ward, respectively.

371.

REDACTED -- PUBLIC VERSION



372.    The GAO noted that the Butorphanol Tartrate had an "extraordinary price increase" in the years 2014-2015.

373.    █████████████████████████████████████████████████
████████████████

374.    The ability of Apotex, Mylan, and West-Ward to reach agreements regarding Butorphanol Tartrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

375.    █████████████████████████████████████████████████
███████████████████████

REDACTED – PUBLIC VERSION

376.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

377.     The agreement between Defendants Apotex, Mylan, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Butorphanol Tartrate Nasal Spray.

**20.   Capecitabine**

378.     Capecitabine, also known by the brand name Xeloda, is a chemotherapy medication used to treat multiple types of cancer, including breast and colon cancer.  It has been available in the United States in a generic form for years.

379.     The market for Capecitabine is mature.  At all relevant times, there have been multiple manufacturers of Capecitabine.

380.     During the relevant time frame, Teva and Mylan were the primary manufacturers of Capecitabine Tablets.

381.     Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Capecitabine beginning at least as early as the winter of 2013-2014.

382.     As early as the winter of 2013-2014, Teva and Mylan shared commercially sensitive information about their preparations to launch Capecitabine, which was just opening up to generic competition.  For example, Teva and Mylan shared customer-specific sales information, which they provided to one another in order to allocate the Capecitabine market between them.

REDACTED – PUBLIC VERSION

383.     By late February, Mylan had informed Teva that its launch would be delayed. Teva proceeded with its launch and became the exclusive generic Capecitabine manufacturer in early March 2014.

384.     Leading up to Mylan's launch in August 2014, Mylan and Teva communicated by phone on multiple occasions about the drug and Fair Share allocation of the market. For example, Teva's Rekenthaler and Mylan's Nesta discussed three large customers and a targeted market share of 35% for Mylan. Mylan ultimately sought business from each of the three customers that Rekenthaler and Nesta had spoken about, and Teva conceded each of them, pursuant to an agreement the two had reached around the time of Mylan's launch.

385.     The ability of Teva and Mylan to reach agreements on Capecitabine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

386.     The coordination by Teva and Mylan is consistent with the Fair Share Agreement.

387.     The agreement between Teva and Mylan as to these three customers was part of broader market allocation scheme for Capecitabine, as further demonstrated by Teva's concession other smaller customers to Mylan as well. This agreement was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Capecitabine Tablets.

**21.     Captopril**

388.     Captopril is an angiotensin converting enzyme (ACE) inhibitor prescribed for treating high blood pressure, heart failure, and for preventing kidney failure due to high blood pressure and diabetes. It is available in Tablet and Oral Liquid formulations. It has been available in the United States for decades in a generic form.

389.     The market for Captopril is mature.  At all relevant times, there have been multiple manufacturers of Captopril.

390.     Defendants Mylan, West-Ward and Wockhardt dominate sales of Captopril Tablets (12.5, 25, 50, and 100 mg).  During much of the relevant time period, Wockhardt had approximately 85% of the market and Mylan had approximately 15%.  West-Ward re-entered the market after the price increase and had a small share.

391.



REDACTED -- PUBLIC VERSION

392.     The GAO noted Captopril Tablets had "extraordinary price increases" in the years 2013-2015.

393.     ███████████████████████████████████████████████████████

394.     The ability of Mylan, West-Ward, and Wockhardt to reach agreements regarding Captopril was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

395.     ███████████████████████████████████████████████████
███████████████████████████████

396.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

397.     The agreement between Defendants Mylan, West-Ward, and Wockhardt was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Captopril Tablets (12.5 mg, 25 mg, 50 mg, and 100 mg).

**22.     Carbamazepine, Clotrimazole, and Warfarin Sodium**

398.     Carbamazepine, which is known by other names such as Epitol, is an anticonvulsant medication used to treat seizure disorders and neuropathic pain that has been available in the United States for decades.  The World Health Organization includes it on its List of Essential Medicines.  In the United States, where it is sold in Capsules and Tablets in various forms such as ER and chewable.  It ranks within the top 200 most prescribed medications.

399.     The market for Carbamazepine is mature.  At all relevant times, there have been multiple manufacturers of Carbamazepine. ██████████████████████████
███████████████████████████████████████████████████████████

REDACTED – PUBLIC VERSION

400.



REDACTED – PUBLIC VERSION



401.     The GAO noted that Carbamazepine had "extraordinary price increase[s]" in the years 2014-2015.

402.     Defendants coordinated their increases and raised their list (WAC) prices in lockstep, beginning on June 3, 2014, when Taro drastically raised its WAC prices on several drugs, including Carbamazepine (increasing the price of 200 mg tablets a whopping 2,328%). Teva and Apotex soon matched:

REDACTED – PUBLIC VERSION





403.    Similarly, in May 2013, Taro and Sandoz almost simultaneously began to increase their Carbamazepine Tablets ER prices by announcing identical list (WAC) prices.  In

REDACTED – PUBLIC VERSION

the spring and summer of 2014, Taro instituted more price increases on Carbamazepine Tablets
ER that Sandoz quickly followed.

404.    Documentary evidence confirms that these parallel price increases were the result
of collusion among Apotex, Sandoz, Taro, Teva, and Torrent. Notably, Teva's Nisha Patel knew
of these (and other) Taro increases well in advance, and had prepared so that Teva could quickly
match the price increases.

405.    Patel likely obtained this information from Taro's Ara Aprahamian on May 14,
2014, when the two exchanged eight text messages and spoke for more than four minutes by
phone. It was understood in advance that Teva would match the Taro price increases based on
these and earlier conversations. In fact, Teva agreed and made plans to match them before Taro
had even put them into effect.

406.    After speaking with Aprahamian, Patel directed a colleague to create a list of
future price increase candidates, based on a set of instructions and data she had given him. On
May 28, 2014, that colleague sent her a list titled "2014 Future Price Increase Candidate
Analysis." The list included several drugs sold by Taro with the notation "Follow/Urgent" listed
as the reason for the increase. That list included two drugs, Carbamazepine and Clotrimazole,
even though Taro had not yet increased its price on those drugs or notified its customers that it
would be doing so:

| Item Description | BUCKET |
|---|---|
| CARBAMAZEPINE TABLETS 200 MG 100 | Follow/Urgent |
| CARBAMAZEPINE TABLETS 200 MG 1000 | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1%  10 ML | Follow/Urgent |
| CLOTRIMAZOLE TOPICAL SOLUTION 1% 30 ML | Follow/Urgent |

407.    On June 3, 2014 – the date of the Taro price increases on Carbamazepine and
other drugs –Patel and Aprahamian exchanged five text messages. After texting Aprahamian,
Patel confirmed to Teva's Kevin Green and another Teva representative that Taro had in fact

raised its pricing on one of the drugs, Fluocinonide, and then added: "I expect to provide guidance at some point in the morning" on "Carbamazepine as well.  I'll be looking at shares and intel tomorrow and will provide commentary.  (Taro is a high-quality competitor.  It's just a matter of who the others are.)."  At 5:08pm that evening, Patel called Aprahamian and the two spoke for nearly seven minutes.

408.    First thing the next morning, Patel and Aprahamian exchanged two text messages. Then, at 9:56 am, the two spoke again for almost twenty-six minutes.  Shortly after hanging up the phone with Aprahamian, Patel sent an email to Teva's K.G. making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put into writing, stating: "I have additional intel (I can discuss with you) that will be useful."

409.    That same day, Teva received a bid request from a large customer, Walmart. Shortly after it was forwarded to her, Patel responded by making it clear that Teva would play nice in the sandbox with Taro and would not bid on any of the Walmart business.

410.    On June 12, 2014, Teva internally discussed future projections regarding carbamazepine – including the fact that its API supplier might run out of supply sometime in 2015.  One of the options discussed was a price increase.  K.G., a senior marketing executive at Teva – aware that Patel had been in discussions with Aprahamian and had "intel" regarding the Taro price increase on carbamazepine (and other drugs) – stated: "Nisha [Patel] would be able to provide guidance relative to [the carbamazepine] price increase for the analysis being put together."  In fact, Patel had communicated with Aprahamian earlier that day on the phone for more than nine minutes,

411.    On June 13, 2014, Patel sent an internal email alerting her group, including K.G., about a list of drugs on which Teva planned to raise prices.  A number of them -- including

REDACTED – PUBLIC VERSION

Carbamazepine — included the notation "Follow/Urgent - Taro" as the reason for the increase. The next day Patel and Aprahamian exchanged two text messages. Then, at 9:56 am, the two spoke again for almost twenty-six minutes. Shortly after hanging up the phone with Aprahamian, Patel sent an email to K.G., making it clear that she had obtained additional "intel" regarding the Taro price increases that she did not want to put in writing, stating: "I have additional intel (I can discuss with you) that will be useful."

412.     For that list of drugs, Patel directed that "we should not provide any decreases on these products." Patel's directive meant that Teva would not seek to compete for market share against Taro (or other Defendants) when approached by customers due to the competitors' price increases.

413.     On June 18, 2014, Patel emailed the entire sales team at Teva to inform them of the status of Teva's next price increase. She noted that Teva had already been "receiving multiple requests on several items that are prioritized as increase candidates." Patel continued: "While we do not have an exact date of increase, we are taking our increase plans into consideration and are bidding on new business at the planned increase price where our WAC allows." Finally, Patel stated:

> This is all in consideration of market factors, quality of competitors, current market share (including McK RFP results) and intelligence we have been able to gather. As you know, each situation is unique, but this should provide a high level overview.

414.     Some of the "intelligence" referred to by Patel was gathered during a phone conversation she had with Aprahamian of Taro the day before, on June 17, 2014, which lasted more than fifteen minutes.

REDACTED – PUBLIC VERSION

415.     The next day, Patel continued to gather "intelligence" and made concerted efforts to simultaneously coordinate with Aprahamian, including a thirteen- minute phone call on June 19, 2014.

416.     Teva again demonstrated that it would play nice with Taro, when it chose to forego an opportunity to compete on an RFP from McKesson.  In an internal email, Patel wrote to her colleague, K.G.: "For Carbamazepine and Clotrimazole, I would suggest bidding on a smaller customer when there is an opportunity.  Taking the volume would put [us] at a disproportionately high market share.  I think Taro will pursue elsewhere and would be concerned about an increase sticking."  Patel's recommendation was based on a market share analysis, which computed that additional market share that Teva would accrue if it competed for Taro's largest customer:

| Product Family | Teva current market share | Teva current market share w/ McK award | McKesson market share% | Walmart | Walmart market share% | Kaiser | Kaiser market share% | Possible market share w/ all awards |
|---|---|---|---|---|---|---|---|---|
| CARBAMAZEPINE TABLETS | 41.5% | 71.3% | 29.8% | | | | | 71.3% |
| CLOTRI MAZOLE TOPICAL SOLUTION | 46.0% | 71.8% | 25.8% | | | | | 71.8% |
| FLUOCINONIDE OINTMENT | 50.5% | 61.4% | 10.9% | 75,600 | 6.8% | | | 68.2% |
| WARFARIN SODIUM TABLETS | 20.9% | 28.4% | 7.5% | | | 348,495 | 2.4% | 30.8% |

417.     On August 28, 2014, Teva matched the Taro price increases on Carbamazepine, and numerous other drugs.  Teva coordinated its increases with Taro (and other Defendants) through direct communications with its purported competitors in the days leading up to the increase.  At 8:27 am on August 27, 2014, the day before the increase became effective, Patel had a two-minute call with Aprahamian as well as other calls during the course of the day with her contacts at Sandoz, Actavis, Taro, Zydus and Glenmark to discuss the price increases:

| Date | Call | Target Name | Direction | Contact Name | Time | Duration |
|------|------|-------------|-----------|--------------|------|----------|
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 7:11:03 | 0:11:13 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:19 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:02:42 | 0:00:03 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Aprahamian, Ara (Taro) | 8:27:27 | 0:02:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | CW-1 (Sandoz) | 8:31:03 | 0:00:33 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 8:32:42 | 0:20:31 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:01 | 0:00:00 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Rogerson, Rick (Actavis) | 8:41:06 | 0:00:25 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Rogerson, Rick (Actavis) | 8:58:01 | 0:16:23 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Green, Kevin (Zydus) | 9:23:26 | 0:18:34 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Brown, Jim (Glenmark) | 10:34:34 | 0:00:06 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Incoming | Brown, Jim (Glenmark) | 16:29:08 | 0:07:52 |
| 8/27/2014 | Voice | Patel, Nisha (Teva) | Outgoing | Green, Kevin (Zydus) | 17:09:15 | 0:00:06 |

418.     Meanwhile Patel coordinated with Apotex to raise prices on a large number of drugs, in which Carbamazepine 200 mg Tablets are believed to be included.  Previously, in May 2013, Teva ranked Apotex as one of the competitors that was least likely to coordinate on prices (*i.e.*, competitor "quality") with a ranking of -3.  When Patel updated her Quality Competitor rankings in May 2014, however, Apotex was rated +2 – an increase in five points over that twelve-month period.  Apotex made this jump in Teva's quality competitor rankings in large part due to Patel's relationship with B.H., a senior sales executive at Apotex, and the successful coordination between Apotex and Teva in 2013 on various drugs.

419.     For example, from May 20-24, 2013, Patel had the following series of phone calls with B.H. during which Apotex agreed to raise drug prices:

- 5/20/2013 Voice Patel, Nisha Patel (Teva) Incoming B.H. (Apotex) 0:21:56

- 5/21/2013 Voice Patel, Nisha Patel (Teva) Incoming B.H. (Apotex) 0:11:28

- 5/23/2013 Voice Patel, Nisha Patel (Teva) Incoming B.H. (Apotex): 0:06:13

- 5/24/2013 Voice Patel, Nisha Patel (Teva) Incoming B.H. (Apotex) 0:00:39

- 5/24/2013 Voice Patel, Nisha Patel (Teva) Outgoing B.H. (Apotex) 0:12:07

These were the first documented phone calls between Patel and B.H. since Patel had joined Teva.

- 107 -

REDACTED – PUBLIC VERSION

420.    Apotex matched its price on Carbamazepine on July 11, 2013.  In the weeks leading up to the Teva price increases, Patel spoke to B.H. at Apotex three times to coordinate, including one call on August 1, 2013, between Patel and B.H. that lasted over 14 minutes.  On information and belief, Defendant Apotex destroyed additional communications with Teva and Taro when it destroyed B.H.'s entire custodial file after the States requested it through an investigatory subpoena in July 2017—without informing the States for a year.

421.    Along with the phone communications, representatives from Teva and every other Defendant met in Boston, Massachusetts shortly before the increase, from August 23-26, 2014, for the NACDS annual event, which was the largest pharmaceutical industry meeting of the year. Teva executives Cavanaugh, Rekenthaler and Patel, along with many other Teva executives, as well as executives from every other corporate Defendant, attended, providing further opportunities to discuss their overarching conspiracy.

422.    Teva and Taro's coordination over the price of Carbamazepine occurred at the same time these Defendants conspired to raise the prices of Warfarin Sodium and Clotrimazole.

423.    For example, the 2014 Future Price Increase Candidate Analysis spreadsheet that Teva internally circulated on May 28, 2014, included Clotrimazole in the bucket marked "FOLLOW/URGENT."  After exchanging five texts with Taro's Aprahamian, on June 3, 2014— when Taro increased its price on Carbamazepine, Clotrimazole, Warfarin, and other drugs– Teva's Patel and Taro's Aprahamian exchanged five text messages.  Patel internally communicated with other Teva executives that she expected to get more information the next day and to be able to provide guidance on Warfarin pricing along with other drugs.  At 5:08 pm that evening, Patel called Aprahamian and the two spoke for nearly seven minutes.  And on June 13, 2014, when Zydus increased its price for Warfarin, Patel observed that its competitors' price

REDACTED – PUBLIC VERSION

increases would "likely increase the demand on [the] Teva product." That same day Teva was presented with an offer from a customer for a one-time buy on that drug. Despite the clear opportunity to increase market share, Patel responded: "We will review, but note that we intend to follow Taro and Zydus [to] increase price." And on August 27, 2014, the day before Teva's price increases too effect, Patel spent much of her day discussing the price increases with her contacts at Taro, Zydus and other Defendants, including a 20-minute call with Zydus at 8:32 am, a 16-minute call with Zydus at 8:58 am and a two-minute call with Aprahamian.

424.    Clotrimazole is an antifungal medication. The GAO reported that Clotrimazole had an "extraordinary price increase." Defendants Taro and Teva have long dominated the market for that drug. After years of stability, the prices began to increase drastically, ▮▮▮▮▮ ▮▮▮▮▮▮▮:



425.    As they did with Carbamazepine, Defendants coordinated their price increases by raising WACs in lockstep:

REDACTED – PUBLIC VERSION



426.    The World Health Organization includes Warfarin Sodium on its list of essential medications. Warfarin has been on the market in the United States for half a century and is used to treat blood clots such as deep vein thrombosis and pulmonary embolism and to prevent stroke in people who have atrial fibrillation, valvular heart disease or artificial heart valves. At all relevant times, Defendants Amneal, Teva, Taro, and Zydus have dominated the Warfarin Sodium Tablet market.

427.    Previously, in May 2013, Zydus had been one of Teva's lowest-ranked competitors, but the following year Patel updated her quality competitor and increased Zydus's rank five points to +2. This change is directly related to Kevin Green, who had himself conspired with a number of competitors while at Teva, and moved from Teva to Zydus in November 2013. With Green firmly installed at Zydus, Patel was emboldened to more fully include Zydus in the conspiracy. Warfarin Sodium is just one of their price fixing conspiracies.

428.    Amneal is another example of a Defendant, who moved up the ranks on Teva's list of "quality competitors," *i.e.*, those most likely to coordinate prices. It was ranked +1 in May

REDACTED – PUBLIC VERSION

2013 and improved to a ranking of +2 the following year.  Amneal's dubious distinction of ranking high on Teva's collusion list was partly the result of David Rekenthaler of Teva's strong relationship with S.R.(2), a senior sales executive at Amneal.  From May 2013 to May 2014, they spoke eight times by phone, and attended many trade association meetings and customer conferences together as well.  Rekenthaler and S.R.(2) were regular participants in an annual golf outing hosted by a packaging contractor in Kentucky, where – as discussed above – the generic drug manufacturer participants (competitors) played golf by day and gathered socially by night, referring to each other as "friends" and "fraternity brothers."  Teva's Patel also had a strong relationship with S.R.(2) as well as S.R.(1), a senior sales and finance executive at Amneal, with whom Patel coordinated the price increases of several drugs.

429.    As a result of their collusion, after years of stable prices, Defendants Amneal and Zydus joined Teva and Tara and significantly increased Warfarin Sodium prices during ██, as illustrated in the following graph depicting 1 mg prices:

REDACTED – PUBLIC VERSION



430.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

431.   The agreement between these Defendants was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carbamazepine, Clotrimazole, and Warfarin Sodium.

REDACTED – PUBLIC VERSION

23. **Carisoprodol**

432.    Carisoprodol is a muscle relaxant and pain reliever.  It is available in Tablet form, including a 350 mg strength and has been available in the United States for many years in a generic form.

433.    The market for Carisoprodol is mature.  At all relevant times, there have been multiple manufacturers.

434.    Defendants Par and Teva dominate sales of Carisoprodol Tablets with each accounting for roughly 55% and 35% of the market, respectively in the relevant times.

435.    



436.    The GAO noted that Carisoprodol had "extraordinary price increases" in the years 2013-2014.

REDACTED – PUBLIC VERSION

437.     The ability of Par and Teva to reach agreements on Carisoprodol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

438.     The parallel price increases by Par and Teva are consistent with the Fair Share Agreement.

439.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

440.     The agreement between Defendants Par and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Carisoprodol Tablets (350 mg).

**24.     Cefdinir and Cefprozil**

441.     Cefdinir and Cefprozil are medications used to treat bacterial infections.  Cefdinir is available in Capsule and Oral Suspension formulations.  Cefprozil is available in Tablet formulation.

442.     They have been available in the United States in a generic form for many years.

443.     The market for Cefdinir and Cefprozil is mature.  At all relevant times, there have been multiple manufacturers of Cefdinir and Cefprozil.

444.     During the relevant time frame, Defendants Lupin, Sandoz, and Teva were the primary manufacturers of Cefdinir and Cefprozil.

445.     Not long after Patel started at Teva, she sent her first list of proposed price increases to her supervisor on May 24, 2013.  The list included Cefdinir and Cefprozil.

REDACTED – PUBLIC VERSION

446.    Patel communicated with competitors to coordinate the proposed price increases. For example, Patel spoke to Berthold of Lupin six (6) times on May 16, two (2) times on May 17, once on May 20, once on May 21, and three (3) times on May 23, 2013.

447.    By summer, Teva and Lupin had raised prices on Cefdinir and Cefprozil, as agreed. Patel and Rekenthaler at Teva also communicated with contacts at Sandoz, which joined the price-fixing agreement on Cefdinir and Cefprozil.

448.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

449.    The ability of Lupin, Sandoz, and Teva to reach agreements on Cefdinir and Cefprozil was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

450.    The coordination by Lupin, Sandoz, and Teva is consistent with the Fair Share Agreement.

451.    The agreement between Defendants Lupin, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cefdinir Capsules and Suspension and Ceprozil Tablets.

**25.    Cefuroxime Axetil**

452.    Cefuroxime Axetil is an antibiotic used to treat bacterial infections.  It is available in Tablet and Oral Suspension formulations.  It has been available in the United States for over a decade in a generic form.

453.    The market for Cefuroxime Axetil is mature.  At all relevant times, there have been multiple manufacturers of Cefuroxime Axetil.

- 115 -

454.    Defendants Aurobindo, Citron, and Lupin dominate sales of Cefuroxime Axetil Tablets (250 and 500 mg).  During much of the relevant period, ████████████████ ████████████████████████████████, with other competitors sharing the remainder.  Mylan ████████████████████████████ ███████████████████.

455.    ██████████████████████████████ ███████████████████████████████████████ ███████████████████████████████



REDACTED – PUBLIC VERSION



456.    The GAO noted that the Cefuroxime Axetil had "extraordinary price increases" in the years 2014-2015.

457.    ███████████████████████████████████

Under the Fair Share Agreement, Aurobindo, Citron, and Lupin did not attempt to undercut competitors' prices in order to gain additional market share.  For example, in April 2014, Aurobindo submitted a bid to OptiSource for Cefuroxime Axetil.  OptiSource responded asking Aurobindo to match a lower price.  In discussing the proposal internally at Aurobindo, Tim Gustafson of Aurobindo wrote to colleagues, "[W]e don't need to be competitive (my opinion)…If we want to hold firm, I can convey that message."  Ultimately, Aurobindo declined to decrease its pricing to the level requested by OptiSource and instead lowered its price slightly to move closer to Lupin's pricing.

458.    The ability of Aurobindo, Citron, and Lupin to reach agreement regarding Cefuroxime Axetil 250 mg and 500 mg Tablets was aided by the prevalence of trade association

REDACTED – PUBLIC VERSION

meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade

Association Contacts as to the Named Generic Drugs).

459. ████████████████████████████████████████████████████████

████████████████████████

460.     No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

461.     The agreement between Defendants Aurobindo, Citron, and Lupin was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Cefuroxime

Axetil Tablets (250 and 500 mg).

**26.    Celecoxib**

462.     Celecoxib is a medication used to treat pain.  It is available in a Capsule

formulation.

463.     It has been available in the United States in a generic form for several years.

464.     The market for Celecoxib is mature.  At all relevant times, there have been

multiple manufacturers of Celecoxib.

465.     During the relevant time frame, Defendants Actavis and Teva were the primary

manufacturers of Celecoxib.

466.     In November 2014, as Actavis and Teva were preparing to launch Celecoxib, they

communicated directly with each other to coordinate Fair Shares.  For example, Actavis's Falkin

communicated by phone with Teva's Rekenthaler on November 17, 18, 25, and with Maureen

Cavanaugh (Senior Vice President of Sales) on November 11 and 14.

467.     The lines of communication remained open the following month as well. In the

days leading up to and following Teva's December 10, 2014 launch of Celecoxib, Teva's Patel

REDACTED – PUBLIC VERSION

and the Senior Vice President of U.S. Sales at Actavis communicated by phone on December 5 and 8.

468.    In addition, Actavis's Falkin communicated by phone with Rekenthaler (December 3, 9, 10, 17, 18), including at least three times on the day of the launch.

469.    The ability of Actavis and Teva to reach agreements on Celecoxib was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

470.    The coordination by Actavis and Teva is consistent with the Fair Share Agreement.

471.    The agreement between Defendants Actavis and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Celecoxib Capsules.

**27.    Cephalexin (Cefalexin)**

472.    Cephalexin (also spelled Cefalexin) is an antibiotic that has been available in the United States for decades.  It is available in Capsule, Tablet, and Suspension formulations.  Due to, among other things, its clinical efficacy and safety, Cephalexin has been designated as an essential medicine by the World Health Organization.

473.    The market for Cephalexin is mature.  At all relevant times, there have been multiple manufacturers of Cephalexin.

474.    Defendants Lupin and Teva dominate sales of Cephalexin Suspension, which comes in two dosage strengths: 125mg/5ml and 250mg/5ml.

475.    ████████████████████████████████████████████████████
████████████████





476.    The GAO noted that Cephalexin had an "extraordinary price increase."

REDACTED – PUBLIC VERSION

477.     Documentary evidence confirms that these parallel price increases were the result of collusion among Lupin and Teva.

478.     The ongoing understanding between Lupin and Teva was institutional, not dependent upon a relationship between specific individuals.  For example, David Berthold of Lupin colluded with numerous individuals at Teva on a variety of drugs.

479.     By mid-2013, Lupin and Teva became aware of the potential for price increases on Cephalexin.  For example, on August 26, 2013, Teva's T.S. sent an internal email to Rekenthaler, Patel, K.G., and J.L. commenting on Cephalexin stating: "Possible price increase product?  Perhaps this is old intel?  Cephalexin Suspensions – Karalex is out of the market. Leaves Teva and Lupin."

480.     By early October 2013, Lupin had decided to raise price on Cephalexin knowing that Teva would match the increase.

481.     On October 14, 2013, Lupin's Berthold called Teva's Rekenthaler.  They spoke for sixteen minutes that day.  During that conversation, Lupin conveyed its intention to raise prices on Cephalexin.

482.     On October 31, 2013, which was the day before Lupin was scheduled to increase its price on Cephalexin, Lupin's Berthold called Teva's T.S.  Berthold called T.S. at 9:18 am that morning and left a message.  T.S. returned the call at 9:57 am and the two spoke for nearly five minutes.  Within minutes of hanging up the phone, T.S. notified others internally at Teva about the substantial Lupin price increase, stating: "I have heard [] Lupin is implementing a price increase today on Cephalexin Oral Suspension (4-6x's current price)."  K.G. responded later that day asking: "Did Lupin increase the Caps as well?"  Rekenthaler answered immediately, with

information he had learned from Lupin's Berthold in mid-October: "Lupin did not increase the caps, only the susp[ension]."

483.    The Lupin price increase on Cephalexin became effective the next day, November 1, 2013.

484.    On November 22, 2013, a large customer requested a bid from Teva on Cephalexin due to the Lupin price increase.  Teva's T.S. forwarded the email from the customer to Rekenthaler, K.G., and others with the suggestion that, because Teva already had the majority share, it should not bid for the business.  K.G. agreed, and simultaneously forwarded the email to Teva's Patel stating: "Nisha, let's add this to our list to discuss."  Patel called Lupin's Berthold the same day and left a message.

485.    In January 2014 Patel sent an initial list of possible Teva price increase candidates and forwarded it to K.G.  Cephalexin was on the list.  By April 2014, Teva raised its prices on Cephalexin to match Lupin's prices.  Patel coordinated the increase consistently with Lupin throughout this period.

486.    ███████████████████████████████████████████████████████
███████████████████████████████

487.    ███████████████████████████████████████████  Because of the ongoing understanding of the Fair Share Agreement between the two companies, they did not worry about their ostensible competitor cutting prices to gain market share.  For example, on March 25, 2015, a Teva employee emailed a customer about Cephalexin in response to a request for lower pricing stating: "I see Lupin and Teva around the same market share.  Not sure why Lupin would be decreasing price."

REDACTED – PUBLIC VERSION

488.    The ability of Lupin and Teva to reach agreement regarding Cephalexin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

489.    ████████████████████████████████████████

████████████████████████████████████████████

490.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

491.    The agreement between Defendants Lupin and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cephalexin Suspension.

## 28.    Chlorpromazine HCL

492.    Chlorpromazine HCL is an antipsychotic used to treat mood disorders such as schizophrenia or bipolar disorder.  It is available in Tablet, Injection, and Oral Liquid formulations.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Chlorpromazine HCL has been designated as an essential medicine by the World Health Organization.

493.    The market for Chlorpromazine HCL is mature.  At all relevant times, there have been multiple manufacturers of Chlorpromazine HCL.

494.    Defendants Sandoz and Upsher-Smith dominate sales of Chlorpromazine HCL Tablets.  During much of the relevant time period, Sandoz and Upsher-Smith divided the market in a roughly 50/50 split.

495.    ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



496.    The GAO noted that the Chlorpromazine HCL had "extraordinary price increases" in the years 2011-2012.[29]

497.    ████████████████████████████████████████████

Under the Fair Share Agreement, the defendants expected that their ostensible competitor would not undercut their prices in order to gain additional market share. When their ostensible competitor did seek additional market share, defendants showed surprise and dismay that one would not expect in a competitive market. For instance, in May 2015, B.P. of Upsher-Smith complained to B.L. and C.O. of Upsher-Smith that Sandoz challenged them at Armada for Chlorpromazine HCL. B.P. said, "I can't believe they have chosen to compete against us since we had this business. How does this help us? We play fair and they don't?"

---

[29] The chlorpromazine hydrochloride 100 mg and 200 mg tablets also experienced "extraordinary price increases" in the years 2014-2015, according to the GAO.

REDACTED – PUBLIC VERSION

498.    The ability of Sandoz and Upsher-Smith to reach agreement regarding Chlorpromazine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

499.    ███████████████████████████████████████████████████████████
████████████████████

500.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

501.    The agreement between Defendants Sandoz and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Chlorpromazine HCL Tablets (10, 25, 50, 100, 200 mg).

**29.    Cholestyramine**

502.    Cholestyramine is a commonly prescribed medication to reduce cholesterol levels in the blood. It has been on the market for decades and is available in several forms, including Powder (4 gm) and Oral Solids (4 gm).

503.    The market for Cholestyramine is mature. At all relevant times, there have been multiple manufacturers. Defendants Par, Sandoz, and Upsher-Smith dominated sales of Cholestyramine in the relevant period.

504.    For many years the price of Cholestyramine remained stable. However, prices began to rise dramatically ██████████████, some months after Upsher-Smith entered the market, as illustrated below:

REDACTED – PUBLIC VERSION



REDACTED – PUBLIC VERSION

505.     WAC pricing also rose in a coordinated fashion.  Upsher-Smith raised prices on June 7, 2013, roughly doubling its prior WAC prices, a decision it would not have made unless it had pre-existing knowledge that the others would quickly match, as they did.  Sandoz matched Upsher-Smith's WAC prices on July 26, 2013, which also resulted in significant increases, including a 130% increase over its prior WAC price for 4gm Powder.  On August 27, 2013, Par also matched Defendants' pricing, causing as much as a fourfold increase in its prior WAC prices.

506.     ███████████████████████████████████████████████████████████
███

507.     Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares.  Par and Sandoz roughly split the market with Upsher-Smith having a small but steady market share after its entry.

508.     Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Sandoz, and Upsher-Smith.  Defendant Teva identified both Par and Sandoz in this timeframe as "quality" competitors, *i.e.*, competitors willing to coordinate price increases under the Fair Share Agreement.  Defendants' coordination included raising Cholestyramine prices.

509.     The ability of Par, Sandoz, and Upsher-Smith to reach agreement regarding Cholestyramine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

510.     ███████████████████████████████████████████████████████████
██████████████████████████

REDACTED – PUBLIC VERSION

511.     The agreement between Defendants Par, Sandoz, and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including 4gm Cholestyramine Powder (4 gm) and Oral Solids (4 gm).

**30.     Ciclopirox**

512.     Ciclopirox is a commonly prescribed antifungal medication that has been on the market for decades and is available in several forms, including a Dermatological Liquid (8%).

513.     The market for Ciclopirox is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Akorn, G&W, and Perrigo dominated sales of Ciclopirox in the relevant period.

514.     For many years the price of Ciclopirox remained stable.  However, prices began to rise dramatically ███████████████, as illustrated below:

REDACTED – PUBLIC VERSION



515.    Defendants' WAC pricing also rose in a coordinated fashion.  G&W and Akorn announced new pricing on May 9, 2013 and May 10, 2013 respectively, which doubled and tripled their prior WAC prices for Ciclopirox.  Perrigo also substantially increased its WAC price on August 1, 2013.

516.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

517.    Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares.  G&W and Akorn roughly split the market with Perrigo having a small but steady market share.

518.    The GAO found that Ciclopirox had "extraordinary price increases" in 2013-2014.

- 131 -

519.     The ability of Akorn, G&W, and Perrigo to reach agreement regarding Ciclopirox was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

520.     ███████████████████████████████████████████████████████
████████████████████

521.     The agreement between Defendants Akorn, G&W, and Perrigo was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ciclopirox Dermatological Liquid (8%).

**31.    Cimetidine**

522.     Cimetidine is a medication used to ulcers.  It is available in a Tablet formulation.

523.     It has been available in the United States in a generic form for many years.

524.     The market for Cimetidine is mature.  At all relevant times, there have been multiple manufacturers of Cimetidine.

525.     During the relevant time frame, Defendants Mylan and Teva were the primary manufacturers of Cimetidine.

526.     Beginning in the summer of 2012, Teva and Mylan began steady and coordinated price increases for Cimetidine.

REDACTED – PUBLIC VERSION



527.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

528.     Throughout this period, Teva and Mylan met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Cimetidine tablets and of their Fair Share agreement.

529.     For example, in order to coordinate the pricing of their products, including Cimetidine tablets, Teva's Green spoke to Nesta at Mylan on May 7, 2013 three times. Green and Nesta also spoke a number of times over the next several days, including on May 8, May 9, and May 10, 2013. On May 17, 2013, Green spoke to Nesta six (6) times.

530.     Meanwhile, Teva's Patel—who was receiving regular updates from Green—expressed the expectation that Mylan would soon be raising prices on Cimetidine and was preparing Teva to do the same. And both manufacturers did raise prices.

531.     As Mylan and Teva imposed price increases for Cimetidine, they were careful to maintain Fair Share and not to disrupt pricing or steal customers. To that end, Teva and Mylan continued to communicate throughout this period. For example, on May 9, 2014, Teva's Rekenthaler and Nesta at Mylan spoke for nearly eight (8) minutes. Rekenthaler and Nesta spoke again on May 20 and May 27, 2014. The two spoke several more times that summer, including at least on August 4, 7, 11, 18, and 21, 2014 in order to coordinate the prices of Cimetidine and other drugs.

532.     The coordination by Mylan and Teva is consistent with the Fair Share Agreement.

533.     The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Cimetidine Tablets.

**32.     Clarithromycin**

534.     Clarithromycin is an antibiotic used to treat bacterial infections affecting the skin and respiratory system.  It is available in, for example, Tablet ER and Suspension formulations. It has been available in the United States for over a decade in a generic form.  Due to, among other things, its clinical efficacy and safety, Clarithromycin has been designated as an essential medicine by the World Health Organization.

535.     The market for Clarithromycin is mature.  At all relevant times, there have been multiple manufacturers of Clarithromycin.

536.     Defendants Actavis and Teva dominate sales of Clarithromycin Tablets ER and had ███████████████████████████████████████.

REDACTED – PUBLIC VERSION

537.   ████████████████████████████████████████

██████████████████████████████████████



538.   ████████████████████████████████████████

████████████   The GAO noted that Clarithromycin had "extraordinary price increases" in

the years 2011-2012.

539.   ████████████████████████████████████████

540.   The ability of Actavis and Teva to reach agreements on Clarithromycin Tablets

was aided by the prevalence of trade association meetings and conferences where the parties

were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic

Drugs).

REDACTED – PUBLIC VERSION

541.    ████████████████████████████████████████

████████████

542.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

543.    The agreement between Defendants Actavis and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Clarithromycin Tablets ER.

**33.    Clindamycin Phosphate**

544.    Clindamycin Phosphate is an antibiotic used to treat certain types of bacterial infections such as middle ear infections, vaginal infections, and acne.  It is available in, for example, Lotion, Gel, Foam, Vaginal Cream, and Solution formulations.  It has been available in the United States for decades in a generic form.

545.    The market for Clindamycin Phosphate is mature.  At all relevant times, there have been multiple manufacturers of Clindamycin Phosphate.

546.    Defendants Actavis, Greenstone, Perrigo, Sandoz, and Taro dominate sales of Clindamycin Phosphate.  Greenstone and Sandoz dominate sales of Clindamycin Phosphate 1% Lotion, 1% Gel, and 2% Vaginal Cream.  During much of the relevant time period, Greenstone and Sandoz had a roughly 60/40 split on the Lotion and Vaginal Cream/Jelly.  Greenstone and Sandoz had a roughly 50/50 split on the Clindamycin Phosphate Jelly.  On the Liquid Solution, Greenstone had the majority of the share, and Sandoz, Perrigo, Taro, and Teva had smaller shares.

REDACTED – PUBLIC VERSION

547.



REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



548.   The GAO noted that Clindamycin Phosphate had extraordinary price increases in the years 2012-2014.

549.   ████████████████████████████████████████████████████

████████████████ Under the Fair Share Agreement, Defendants did not attempt to undercut competitors' prices in order to gain additional market share.  For example, in December 2012, after he heard that Greenstone took a price increase on Clindamycin, Armando Kellum of Sandoz wrote to colleagues at Sandoz and said, "████████████████████████████"

550.   The ability of Actavis, Greenstone, Perrigo, Sandoz, and Taro to reach agreements regarding Clindamycin Phosphate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

- 139 -

REDACTED -- PUBLIC VERSION

551.   ███████████████████████████████████████
████████████████████████

552.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

553.   The agreement between Defendants Actavis, Greenstone, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Clindamycin Phosphate Lotion (1%), Gel (1%), Vaginal Cream (2%), and Solution (1%).

**34.   Clonidine TTS**

554.   Clonidine TTS Patch, also known by the brand name Catapres-TTS, is a medication in the form of a transdermal patch that is used to treat high blood pressure.  It has been available in the United States in a generic form for many years.

555.   The market for Clonidine TTS is mature.  At all relevant times, there have been multiple manufacturers of Clonidine TTS.

556.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Clonidine-TTS.  Defendant Actavis joined the Clonidine-TTS market and the Clonidine-TTS conspiracy in 2014.

557.   Teva and Mylan had ███████████████████████████, as contemplated by their Fair Share agreement.  Mylan, however, encountered some supply disruptions that skewed share in favor of Teva. In order to navigate and reallocate the market, Teva and Mylan communicated frequently to ensure that each of them had a Fair Share.

REDACTED – PUBLIC VERSION

558.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Clonidine-TTS beginning at least as early as the fall of 2011.

559.    For example, in early 2012, after the first of Mylan's supply issues were resolved, Teva conceded two large customers to Mylan to help it regain its Fair Share.

560.    In May, not long after ceding the Clonidine-TTS business to Mylan, Teva was approached by another large customer seeking bids on a different drug, Doxazosin.  Teva declined the opportunity to the Doxazosin business in an effort to "be cautious after what happened with Clonidine."

561.    Later in 2012, Mylan again experienced supply disruptions, this time severe enough to force it out of the market entirely on certain dosages from approximately September 2012 through February 2013.  To coordinate how to deal with this, on September 28, 2012, Mylan's Nesta and Teva's Green spoke by phone at least twice.  Mylan and Teva maintained regular contact as former Mylan customers approached Teva because of Mylan's supply issues.  For example, Rekenthaler spoke to a contact at Mylan on October 1, and Green spoke to Nesta on October 1 and 4, 2012.  On October 10, 2012, Green and Nesta spoke again.

562.    When Mylan relaunched Clonidine-TTS in early 2013, Teva conceded accounts to Mylan to allow it to regain a Fair Share of the market.  For example, Teva's internal documents state that they chose to "concede" a number of large customers to Mylan.  Teva's internal documents are explicit that it had no intention of competing on price, but instead was "trying to concede the Clonidine business" to Mylan.

REDACTED – PUBLIC VERSION

563.     Teva and Mylan remained in regular contact in order to coordinate and maintain Fair Shares. In February and March 2013 alone, Teva and Mylan representatives called each other at least 33 different times.

564.     In the spring of 2014, another manufacturer, Actavis, was preparing to enter the market for Clonidine-TTS. Teva and Actavis immediately commenced an extensive negotiation over price and market share. Teva's Rekenthaler and Actavis's Falkin were in direct phone contact to hammer out the details. Teva considered which customers to concede, and encouraged Actavis to enter the market with high prices.

565.     Teva's Patel also communicated with Actavis to work out the details of Actavis's entry into the market. She spoke with Actavis's Rogerson multiple times, learning that Actavis wanted 25% of the market and expected that 10%-15% of its share would come from Teva.

566.     Teva's Rekenthaler expressed his view that Actavis could have no more than a 15% market share from Teva, which prompted a Teva executive to admonish Rekenthaler to "play nice in the sand box" so that Actavis would be "responsible in the market."

567.     Rekenthaler heeded the advice and Teva conceded share to Actavis in order to allow it to gain its Fair Share of the market for Clonidine-TTS.

568.     The ability of Teva, Mylan and Actavis to reach agreements on Clonidine-TTS was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

569.     The coordination among Teva, Mylan, and Actavis is consistent with the Fair Share Agreement.

570.    The agreement between Defendants Teva, Mylan and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including the Clonidine-TTS Patch.

**35.    Desmopressin Acetate**

571.    Desmopressin Acetate, also known by the brand names Concentraid, DDAVP, and Stimate, is an antidiuretic agent used in the treatment of central diabetes insipidus.  It has been available in the United States in a generic form for many years.

572.    The market for Desmopressin Acetate is mature.  At all relevant times, there have been multiple manufacturers of Desmopressin Acetate.

573.    During the relevant time frame, Teva and Actavis were the primary manufacturers of Desmopressin Acetate Tablets.

574.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Desmopressin Acetate tablets beginning at least as early as the summer of 2014.

575.    In August 2014, Teva increased prices on Desmopressin Acetate tablets, along with a number of other drugs.  In the lead up and follow-up to the price increases, Teva was in frequent contact with other drug manufacturers to coordinate price increases and Fair Shares.  Actavis, which was the only other manufacturer of Desmopressin Acetate, was no exception.

576.    On October 15, 2014, Teva received a request from a customer asking Teva to reduce prices for Desmopressin Acetate.  Teva's Patel—who already knew that Actavis would be raising prices—responded to the customer by declining to lower the price with the explanation: "[w]e believe the market is still settling on this product."

577.    On December 19, 2014, Actavis followed Teva's price increase on Desmopressin Acetate, announcing identical list (WAC) prices.

578.    Leading up to Actavis's price increase, Rekenthaler of Teva and Falkin of Actavis spoke frequently, including calls on November 18, November 21, and November 25, 2014.

579.    The ability of Teva and Actavis to reach agreements on Desmopressin Acetate Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

580.    The coordination between Teva and Actavis is consistent with the Fair Share Agreement.

581.    The agreement between Defendants Teva and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rid bids, and engage in market and customer allocation for generic drugs, including Desmopressin Acetate Tablets.

### 36.    Dexmethylphenidate HCL

582.    Dexmethylphenidate HCL, also known as Dexmeth ER or by the brand name Focalin, is a muscle relaxant used to treat attention deficit hyperactivity disorder (ADHD).  It has been available in the United States in a generic form for many years.

583.    The market for Dexmeth ER is mature.  At all relevant times, there have been multiple manufacturers of Dexmeth ER.  During the relevant time frame, Teva, Sandoz, and Par were the primary manufacturers of Dexmeth ER.

584.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Dexmeth ER Capsules (5, 15, 20, 40 mg) beginning at least as early as February 2014.

REDACTED – PUBLIC VERSION

585.     In February 2014, Sandoz was preparing to enter the market for Dexmeth ER.  To coordinate, Teva's Patel spoke frequently with the Associate Director of Pricing at Sandoz about how to divide the market in order to permit Sandoz to obtain a Fair Share.

586.     Following multiple conversations between Patel and her contact at Sandoz, Teva conceded two large customers to Sandoz.  As Patel explained in a February 12 internal email reflecting the understanding reached between Teva and Sandoz, **"Sandoz is being responsible with their pricing. We should be responsible with our share."**

587.     Around the same time, on February 14, 2014, Teva also refused to lower its price for Dexmeth ER when approached by yet another large customer, thereby conceding the business to Sandoz.

588.     On February 20, 2014, another large retail customer approached Teva seeking price protection terms.  Patel spoke to the Associate Director of Pricing at Sandoz that same day, and the next day, internal emails indicated that Patel had inside information about Sandoz's plans for Dexmeth ER.

589.     Par also abided by the Fair Share agreement when Sandoz entered, and when faced with a decision to cede share, "gave up the business to keep the market share even."

590.     Again, to coordinate Fair Share, Rekenthaler of Teva was speaking to the Vice President of National Accounts at Par, right around the same time that Patel had been speaking to Sandoz Associate Director of Pricing, to confirm their agreement.

591.     In May 2015, Teva again passed on an opportunity to sell more than its Fair Share of Dexmeth ER.  It declined to bid for the Dexmeth ER business with a large customer, because "there is equal share in the market between competitors."

REDACTED – PUBLIC VERSION

592.     Similarly, in June 2015, Sandoz declined to bid on Dexmeth ER business because it already had more than its Fair Share.  When a Sandoz national account representative communicated the decision to the customer, he mispresented the reason, falsely explaining that the decision not to bid was based on limited supply.  In fact, it was because of the Fair Share agreement between Teva, Sandoz and Par.

593.     As a result of the agreement and anticompetitive coordination between Teva, Sandoz, and Par, prices for Dexmeth ER were higher than they would have been in a competitive market.

594.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

595.     The ability of Teva, Sandoz, and Par to reach agreements on Dexmeth ER was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

596.     The agreement between Defendants Teva, Sandoz, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Dexmeth ER Capsules (5, 15, 20, 40 mg).

**37.     Dextroamphetamine Sulfate**

597.     Dextroamphetamine Sulfate, also known as Dex Sulfate or by the brand name Dexedrine, among others, is a medication used to treat attention deficit hyperactivity disorder (ADHD).  It has been available in the United States in a generic form for many years.

598.     During the relevant time frame, Defendants Teva, Impax, Mallinckrodt and Actavis were the primary manufacturers of Dextroamphetamine Sulfate Capsules (ER).

REDACTED – PUBLIC VERSION

599.     Teva, Mallinckrodt and Aurobindo were the primary manufacturers of Dextroamphetamine Sulfate Tablets (ER).

600.     Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Dextroamphetamine Sulfate Tablets and Capsules beginning at least as early as the summer of 2011.

601.     For years, Teva was effectively the sole supplier of Dextroamphetamine Sulfate Capsules and Tablets.  Mallinckrodt, which had been a supplier, exited both in late 2008. Without competitive pressure to keep prices low, Teva slowly and steadily raised prices. Eventually, however, both Capsules and Tablets attracted additional manufacturers.  Typically, this would have driven prices lower; the addition of suppliers tends to spur price competition which drives down prices.  Here, however, because of Defendants' Fair Share Agreement, the addition of suppliers to the market caused the prices of Dextroamphetamine Sulfate Capsules and Tablets to rise.

602.     As to Capsules, Impax was the first competitor to enter in the fall of 2011.  In anticipation of Impax's entry, Teva announced a large list (WAC) price increase in August 2011. Teva immediately raised the prices it charged customers, ████████████████████████████ When Impax entered the market, rather than offer lower prices to win customers, it matched Teva's market prices.  Impax did not announce list (WAC) prices until later, but when it did so, they were even higher than Teva's.

603.     Similarly, when Mallinckrodt re-entered with Capsules in the summer of 2012, it did so at the high prices that Teva and Impax already had coordinated.  Even before it began shipping product, Mallinckrodt announced list (WAC) prices in April 2012 that matched Teva's,

REDACTED – PUBLIC VERSION

and which were more than five times higher than Mallinckrodt's former prices for
Dextroamphetamine Sulfate Capsules.

604.     Not long after Mallinckrodt entered with Capsules, it also re-launched its Tablets.
The same pattern as Capsules followed.  In anticipation of Mallinckrodt's entry, Teva drastically
increased its prices.  At the end of July 2012, Teva increased its list (WAC) prices on Tablets by
more than 800%.  Within weeks, Mallinckrodt matched the price increase.  As it had done with
Capsules, rather than offer lower prices to win customers, Mallinckrodt coordinated with Teva to
impose higher prices.

605.     In 2014, Actavis joined with Capsules and Aurobindo joined with Tablets.  Like
Mallinckrodt and Impax before them, they eschewed price competition and instead announced
identical list (WAC) prices as Teva and Mallinckrodt.  Adding yet more suppliers of Capsules
and Tablets did not drive prices back down to a competitive level.  Instead, the Fair Share
agreement kept prices high.

606.     Throughout this period, Defendants monitored their Fair Share agreement, and
made sure to cede share where necessary to keep prices high.  For example, in January 2013,
Teva was confronted with a request for pricing from a large customer that had been approached
by Mallinckrodt.  This prompted Teva to assess Fair Shares of Tablets.  Teva's David
Rekenthaler pointed out that Teva was expecting to cede share to Mallinckrodt: █████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Teva's

Director of Marketing responded, ████████████████████████████████████████

████████████████████████ Ultimately, however, Teva's Senior Director of Sales signed

off, ██████████ By ceding customers, Teva ensured that each manufacturer obtained a

REDACTED – PUBLIC VERSION

Fair Share of the market, and all manufacturers ensured that prices for Dextroamphetamine Sulfate remained high.

607.     Similarly, in February 2014, Teva again recognized the need to walk away from business in order to maintain Fair Shares and higher prices.  In an internal analysis describing Dextroamphetamine Sulfate, Teva noted: ████████████████████████████████████

████████████████████████████████████████████████████████████████

The underlying premise of the Fair Share agreement—less sales but higher prices— continued to work throughout the period.  That same month, Teva confirmed in an internal document ████████

████████████████████████████████████████████████████████████████

████████████████████████████████

608.     The NSP price chart and list (WAC) price chart below highlight the large and sustained price increases for Dextroamphetamine Sulfate.



- 149 -

REDACTED – PUBLIC VERSION





- 150 -

REDACTED – PUBLIC VERSION

609.     Throughout this period, Teva, Mallinckrodt, Impax, Actavis and Aurobindo met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Dextroamphetamine Sulfate and of the Fair Share agreement.

610.     For example, representatives from Teva and Impax attended the NACDS 2011 Pharmacy & Technology Meeting in Boston from August 27 to 30, 2011, shortly before Impax entered with Capsules in September 2011 at the inflated prices that Teva had recently imposed.

611.     Similarly, representatives of Mallinckrodt and Teva attended the HDMA 2012 Business and Leadership Conference in San Antonio on June 13, 2012, not long before Teva announced list (WAC) price increases on Tablets in July that Mallinckrodt quickly followed.

612.     Defendants also communicated directly with each other by phone to coordinate pricing.  For example, in January and February 2014—when Aurobindo was entering with Tablets, Teva's Rekenthaler spoke to R.C., the CEO of Aurobindo multiple times.

613.     Teva's Rekenthaler also coordinated with Actavis when it entered with Capsules that year.  On June 19, 2014, as Actavis was entering the market, Rekenthaler spoke twice with Falkin of Actavis, and they discussed Actavis's market share goal of "20-25%."  Actavis entered not long after, and as contemplated by the Fair Share agreement between them, Teva conceded a large Dextroamphetamine Sulfate customer to Actavis.  Meanwhile (on June 13, 20, 23 and 26), Falkin (Actavis) communicated by phone with T.E., Impax Senior Director of Sales Operations.

614.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

615.     The ability of Teva, Mallinckrodt, Impax, Actavis and Aurobindo to reach agreements on Dextroamphetamine Sulfate Capsules and Tablets was aided by the prevalence of

REDACTED – PUBLIC VERSION

trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

616.    The coordination by Teva, Mallinckrodt, Impax, Actavis, and Aurobindo is consistent with the Fair Share Agreement.

617.    The agreement between Defendants Teva, Mallinckrodt, Impax, Actavis and Aurobindo was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, Dextroamphetamine Sulfate Capsules (ER) and Tablets (ER).

### 38.    Diclofenac Potassium

618.    Diclofenac Potassium, also known by the brand name Cataflam, among others, is a non-steroidal anti-inflammatory drug (NSAID) used to relieve pain and swelling.  It has been available in the United States in a generic form for many years.

619.    The market for Diclofenac Potassium was mature and at all relevant times had multiple manufacturers.

620.    During the relevant time frame, Defendants Teva, Mylan, and Sandoz were the primary manufacturers of Diclofenac Potassium Tablets.

621.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Diclofenac Potassium beginning at least as early as the fall of 2012.

622.    For years, the prices for Diclofenac Potassium tablets were relatively low and stable.  In late 2012, however, Mylan, Teva and Sandoz began a series of coordinated price increases that resulted in list (WAC) prices nearly double the prior levels, and ███████████ ██████████████████████.

REDACTED – PUBLIC VERSION





- 153 -

REDACTED – PUBLIC VERSION

623.     Throughout this period, Mylan, Teva, and Sandoz met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Diclofenac Tablets and their Fair Share Agreement.

624.     For example, on August 9, 2013, Teva raised its list price on Diclofenac Potassium to match that of Mylan. ████████████████████████████████ ████████████████████ but had not yet raised its list price.

625.     As with numerous other drugs during this period, Teva coordinated with Mylan and Sandoz before announcing a price increase.  For example, Green of Teva spoke to Nesta of Mylan on August 1 (two times), August 2, August 6 (three times), and August 8 (three times), 2013.  The day before the price increase went into effect – August 8, 2013, Patel called Nesta of Mylan twice and also called a contact at Sandoz.

626.     On August 28, 2014, Teva again raised list prices on Diclofenac Potassium Tablets.  This time it was the first manufacturer to increase prices.  Leading up to the price increase, Patel and Rekenthaler were communicating with Mylan and Sandoz to coordinate.  For example, Rekenthaler spoke to Nesta on August 4, 7, 11 (2 calls), 18 (2 calls), and 21.  Patel spoke to a contact at Sandoz on August 11, 26, 27 (2 calls), and 28, 2014.

627.     The coordination worked.  Sandoz followed Teva's price increases on Diclofenac Potassium Tablets and announced an identical list price approximately 6 weeks later.  Mylan followed, also matching Teva and Sandoz's list prices, on March 4, 2015.  Rekenthaler coordinated with Nesta of Mylan during two phone calls on February 18 and one call on February 19, 2015.

628.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

629.    The ability of Teva, Mylan, and Sandoz to reach agreements on Diclofenac

Potassium tablets was aided by the prevalence of trade association meetings and conferences

where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to

the Named Generic Drugs).

630.    ███████████████████████████████████████████████████████

████████████████████████

631.    The agreements between Mylan, Teva, and Sandoz was part of an overarching

conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and

engage in market and customer allocation for generic drugs, including Diclofenac Potassium

Tablets.

### 39.    Diltiazem HCL

632.    Diltiazem HCL, also known by the brand name Cardizem, among others, is a

medication to treat angina (severe chest pain) or hypertension (high blood pressure).  It has been

available in the United States in a generic form for many years.

633.    The market for Diltiazem HCL tablets was mature and at all relevant times had

multiple manufacturers.  During the relevant time frame, Defendants Teva and Mylan were the

primary manufacturers of Diltiazem HCL Tablets (30, 60, 90, 120 mg).

634.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired

to fix, raise, maintain or stabilize the prices of Diltiazem HCL beginning at least as early as the

spring of 2013.

635.    For years, the prices for Diltiazem HCL tablets were relatively low and stable.  In

the spring of 2013, however, Teva and Mylan imposed a series of coordinate price increases, first

in mid-2013, then again in late 2014 and early 2015.  By January 2015, Teva and Mylan list

REDACTED – PUBLIC VERSION

(WAC) prices ████████████ were nearly three times higher than they were before the collusive price increases.

636.    The NSP price chart below shows ████████████████████████████ ██████████████████████████████████████████████████████.



637.    Throughout this period, Mylan and Teva met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Diltiazem HCL Tablets and of their Fair Share agreement.

638.    For example, immediately after she began at Teva, Patel began to investigate Mylan drugs as a potential source for coordinated price increases. She asked her colleague, Kevin Green, to "gather as much market intelligence as possible" for certain, specific items, including Diltiazem HCL Tablets.

- 156 -

REDACTED – PUBLIC VERSION

639.     On, May 7, 2013, Teva's Green spoke to Nesta at Mylan three times.  Green and

Nesta also spoke a number of times over the next several days, including on May 8, May 9, and

May 10, 2013.

640.     On May 14, 2013, Patel asked several Teva account managers, including Green,

to obtain "price points" on certain drugs in preparation for a potential price increase.  She

indicated internally to another Teva colleague that she was expecting "additional Mylan intel"

and that she was expecting Mylan "to take an additional increase" on those items.  On May 17,

2013, Green spoke to Nesta six times.

641.     Green communicated extensively with Mylan to coordinate the price increases.

For example, on July 10, 2013, Green and Mylan's Nesta spoke twice.  Shortly after the second

call, Green called Patel, and the two spoke for just over seven (7) minutes.  The next day, on July

11, Nesta and Green exchanged several more calls.

642.     Patel and Green coordinated the increase with Mylan in the days and weeks

leading up to the increase.  For example, Green spoke to Nesta (Mylan) twice on August 1, once

on August 2 and three times on August 6.

643.     The day before the price increase went into effect – August 8, 2013 – Patel had

three calls with Nesta of Mylan, and on August 9, 2013, Teva raised prices on numerous drugs,

including Diltiazem HCL.

644.     No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

645.     The ability of Teva and Mylan to reach agreements on Diltiazem HCL was aided

by the prevalence of trade association meetings and conferences where the parties were able to

meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

- 157 -

REDACTED -- PUBLIC VERSION

646.    ████████████████████████████████████████████████

████████████

647.    The agreement between Defendants Teva and Mylan was part of an overarching

conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and

engage in market and customer allocation for generic drugs, including Diltiazem HCL Tablets

(30, 60, 90, 120 mg).

**40.    Diphenoxylate Atropine HCL**

648.    Diphenoxylate Atropine is a combination medicine used to treat diarrhea.  It is

available in Tablet and Oral Liquid formulations.  It has been available in the United States for

decades in a generic form.

649.    The market for Diphenoxylate Atropine is mature.  At all relevant times, there

have been multiple manufacturers of Diphenoxylate Atropine.

650.    Defendants Greenstone and Mylan dominate sales of Diphenoxylate Atropine

Tablets (2.5-0.025 mg).  During much of the relevant time period, Mylan had approximately

75% of the market, and Greenstone had approximately 25% of the market.

651.    ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

REDACTED – PUBLIC VERSION



652.    The GAO noted that the Diphenoxylate Atropine had "extraordinary price increases" in the years 2014-2015.

653.    ████████████████████████████████████

654.    The ability of Greenstone and Mylan to reach agreement regarding Diphenoxylate Atropine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

655.    ████████████████████████████████████
████████

656.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

657.    The agreement between Defendants Greenstone and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Diphenoxylate Atropine Tablets (2.5-0.025mg).

**41.    Doxazosin Mesylate and Etodolac**

658.    Doxazosin Mesylate is a commonly prescribed medication for the treatment of high blood pressure and the symptoms of benign prostatic hyperplasia (*i.e.*, enlarged prostate gland).  It has been available in the United States for decades and is one of the 200 most prescribed drugs in the United States.  Doxazosin Mesylate tablets are available in 1 mg, 2 mg, 4 mg, and 8 mg dosage strengths.

659.    The market for Doxazosin Mesylate is mature.  At all relevant times, there have been multiple manufacturers of Doxazosin Mesylate.  Defendants Apotex, Mylan, and Teva dominated sales of Doxazosin Mesylate.  Greenstone and Par also sell Doxazosin Mesylate and together with Apotex, Mylan, and Teva ██████████████████████████████ ████████████

660.    ████████████████████████████████████████████████ ████████████████████████████████████████████████

REDACTED – PUBLIC VERSION



661.   The GAO noted that all four dosage strengths of Doxazosin Mesylate had an "extraordinary price increase."  Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Apotex, Greenstone, Mylan, Par, and Teva.

662.   As explained above, Mylan was Teva's highest-ranked competitor by "quality." Teva is also known to have viewed at least Apotex and Greenstone as "high quality" competitors.

663.   For years Mylan and Teva were highly conscious of their respective shares in the Doxazosin Mesylate market and generally dared not cross each other.  For example, on May 7, 2012, when Dale Hill at Cardinal Health asked if Teva had any interest in becoming its primary supplier, the first response of Teva's K.G. (Senior Director of Marketing) was to ask his colleague T.C. (Senior Director of National Sales): "Is Mylan having problems?  The market is primarily supplied by Teva (76%) and Mylan (22%)."  T.C. reported back that Mylan was

"having [an] issue on the 4mg backordered until 6-30," but Cardinal Health wanted "to move the entire line." K.G. responded: "We will need to be cautious after what happened with Clonidine. I would rather cover them on a short-term basis where they have an issue and revisit if [it] becomes a more prolonged and extensive event." The Clonidine incident references a rare and brief incidence of competition between Teva and Mylan in late 2011 and early 2012 for market share of Clonidine-TTS, which ended first with Teva conceding its "McKesson business" and then later CVS, its "largest customer," to make peace with Mylan, who, as Teva internally lamented, was "trashing the price in pretty much a two-player market."

664.    Determined not to let that happen again, Patel began immediately after she was hired at Teva, to investigate Mylan drugs as a potential source for coordinated price increases. Teva and Mylan coordinated price increases on multiple drugs over time, including their drastic price increases on Doxazosin Mesylate in the summer of 2013. During each step in the process, Teva and Mylan executives kept their generic manufacturer co-conspirators apprised of their decisions. Between May and August 2013, for example, Teva and Mylan exchanged 101 phone and text communications. Patel typically initiated Teva's communication with Nesta of Mylan either directly or through Green, whom she asked to seek "intel" from Nesta on many different drugs.

665.    For example, on July 22, 2013, Patel emailed Green a spreadsheet titled "Round 2" increase items, telling him that she was "seeking intel" for a group of drugs, including doxazosin mesylate, in the attached spreadsheet with a highlighted yellow "x" and included in a column titled "Follow Mylan/Other:"

666.

| Product Family | Initial Comments | PM Related | Follow Mylan/Other |
|---|---|---|---|
| Amiloride | Mylan increase; Teva only has HCTZ | | x |
| Diclofenac Tab | Mylan increase; On historical PI list | x | x |
| Doxazosin Mesylate Tabs | Mylan increase; On historical PI list | | x |
| Enalapril Tab | Mylan increase; On historical PI list--COMPLETED | | x |
| Ketoprofen | Follow Mylan; Deletion candidate; PM related | x | x |
| Ketorolac | Follow Mylan; Deletion candidate; PM related | x | x |
| Metoprolol | Mylan increase (Teva does not have 25mg but small sku) | | x |
| Nystatin | Heritage involved  follow Mutual  deletion candidate  PM related | x | x |
| Pravastatin | Carried over from round 1 | | x |
| Sotalol | Mylan increase; On historical PI list | | x |
| Tolmetin Tab | Mylan increase; Teva has 94 share; On historical PI list | | x |
| Verapamil (Isoptin SR) | Mylan increase (lost Kroger and OneStop--to who?) | | x |

667.   The next day – July 23, 2013 – at 4:30 pm, Green and Nesta spoke for more than six minutes.  Immediately after hanging up the phone, Green called Patel to convey the "intel" he had obtained from Mylan.  The call lasted more than three minutes.

668.   On July 26, 2013, Teva received a bid request from AmerisourceBergen for multiple products, including Doxazosin Mesylate.  For many products, AmerisourceBergen described the reason for the bid as a "change in market dynamics."  Patel interpreted this to refer to products, which were "[a]warded to Teva, but put out to bid due to our 7/3 increase" or "[a]warded to Mylan and put out to bid due to their 7/1 increase."  She proposed the following response, designed to support the Fair Share Agreement:

- We may plan to follow and will not bid

- We may not follow and may bid at a higher price than normal (bid new business at higher prices)

- We may plan to take no pricing action and will bid as we normally would.

669.   Consistently, when Teva received requests from OptumRx and Rite Aid to bid on Doxazosin Mesylate and other drugs, Teva offered a bid only for the drug that was not subject to price coordination: "Etodolac and Doxazosin are strong increase candidates. We are unable to bid at this time."

- 163 -

REDACTED -- PUBLIC VERSION

670.    Likewise, on July 31, 2013, in response to a request from Walgreens, Teva's Green analyzed market share before determining Teva's response.

671.    Defendants coordinated the amount and timing of their price increases.  For example, Apotex increased its price on July 23, 2013 after a conversation between B.H. of Apotex and Patel of Teva.  And similarly, approximately a week before Teva matched Apotex's and Mylan's prices after B.H. and Patel spoke again for almost fifteen minutes

672.    The Defendants continued to police the Fair Share Agreement as it applied to Doxazosin Mesylate.  For example, Par matched the elevated pricing when it entered the market in late 2013.  Additionally, when Greenstone entered the market, a year after the dramatic increase in the price of Doxazosin Mesylate Tablets, Patel cautioned against bidding on a supply agreement willing to cede share to keep prices high.

673.    The other drug that was discussed along with Doxazosin Mesylate in a document cite above was Etodolac.  The market for Etodolac is mature.  At all relevant times, there have been multiple manufacturers of Etodolac Capsules and Tablets (including Tablets ER).

674.    During the relevant time period, Defendants Apotex, Sandoz, Taro, Teva, and Zydus were the primary manufacturers of Etodolac.

675.    In the spring of 2012, Taro was the dominant seller of Etodolac.  Teva was preparing to exit and Apotex was preparing to re-enter.

676.    For years, the price of Etodolac Capsules was stable.  That changed in the spring of 2012.  Taro was the dominant seller in the market.  Teva was preparing to exit and Apotex was preparing to re-enter.

- 164 -

677.   In conjunction with Apotex's entry into the market, Taro and Apotex announced identical and nearly simultaneous list (WAC) price increases.  Rather than stimulate price competition, Apotex's entry into the market resulted in much higher prices.

678.   Apotex quickly gained market share, all while it and Taro maintained high prices. Their Fair Share agreement made this possible. For example, in August 2013, ███████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████ Doing so would have disrupted the Fair Shares of each manufacturer of Etodolac Capsules and Tablets.



REDACTED – PUBLIC VERSION

679.   █████████████████████████████████████████████

███████████████████████████

680.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

681.   The agreement was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Etodolac Capsules.

682.   The primary manufacturers of Etodolac Tablets and Tablets ER were Apotex, Sandoz, Taro, Teva, and Zydus.  As was the case with Etodolac Capsules, for years the prices of Etodolac Tablets and Tablets ER were relatively low and stable.  That changed around the summer of 2013 when Teva, Taro and Sandoz imposed nearly simultaneous price increases of Tablets and Teva and Taro did the same on Tablets ER. Again, the price increases were very large, and very similar in amount.

683.   When Apotex re-joined with Tablets in the spring of 2015, it matched Sandoz and Teva's prices.  And when Zydus entered with Tablets ER, it matched the prices of Taro and Teva.

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



684.    Throughout this period, Teva, Sandoz, Taro, Apotex and Zydus met at trade conferences and communicated directly with each other,

685.    For example, during July of 2013, there were numerous phone calls among Sandoz, Taro and Teva for the express purpose of implementing price increases on Etodolac. Between July 16 and 18, there were a flurry of calls between individuals at all three companies, including C.B., a National Account Executive at Sandoz, Taro's Aprahamian and Teva's Patel. On July 18, 2013, Patel called M.V., the Associate Director of Pricing at Sandoz, during which the companies agreed to raise prices.

686.    Before any price increases took effect or were made public, Teva knew that Sandoz planned to increase its price on Etodolac, and that Taro would follow suit and raise its prices as well. During those conversations, Teva agreed to follow both price increases.

687.     Leading up to their price increases that were imposed in late July and early August, Sandoz, Teva and Taro continued to communicate and re-affirm their intentions to raise Etodolac prices. For example, on July 23, Patel at Teva spoke with her contact at Sandoz, and Aprahamian at Taro spoke with his contact at Sandoz.

688.     Between July 29 and August 2, 2013, Patel engaged in a series of thirteen calls with her Sandoz contact and Aprahamian of Taro. Aprahamian also spoke to his contact at Sandoz during this time, including three calls between July 30 and August 2, 2013.

689.     When Patel sent the "Price Increase Overview" spreadsheet to her supervisor on August 7, 2013, summarizing Teva's upcoming August 9 price increases, she again made it clear that the reason Teva was increasing its prices for Etodolac and Etodolac ER was because Teva senior executives knew that Taro would be raising its prices on both drugs "this week." Patel's supervisor quickly instructed her to delete those entries. Notably, he did not tell her to stop colluding with Taro or any of Teva's other ostensible competitors, and so she continued to do so.

690.     On August 8, 2013, Patel again spoke to Aprahamian (Taro) numerous times and to her contact at Sandoz. The next day, Teva and Taro announced identical and very large price increases on their Etodolac and Etodolac ER products.

691.     In the spring of 2014, when Zydus's entry into the Etodolac ER market spurred another round of communications and coordination aimed at keeping prices high. In the days leading up to the Zydus launch, there were numerous communications between Teva, Zydus and Taro to discuss how customers would be ceded to Zydus without driving prices down.

692.     The conversations accomplished their goal. Zydus announced list prices identical to those of Teva and Taro. And Teva and Taro ceded customers to Zydus. For example, when Teva learned on May 14, 2014 that one of its wholesaler customers had received a bid from

- 169 -

Zydus for Etodolac ER, it prompted a series of communications between Teva's Patel, Taro's Aprahamian, and Zydus's Green, as well as direct communications between Maureen Cavanaugh at Teva and K.R., Vice President of Sales at Zydus. The end result: Teva ceded its wholesaler customer to Zydus.

693.    In July of 2014, Teva ceded another customer to Zydus to allow it to gain a Fair Share of the market. Patel explained Teva's decision as needed to make room for a new market entrant.

694.    Taro, too, worked to ensure that Zydus maintained a Fair Share of the Etodolac market. For example, in August 2015, Taro declined to bid on Etodolac ER at a large customer where Zydus was the incumbent. Taro worried that pursuing Zydus's customer would result in retaliation, possibly on another product that was part of their Fair Share agreement, Warfarin Sodium Tablets: Zydus "could hit us on Warfarin. Not worth a fight in the sandbox over 300 annual units for Etodolac."

695.    No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

696.    The agreement between Apotex, Sandoz, Taro, Teva, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Etodolac Tablets, Tablets ER, and Capsules.

**42.    Drospirenone and Ethinyl Estradiol**

697.    Drospirenone and Ethinyl Estradiol, commonly known by the brand name Ocella, is an oral contraceptive. It has been available in the United States in a generic form for many years.

698.    The market for Drospirenone and Ethinyl Estradiol is mature.  At all relevant times, there have been multiple manufacturers of Drospirenone and Ethinyl Estradiol Tablets.

699.    During the relevant time frame, Defendants Teva, Lupin, and Actavis were the primary manufacturers of Drospirenone and Ethinyl Estradiol.

700.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Drospirenone and Ethinyl Estradiol beginning at least as early as April 2013.

701.    In early 2013, Lupin was planning to enter the market.  Rather than strategize on how to gain market share through competition, Lupin contacted Teva to reach an agreement on pricing and market share.  In late April, Berthold (Lupin) and Green (Teva) spoke multiple times. Communications between Teva and Lupin eventually looped in Actavis.  For example, Rekenthaler and Patel each spoke with a senior sales and marketing executive at Actavis on April 30, and the next day Patel exchanged a number of text messages with him as well.

702.    Throughout May, intense communications among the competitors continued as they worked out the details of their agreement.  On May 6, Patel and Berthold spoke twice by phone.  Green and Berthold also spoke that same day.  On May 7, Patel and Berthold had yet another call.  Patel also placed a call to Rogerson at Actavis.  Patel again spoke to Rogerson on May 8.  And on May 9, Green again spoke with Berthold twice.  On May 10, Patel spoke to Berthold three times, and also spoke to Rogerson again.

703.    In the wake of all of these communications, Teva agreed to concede business to Actavis in order to maintain higher prices for Drospirenone and Ethinyl Estradiol.

REDACTED – PUBLIC VERSION

704.    Communications continued through the summer.  Numerous calls between Patel and Green at Teva and Berthold at Lupin took place, all aimed at orchestrating Lupin's acquisition of a fair share of Drospirenone and Ethinyl Estradiol, which they did.

705.    The ability of Teva, Lupin and Actavis to reach agreements on Drospirenone and Ethinyl Estradiol was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

706.    ████████████████████████████████████████████████
████████████████████

707.    The agreement between Defendants Teva, Lupin and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Drospirenone and Ethinyl Estradiol Tablets.

**43.    Enalapril Maleate**

708.    Enalapril Maleate is used to treat high blood pressure.  It is available in Tablet form and has been on the market in the United States for years as a generic medication.

709.    The market for Enalapril Maleate is mature.  At all relevant times, there have multiple manufacturers of Enalapril Maleate.

710.    Defendants Bausch, Mylan, Taro, Teva, and Wockhardt dominate sales of Enalapril Maleate.

711.    For years, the prices of Enalapril Maleate Tablets were relatively low and stable.  By mid-2013, the market was shared by three Defendants: Mylan, Wockhardt, and Teva.  Those three manufacturers coordinated a significant price increase for Enalapril Maleate in the second half of 2013.

REDACTED – PUBLIC VERSION

712.   Mylan increased its list (WAC) price for Enalapril effective July 2, 2013.
Enalapril Maleate was on a list of drugs slated for a price increase that Teva had received from
Mylan in June 2013, before those price increases were put into effect.

713.   Teva quickly followed Mylan's increase, announcing its own list (WAC) price
increases. Wockhardt followed as well, raising its list prices for Enalapril Maleate. Taro, which
was in the process of re-entering with Enalapril Maleate in mid-2013, joined the price increases.
Rather than offer better prices to gain share, Taro raised its list prices.

714.   ████████████████████████████████████████ at that time.

715.   In the spring of 2014, Mylan led another even more extreme round of price
increases. In 2013, Mylan increased list prices by approximately 100%. In April 2014, it
increased list (WAC) prices again, by approximately 300%. Teva followed the increase—
announcing identical WAC prices—in August. Taro did exactly the same in October. And
Wockhardt raised its list (WAC) prices again in December.

716.   After Mylan, Teva, Wockhardt and Taro had completed their second round of
coordinated price increases, Bausch (Oceanside) entered the market. Rather than offer better
prices to win new customers, Bausch (Oceanside) matched the list (WAC) prices of the other
sellers, and NSP prices that ████████████████████.

REDACTED – PUBLIC VERSION



717.     Throughout this period, Mylan, Teva, Wockhardt, Taro and Bausch met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement for Enalapril Maleate and of the Fair Share agreement

718.     For example, in the short window of time after Mylan raised prices in 2013 and before Teva, Taro, and Wockhardt followed the increase, Teva received a request on July 10, 2013 from a customer seeking a lower price on Enalapril.  This set off a series of communications the purpose of which was to ensure that Teva, Taro, and Wockhardt joined Mylan's increase.  On July 10, Green of Teva and Nesta of Mylan had two phone calls, and they spoke twice more the following day.  During these conversations, Nesta explained to Green that Wockhardt already had agreed to follow the Mylan price increase on Enalapril.  Teva's Patel also called Nesta directly on July 12, 2013 and they spoke three times.  Not long after, K.K., a senior

REDACTED – PUBLIC VERSION

national account executive at Wockhardt, spoke to Green of Teva (twice on July 15, 2013), and reported internally the specific price ranges for Enalapril that he had obtained from Green. Soon thereafter, Teva and Wockhardt implemented price increases on their Enalapril Maleate Tablets.

719.    Similarly, as Taro evaluated whether to re-enter the Enalapril market, it engaged in a series of communications to shore up the Fair Share agreement among Defendants. Aprahamian of Taro communicated with Patel of Teva and M.C., Senior Vice President of Sales and Marketing at Wockhardt in July 2013, in the midst of the coordinate price increases by those manufacturers.

720.    Aprahamian also coordinated with M.A., a Mylan National Account Director, on how to allocate Enalapril; the two spoke on December 6, 11, and 12, 2013.

721.    On December 5, 2013, Aprahamian spoke to Teva's Patel and sought her input before sending a proposal to a Teva customer.

722.    On December 31, 2013, Aprahamian spoke with M.C. at Wockhardt, and they agreed that Wockhardt would concede one large customer to Taro so long as Wockhardt was able to retain a different large customer.

723.    In early 2014, market share was allocated "fairly" among the four competitors. As Teva was considering whether to bid on an RFP, with regard to Enalapril Patel cautioned: "no bid due to potential market/customer disruption, aka strategic reasons." The same day, Patel spoke to Aprahamian and exchanged 8 text messages with him.

724.    As 2014 progressed, Defendants again communicated directly in order to coordinate a second round of price increases. For example, Taro's Aprahamian spoke with his contact at Wockhardt on August 8 and August 14, 2014, and spoke with Teva's Patel on August 27.

REDACTED – PUBLIC VERSION

725.   ████████████████████████████████████████████████
████████████████████████████████

726.   The agreement between Defendants Mylan, Taro, Teva, Wockhardt, and Bausch was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Enalapril Maleate Tablets (2.5, 5, 10, 20 mg).

**44.    Entecavir**

727.   Entecavir, also known by the brand name Baraclude, among others, is a medication used to treat chronic Hepatitis B.  It has been available in the United States in a generic form for many years.

728.   The market for Entecavir is mature.  At all relevant times, there have been multiple manufacturers of Entecavir.

729.   During the relevant time frame, Defendants Teva and Par were the primary manufacturers of Entecavir.

730.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Entecavir Tablets beginning at least as early as the summer of 2014.

731.   In the summer of 2014, Teva and Par were preparing to enter the market for Entecavir.  Both companies were soliciting new customers before their launch.  On August 28, 2014, Rekenthaler had three phone calls with M.B, a Vice President of National Accounts at Par.  The next day, one of Teva's potential customers sought a lower price from Teva, suggesting it could lose the business to Par.  Teva, reassured by its discussions with Par, refused to lower its price, and retained the customer's Entecavir business.  In light of the successful coordination internally at Teva, Rekenthaler discussed the possibility of conceding a large customer to Par.

REDACTED – PUBLIC VERSION

732.    Teva and Par both launched their Entecavir on September 4, 2014. Within a few weeks, however, Teva and Par had divided the market according to the Fair Share agreement.

733.    Teva and Par continued to coordinate pricing and allocate customers, with Rekenthaler and the VP at Par speaking twice on October 2. For the entirety of the period in which Par and Teva were the only generic suppliers of Entecavir, market share and prices remained stable and higher than they would have been in a competitive market.

734.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

735.    The ability of Teva and Par to reach agreements on Entecavir tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

736.    ████████████████████████████████████████████████████
████████████████

737.    The agreement between Defendants Teva and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Entecavir Tablets.

**45.    Estradiol**

738.    Estradiol is a hormone. It is available in a Tablet formulation.

739.    It has been available in the United States in a generic form for many years.

740.    The market for Estradiol is mature. At all relevant times, there have been multiple manufacturers of Estradiol.

741.    During the relevant time frame, Defendants Actavis, Mylan, and Teva were the primary manufacturers of Estradiol.

REDACTED – PUBLIC VERSION

742.   ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████

743.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

744.   Throughout this period, Teva, Mylan and Actavis met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Estradiol and other drugs.

745.   For example, in the summer of 2012, Teva, Mylan and Actavis began coordinated price increases on Estradiol tablets.  As they began to roll out increases to customers, the lines of communication were open and frequently utilized. Teva's Green spoke to Mylan's Nesta on August 1, 2, 6, 7, 8, 10, 13, 15, 16, 17 and 28.

746.   Teva was also in touch with Actavis.  T.C., Teva's Senior Director of Sales, spoke twice (once for 10 minutes and another time for 15 minutes) with L.P., a Senior Director of National Accounts at Actavis, on August 6, 2012. By the end of the year, Actavis, Mylan and Teva had increased their Estradiol prices to customers by double or more.

747.   In early 2015, when Actavis, Mylan and Teva imposed another round of price increases, they again orchestrated these price increases by direct communication.  For example, Teva's Rekenthaler spoke to Nesta of Mylan on January 14 (two calls) and 20, 2015. In addition, Rekenthaler spoke to Falkin of Actavis on January 13, 14 (two calls), and 16, 2015.  Over the ensuing months, all three manufacturers were again able to impose price Estradiol price increases for their customers.

REDACTED – PUBLIC VERSION

748.    The coordination by Actavis, Mylan, and Teva is consistent with the Fair Share Agreement.

749.    The agreement between Defendants Actavis, Mylan, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Estradiol Tablets (0.5, 1, and 2 mg).

**46.    Estradiol and Norethindrone Acetate**

750.    Estradiol and Norethindrone Acetate, also known as Mimvey, is an oral contraceptive. It has been available in the United States in a generic form for many years.

751.    The market for Mimvey is mature. At all relevant times, there have been multiple manufacturers of Mimvey.

752.    During the relevant time frame, Defendants Teva and Breckenridge were the primary manufacturers of Mimvey.

753.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Mimvey tablets beginning at least as early as October 2013.

754.    On November 14, 2013, Breckenridge increased its pricing on Mimvey. Leading up to that increase, Rekenthaler of Teva had several phone calls with the Director of Sales at Breckenridge to coordinate the price increases, including two calls on October 14, 2013 and one on October 24, 2013. After those calls, they did not speak again until mid-January 2014, when Teva began preparing to implement its increase.

755.    On April 4, 2014, Teva increased pricing on a number of drugs, including Mimvey. Teva's new list (WAC) price exactly matched Breckenridge's list price. As Patel of Teva planned for Teva's April 4, 2014 price increases, both she and Rekenthaler continued to

communicate with their counterparts at Breckenridge. Rekenthaler spoke again to the Director of Sales at Breckenridge on January 15, 2014 and Patel spoke with a Director of National Accounts at Breckenridge two times on February 7, 2014.

756.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

757.    The ability of Teva and Breckinridge to reach agreements on Mimvey tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

758.    The coordination between Teva and Breckenridge is consistent with the Fair Share Agreement.

759.    The agreement between Defendants Teva and Breckinridge was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Estradiol and Norethindrone Acetate [Mimvey] Tablets.

**47.    Ethinyl Estradiol and Levonorgestrel**

760.    Ethinyl Estradiol and Levonorgestrel, when used in combination, is an oral contraceptive used to prevent pregnancy. It has been available in the United States in a generic form for many years.

761.    The market for Ethinyl Estradiol and Levonorgestrel is mature. At all relevant times, there have been multiple manufacturers of Ethinyl Estradiol and Levonorgestrel.

762.    During the relevant time period, both Teva and Sandoz marketed Ethinyl Estradiol and Levonorgestrel Tablets under multiple names – including both Portia and Jolessa.

REDACTED – PUBLIC VERSION

763.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, Teva and Sandoz conspired to fix, raise, maintain or stabilize the prices of Ethinyl Estradiol and Levonorgestrel beginning at least as early as the spring of 2012.

764.   In May 2012, Teva had much higher market share than Sandoz for both Portia and Jolessa.  When Walmart contacted Teva with a right of first refusal and explained that Sandoz made an offer for the sale of drugs including Portia and Jolessa, Teva initially sent a competitive offer.  However, after Teva's Green spoke to a contact at Sandoz, Teva withdrew its offer for Portia and Jolessa the next day and conceded Walmart to Sandoz.

765.   Sandoz continued to coordinate with Teva to achieve its Fair Share of the markets for Portia and Jolessa.  In July 2013, a key customer contacted Teva stating it had received bids on Portia and Jolessa, and in order for Teva to retain the business, Teva would have to submit its "best bids."  A few days later, Teva's Patel spoke to a contact at Sandoz, and Teva's Rekenthaler spoke to a different Sandoz contact.  Ultimately, Teva submitted a cover bid to the customer for Portia and Jolessa, intentionally inflating the bid to ensure that Sandoz obtained the primary award with the customer.

766.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

767.   The ability of Teva and Sandoz to reach agreements on Ethinyl Estradiol and Levonorgestrel was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

768.   The coordination by Teva and Sandoz is consistent with the Fair Share Agreement.

REDACTED – PUBLIC VERSION

769.    The agreement between Defendants Teva and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ethinyl Estradiol and Levonorgestrel Tablets.

**48.    Exemestane**

770.    Exemestane is used to treat certain types of breast cancer.  It is available in Tablet form and has been available in the United States for many years as a generic medication.

771.    The market for Exemestane is mature.  At all relevant times, there have been multiple manufacturers of Exemestane.

772.    Defendants Greenstone and West-Ward dominate sales of Exemestane Tablets with █████████████████████████████████████.

773.    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████

REDACTED – PUBLIC VERSION



774.     The ability of Greenstone and West-Ward to reach agreements on Exemestane was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

775.     ████████████████████████████████████████████████
████████████████████████

776.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

777.     The agreement between Defendants Greenstone and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Exemestane Tablets (25 mg).

REDACTED – PUBLIC VERSION

**49.      Fenofibrate**

778.      Fenofibrate, also known by the brand name Tricor, is a medication used to treat cholesterol conditions.  It has been available in the United States in a generic form for many years.

779.      The market for Fenofibrate is mature.  At all relevant times, there have been multiple manufacturers of Fenofibrate.

780.      During the relevant time frame, Defendants Teva, Lupin, Perrigo and Mylan were the primary manufacturers of Fenofibrate.  Defendant Zydus joined the Fenofibrate market and the Fenofibrate conspiracy in February 2014.

781.      Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Fenofibrate Tablets (48 mg and 145 mg) beginning at least as early as the beginning of 2013.

782.      Initially, Teva and Lupin were the first major suppliers of generic Fenofibrate. Perrigo and Mylan joined the market not long after.  In order to keep prices high, the Fenofibrate manufacturers coordinated pricing and market share.

783.      For example, in early 2013, Teva's Green called Mylan's Nesta to find out more about Mylan's plans with Fenofibrate.  Green reported back to his Teva colleagues that Mylan planned to launch Fenofibrate sometime around November 2013.

784.      A few months later in 2013, however, Teva learned that Mylan was moving up its launch date for Fenofibrate.  In advance of this launch, Teva, Lupin, Mylan and Perrigo conspired to allocate the market for Fenofibrate.

785.      For example, executives for Teva, Mylan, and Lupin were in regular contact by phone.  Patel (Teva) spoke to Berthold (Lupin) on May 6 and 7, and Green (Teva) spoke to Berthold on May 6 and 9, 2013.  Further, Green spoke to Nesta (Mylan) on May 7, 8, and 9,

2013.  And Nesta spoke to Berthold on May 7 and 8, 2013.  On these calls, Teva, Mylan, and Lupin executives shared information about Mylan's Fenofibrate launch and the plan to allocate market share to Mylan.

786.    All of the coordination had real effects.  For example, Teva decided to concede one of its largest customers to Mylan so that Mylan could obtain a Fair Share of the market and thus avoid price competition.

787.    Similarly, in February 2014, Zydus was preparing to enter the Fenofibrate market.  Green, formerly at Teva but now at Zydus, colluded with Teva's Patel and Rekenthaler, Mylan's Nesta, and Lupin's Berthold to share pricing information and allocate market share to his new employer, Zydus.  Mylan's Nesta spoke to T.P., Perrigo's Director of National Accounts, on February 6, 2014.

788.    In March 2014, when Zydus entered the Fenofibrate market, it announced list prices that matched Teva, Mylan, and Lupin.  In the days leading up to the launch, executives from all four competitors were in regular contact with each other to discuss pricing and allocating market share to Zydus.  Between March 3 and March 7, 2014, these competitors exchanged at least 26 calls with each other.

789.    In the months that followed, Teva "strategically conceded" several customers to Zydus in accordance with the agreement they had reached.  Throughout, Teva communicated directly with competitors to keep them apprised of developments and to ensure that Fair Share was maintained for Fenofibrate.  For example, Patel continued to communicate directly with Berthold (Lupin) and Green (Zydus) in May and June.

790.    By coordinating prices and market share, Teva, Mylan, Lupin, Perrigo and Zydus were able to keep Fenofibrate prices higher than they would have been in a competitive market.

- 185 -

REDACTED – PUBLIC VERSION

791.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

792.    The ability of Teva, Mylan, Lupin, Perrigo and Zydus to reach agreements on Fenofibrate tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

793.    ████████████████████████████████████████████████████████
████████████████████████████████.

794.    The agreement between Defendants Teva, Mylan, Lupin, Perrigo and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fenofibrate Tablets (48, 145 mg).

**50.    Fluconazole**

795.    Fluconazole is a commonly prescribed antifungal medication that has been available in the United States for decades. The World Health Organization includes Fluconazole on its List of Essential Medicines, *i.e.*, one of the most effective and safe medicines needed in a health system. Fluconazole is available in the United States in several dosage strengths, including 50, 100, 150, and 200 mg Tablets.

796.    The market for Fluconazole is mature. At all relevant times, there have been multiple manufacturers of Fluconazole. Defendants Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva dominated sales of Fluconazole in the relevant period.

797.    ████████████████████████████████████████████████████████
█████████████████████████████████████, as illustrated by the following example of 100 mg Tablets:



798.    The GAO found that all four dosage strengths had "extraordinary price increases" in 2013-2014.  Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva.

799.    Defendants Citron, Dr. Reddy's, Glenmark, Greenstone, and Teva became aware of the potential for coordinating price increases on Fluconazole in early 2013.  As explained above, Glenmark was one of Teva's highest-ranked competitors by "quality."  Teva also viewed Greenstone as a "high quality" competitor.

800.    As discussed previously, Teva's Patel went to great lengths to coordinate Teva's price increases with competitors before sending the list to K.G. on May 24, 2013.  She saw potential when Glenmark prepares to increase the price of a large number of drugs, and Teva also sold a number of them.

801.    In an email to Patel on May 1, 2013, K.G. identified as Teva's "Main priority" price increases for other drugs, namely "Methotrexate, Nadolol, and Fluocinonides. We need to try to get these done within the next 2-3 weeks if we can get approval." Anticipating Glenmark's price increases (which were not made public before May 16, 2013), Patel responded: "I also expect to have some high priority items to add to this list. I should have them shortly." Fluconazole is one of several drugs Patel identified for price increases. And indeed, she had numerous conversations with various sales and marketing executives at Glenmark over the next five days to discuss raising the price of Fluconazole and other drugs, including:

- May 2, 2013: four calls with a senior executive at Glenmark

- May 3, 2013: two calls and one text with a senior executive at Glenmark

- May 6, 2013: three calls with J.C.

- May 7, 2013 three calls with J.C.

802.    Consistent with the Fair Share Agreement, as the Glenmark price increases were approaching, Patel took steps to make sure that Teva did not undermine its competitor's action.

803.    For example, on the morning of May 15, 2013, in anticipation of the Glenmark price increases that had not yet been implemented or made public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to eight different Glenmark drugs, including Fluconazole. Teva planned to "discuss where to price" these drugs "based on market intelligence she has collected." In the interests of coordinating prices, Teva wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

804.    Patel also spoke to a senior executive at Glenmark for nearly six minutes the next day, May 16, 2013 – the day of the Glenmark price increases. Effective that day, Glenmark

- 188 -

increased price on numerous drugs where there was an overlap with Teva, including Fluconazole. Patel also spoke to a senior executive and J.C. at Glenmark multiple times on May 17, 2013. After Glenmark's price increases and before Teva had the opportunity to institute them, Teva was approached by several customers looking for a lower price. Teva refused to bid on most of these solicitations in order to maintain market stability. When it did bid, Teva intentionally bid high so that it would not win the business. As Patel stated to a Teva colleague when a large wholesaler approached Teva about bidding on several drugs for which Glenmark had increased its prices: "IF we bid, we need to bid high, or we will disturb the market."

805.    But Patel did not immediately push to increase Teva's prices on all of the overlapping drugs that Glenmark increased, such as Fluconazole. Instead, Teva waited until July 3, 2013. Teva hesitated because certain overlapping drugs also involved competitors that Patel did not consider at that time to be of the highest "quality." For these drugs, Patel anticipated that a little more work (and communication) was required before she would feel comfortable moving forward with a price increase.

806.    As of Friday, May 17, 2013, Patel had not yet decided whether Teva should institute the Glenmark price increase on Fluconazole, fearing that Greenstone might not be responsive to price coordination. In an internal email that day, Patel indicated to colleagues – including her supervisor, K.G. – that she was "[g]athering some revised intel" about Fluconazole in order to determine next steps.

807.    The following Monday, May 20, Patel called R.H., a director of national accounts at Greenstone but was unable to connect. Patel was ultimately not able to communicate with R.H. by phone until May 28, 2013 when the two had a twenty-one-minute call. The next day

after speaking to R.H. – May 29, 2013 – Patel promptly added Fluconazole to the Teva price increase list.

808.    While it was still deciding whether to institute Glenmark's price increases, Teva declined to capitalize on its competitor's price increase to gain market share. For example, in a May 17, 2013 email about Fluconazole, Teva's B.B. expressed concern to his colleagues about the prospect of taking McKesson's business, which represented all of Greenstone's or Glenmark's customers. Patel agreed and advised the group to decline to bid because she had heard that Greenstone was also increasing its price and because Teva already had 80% share and the lowest price in the market. In another internal Teva email, dated May 22, 2013, a Teva employee reports that Teva declined to bid at One Stop on Fluconazole after a Glenmark price increase and asks "to confirm that we want to follow the same [no-bid] strategy for Rite Aid?" Likewise, when Walgreens asked for a bid on Fluconazole and other items, Teva's Green forwarded the request to Patel on May 30, 2013, and wondered whether Glenmark's price increase prompted the inquiry. Anticipating that Teva would join the others and increase its prices shortly, she responded: "We are in a great inventory position, but not sure I want to steal it on an increase. . . . GS has very little share and no significant customers." Teva's patience and persistence was rewarded when each of the Defendants increased their prices on Fluconazole tablets in coordinated fashion.

809.    Defendants coordinated prices each step of the way and avoided bidding on business that would disrupt the Fair Share Agreement. Like its competitors, Teva increased its prices significantly. Teva's WAC prices for Fluconazole, which it announced on July 3, 2013, resulted in a tripling and quadrupling of its former prices. And just as they had done, when

REDACTED – PUBLIC VERSION

Glenmark increased its prices, Patel spoke to R.H. and a senior executive at Glenmark for nearly 16 minutes and almost five minutes, respectively.

810. ███████████████████████████████████████████

███████████████████████████████

811. No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

812. The agreement between Defendants Citron, Dr. Reddy's Glenmark, Greenstone, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluconazole Tablets.

**51.    Fluocinolone Acetonide**

813. Fluocinolone Acetonide is a commonly prescribed corticosteroid primarily used in dermatology to reduce skin inflammation and relieve itching. It has been on the market for decades and is available in several forms, including Fluocinolone Acetonide Ointment (0.025%), Cream (0.01% and 0.025%), and Solution (0.01%).

814. The market for Fluocinolone Acetonide is mature. At all relevant times, there have been multiple manufacturers. Defendants G&W, Sandoz, Taro, and Teligent dominated sales of these Fluocinolone Acetonide products in the relevant period. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████

815. ████████████████████████████████████████████

████████████████████████████████████████████████



816.    The GAO reported that Fluocinolone Acetonide experienced "an extraordinary price increase" in 2012-2013.

817.    There were no reported shortages of these products in the relevant period.  Yet, rather than lowering its prices in anticipation of competition from G&W and Teligent, Defendant Sandoz tripled its WAC prices on December 21, 2011.  And instead of competing on price, both G&W and Teligent entered the market with similar, supracompetitive prices.  Teligent preceded its entry with the announcement of WACs that matched or slightly exceeded Sandoz's prices.

818.

REDACTED – PUBLIC VERSION

819.    Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period.

820.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including G&W, Sandoz, Taro, and Teligent. Co-Defendant Teva considered Sandoz to be a "quality competitor," with whom it was easy to facilitate price coordination.

821.    The ability of G&W, Sandoz, Taro, and Teligent to reach agreement regarding Fluocinolone Acetonide was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

822.    ███████████████████████████████████████████████
████████████████████████████████

823.    The agreement between Defendants G&W, Sandoz, Taro and Teligent was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluocinolone Acetonide Ointment (0.025%), Cream (0.01% and 0.025%), and Solution (0.01%).

**52.    Fluoxetine HCL**

824.    Fluoxetine HCL is a medication used to treat depression. It is available in a Tablet formulation.

825.    It has been available in the United States in a generic form for many years.

826.    The market for Fluoxetine HCL is mature. At all relevant times, there have been multiple manufacturers of Fluoxetine HCL.

827.    During the relevant time frame, Defendants Mylan, Par, and Teva were the primary manufacturers of Fluoxetine HCL.

828.     In late June 2014, Mylan imposed large price increases on Fluoxetine HCL. Around the time of the increases, Mylan, Teva and Par directly communicated via phone to coordinate.

829.     For example, on June 18, 2014, less than a week before Mylan announced its Fluoxetine HCL price increases, a National Account Manager at Mylan spoke to the Vice President of National Accounts at Par.

830.     On June 24, the day after Mylan announced its price increases, Mylan's Nesta spoke to Teva's Rekenthaler.

831.     Two days later, on June 26, Teva's Patel exchanged a series of text messages with the Chief Commercial Officer at Par.

832.     In January 2015, Teva followed Mylan's price increases for Fluoxetine HCL Tablets.  Again, the manufacturers of Fluoxetine were in communication to coordinate.

833.     On January 5, 14 and 20, Teva's Rekenthaler spoke with Mylan's Nesta.

834.     On January 26, Rekenthaler spoke with a Vice President of National Accounts at Par for 14 minutes, and on January 28, he spoke with Par's Vice President of Sales.

835.     The ability of Mylan, Par, and Teva to reach agreements on Fluoxetine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

836.     The coordination by Mylan, Par, and Teva is consistent with the Fair Share Agreement.

837.     The agreement between Defendants Mylan, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Fluoxetine HCL Tablets.

**53.    Fluticasone Propionate**

838.    Fluticasone Propionate is a steroid medication used for the long-term management of asthma and chronic obstructive pulmonary disease.  It is available as a 50cg Nasal Spray and has been available in the United States for many years in a generic form.

839.    The market for Fluticasone Propionate is mature.  At all relevant times, there have been multiple manufacturers.

840.    Defendants Akorn, Apotex, and West-Ward dominate sales of Fluticasone Propionate ██████████████████████████████████████████████████
████████████████████████████████

841.    ████████████████████████████████████████
██████████████████████████████████████████████████████████████
████

REDACTED – PUBLIC VERSION



842.   The ability of Akorn, Apotex, and West-Ward to reach agreements on Fluticasone Propionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

843.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

844.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

845.   The agreement between Defendants Akorn, Apotex, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Fluticasone Propionate Nasal Spray.

REDACTED – PUBLIC VERSION

**54.**   **Gabapentin**

846.   Gabapentin is an anticonvulsant used to treat seizures.  It is available in Capsule, Tablet, and Oral Solution formulations.  It has been available in the United States for over a decade in a generic form.

847.   The market for Gabapentin is mature.  At all relevant times, there have been multiple manufacturers of Gabapentin.

848.   Defendants Aurobindo, Glenmark, and Teva dominate sales of Gabapentin 600 mg and 800 mg Tablets.  Glenmark had a majority of the market share during the relevant time period, while Teva and Aurobindo had smaller but still significant shares.

849.   ███████████████████████████████████████████
████████████████████████

850.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers Aurobindo, Glenmark, and Teva.

851.   Defendants became aware of the potential for coordinating price increases on Gabapentin in fall 2014.  On October 13 and 14, 2014, Nisha Patel of Teva attended the Annual Meeting of the Pharmaceutical Care Management Association ("PCMA") in Rancho Palos Verdes, California, along with a number of Teva's competitors.  The PCMA described its Annual Meeting as "the . . . ideal venue for senior executives from PBMs, specialty pharmacy, payer organizations and pharmaceutical manufacturers to network, conduct business and learn about the most current strategic issues impacting the industry."

852.   Shortly after returning from that meeting, during the morning of October 15, 2014, Patel informed colleagues at Teva that Glenmark would be taking a price increase on Gabapentin, and suggested that this would be a great opportunity to pick up some market share. The Glenmark price increase had not yet been made public, and would not be effective until

REDACTED -- PUBLIC VERSION

November 13, 2014.  Nonetheless, Patel informed her colleagues in an email that same day that

there would be a WAC increase by Glenmark effective November 13, and that she had already

been able to obtain certain contract price points that Glenmark would be charging to distributors.

At around the time she sent the email, Patel exchanged two text messages with Jim Brown of

Glenmark.

853.     Having relatively little market share for Gabapentin, Teva discussed whether it

should use the Glenmark price increase as an opportunity to pick up some market share.  Over

the next several weeks, Teva did pick up "a bit of share" to be more in line with fair share

principles, but cautioned internally that it did not "want to disrupt Glenmark's business too

much."

854.     ████████████████████████████████████████████

855.     The ability of Aurobindo, Glenmark, and Teva to reach agreements on

Gabapentin was aided by the prevalence of trade association meetings and conferences where the

parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named

Generic Drugs).

856.     ████████████████████████████████████████████
████████████████████

857.     No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

858.     The agreement between Defendants Aurobindo, Glenmark, and Teva was part of

an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices,

rig bids, and engage in market and customer allocation for generic drugs, including Gabapentin

Tablets (600, 800 mg).

REDACTED – PUBLIC VERSION

**55.**    **Glimepiride**

859.    Glimepiride is a medication used to treat diabetes.  It is available in a Tablet formulation.

860.    It has been available in the United States in a generic form for many years.

861.    The market for Glimepiride is mature.  At all relevant times, there have been multiple manufacturers of Glimepiride.

862.    During the relevant time frame, Defendants Dr. Reddy's and Teva were the primary manufacturers of Glimepiride.

863.    On August 28, 2014, Dr. Reddy's significantly increased its Glimepiride pricing. The increases were significant—with the Glimepiride WAC going up by approximately 300% across dosage strengths.  Dr. Reddy's price increases for Glimepiride were preceded by frequent calls between a Vice President of Sales at Dr. Reddy's, and Teva's Patel. They also exchanged text messages on August 25, 2014, three days before the price increase. The Dr. Reddy's VP and Patel continued to communicate after the price increase as well.

864.    Although Teva did not initially follow Dr. Reddy's price increases for Glimepiride, the Dr. Reddy's VP and Patel continued to communicate, and they exchanged four text messages on October 10, 2014.

865.    Several months later, on January 25, 2015, Teva raised prices on a number of different drugs, including Glimepiride. Teva raised its list (WAC) prices to match Dr. Reddy's list prices exactly.

866.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

867.    The ability of Dr. Reddy's and Teva to reach agreements on Glimepiride was aided by the prevalence of trade association meetings and conferences where the parties were

able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

868.     The coordination by Dr. Reddy's and Teva is consistent with the Fair Share Agreement.

869.     The agreement between Defendants Dr. Reddy's and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Glimepiride Tablets.

**56.     Griseofulvin**

870.     Griseofulvin is a medication used to treat fungal infections.  It is available in a Suspension formulation.

871.     It has been available in the United States in a generic form for many years.

872.     The market for Griseofulvin is mature.  At all relevant times, there have been multiple manufacturers of Griseofulvin.

873.     During the relevant time frame, Defendants Actavis and Teva were the primary manufacturers of Griseofulvin.

874.     On September 9, 2014, Actavis notified its customers of a price increase on Griseofulvin Suspension (Micro).  From September, through the day of the price increase Patel and Rekenthaler communicated with Falkin and Rogerson of Actavis to coordinate the increase over the course of at least ten telephone calls.

875.     Teva added Griseofulvin to its own price increase list, with the notation "Follow Competitor – Actavis" as the reason for the price increase, and followed the Actavis increase for Griseofulvin during its next price increase event on January 28, 2015.

876.    As with the Actavis price increase in September, in the days leading up to the January 2015 price increase, Rekenthaler of Teva and Falkin of Actavis coordinated frequently.

877.    Teva's price increase for Griseofulvin matched Actavis's list (WAC) pricing exactly.

878.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

879.    The ability of Actavis and Teva to reach agreements on Griseofulvin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

880.    The coordination by Actavis and Teva is consistent with the Fair Share Agreement.

881.    The agreement between Defendants Actavis and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Griseofulvin Suspension (Micro).

**57.    Halobetasol Propionate**

882.    Halobetasol Propionate is a corticosteroid used to treat a variety of skin conditions such as eczema, dermatitis, psoriasis, and rash.  It has been available in the United States for decades in a generic form.

883.    The market for Halobetasol Propionate is mature.  At all relevant times, there have been multiple manufacturers of Halobetasol Propionate.

884.    Defendants G&W, Perrigo, Sandoz, and Taro dominate sales of Halobetasol Propionate.  During much of the relevant time period, G&W and Perrigo had a roughly 40/60 split of the markets for both Ointment (0.05%) and Cream (0.05%).  Defendant Sandoz rejoined

REDACTED – PUBLIC VERSION

the market for Cream in early 2014, growing to a smaller but still sizeable share of the cream.

Defendant Taro rejoined the market for Cream and Ointment in summer 2014 and had small

shares of both.

885.



REDACTED – PUBLIC VERSION



886.    The GAO noted that the Halobetasol Propionate 0.05% Ointment and 0.05% Cream had "extraordinary price increases" in the years 2013-2014.

887.    ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Under the Fair Share Agreement, Sandoz and Taro did not attempt to undercut competitors' prices in order to gain additional market share.  When reentering the market and gaining share, Sandoz and Taro targeted the competitor with the higher market share in order to maintain market share at what they considered to be "fair share."  For example, in December 2013, when Sandoz was planning its relaunch of the 0.05% Cream, Arpad Szechenyi of Sandoz noted in internal Sandoz emails that G&W had 63% of the market and Perrigo had 36% and that Sandoz would seek to "[t]ake most of the share from G&W and one smaller account from Perrigo."  Likewise, when Taro was relaunching the 0.05% Ointment, Taro made an offer at Publix, and Publix reached out to Perrigo to see if Perrigo would match Taro's price proposal.

REDACTED – PUBLIC VERSION

Internally, Perrigo employees discussed conceding market share on Halobetasol Propionate to Taro, as it was the new entrant.  Tony Polman of Perrigo said, ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████"

888.    The ability of G&W, Perrigo, Sandoz, and Taro to reach agreement regarding Halobetasol Propionate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

889.    ████████████████████████████████████████████████ ████████████████████████████

890.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

891.    The agreement between Defendants G&W, Perrigo, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Halobetasol Propionate Ointment (0.05%) and Cream (0.05%).

**58.    Heloperidol**

892.    Haloperidol is an antipsychotic used to treat disorders such as schizophrenia and Tourette syndrome.  It has been available in the United States for many years in a generic form.

893.    The market for Haloperidol is mature.  At all relevant times, there have been multiple manufacturers.

894.    During the relevant time frame, Defendants Mylan, Sandoz, and Zydus were the primary manufacturers of Haloperidol Tablets.

REDACTED – PUBLIC VERSION

895.    For years, the prices for Haloperidol tablets were relatively low and stable. In the summer of 2013, however, the manufacturers of Haloperidol determined to raise prices. In the second half of 2013, they did so. For example, on the 5 mg dosage, Mylan first announced a list (WAC) price increase that more than tripled its prices. Sandoz followed the increase, announcing similar list (WAC) prices in January 2014. And Zydus, which entered the market in the fall of 2014, offered virtually identical prices as Mylan and Sandoz instead of trying to win customers through price competition.

896.    The NSP data also shows Mylan, Sandoz, and Zydus pricing:



REDACTED – PUBLIC VERSION

897.    Throughout this period, Mylan, Sandoz and Zydus met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Haloperidol and of their Fair Share agreement.

898.    For example, in July 2013, Sandoz executives were carefully monitoring the generic market in order to ensure that they adhered to the Fair Share agreement.  Sandoz did not want to accidentally poach customers from its co-conspirators.  As part of this effort, D.L., a Sandoz Director of National Accounts, called her contact at Mylan, Jim Nesta, and obtained a list of drugs for which Mylan had increased prices, including Haloperidol, so that Sandoz could follow with its own price increase.

899.    Not long after, Nesta twice called this Director of National Accounts at Sandoz on August 6, a few days before Mylan imposed price increases on Haloperidol.  On August 9, 2013, Mylan implemented significant list price increases on Haloperidol.

900.    Nesta also kept Zydus in the loop.  On August 15, Nesta and K.R., a Vice President of Sales at Zydus, exchanged text messages, and the next day the two spoke by phone.

901.    After the Mylan price increase, Sandoz and Zydus were careful not to take business and instead endeavored to maintain high prices, as contemplated by their price-fixing agreement and Fair Share agreement.

902.    For example, on October 2, 2013, M.V., the Associate Director of Pricing at Sandoz, advised a colleague to decline to bid on Haloperidol and Trifluoperazine: "We have been running up against Mylan a lot lately (Nadolol, Benaz/Hctz), and fear blowback if we take on any more products at this moment.  Trying to be responsible in the sandbox."  M.V. went to suggest that a pretextual excuse be offered to the customer: "I recommend you blame supply."

REDACTED – PUBLIC VERSION

Of course, the real reason for turning down the competitive opportunity was Sandoz's adherence to the Fair Share Agreement.

903.   On October 3, 2013, the day after this internal discussion at Sandoz in which it reaffirmed its commitment to "be responsible in the sandbox," D.L. (Sandoz Director of National Accounts) and Nesta of Mylan spoke by phone.  The two spoke again on October 4 and 14, 2013.  Nesta also exchanged text messages with the VP of Sales at Zydus on October 9, 2013. Not long after, Sandoz increased its pricing on Haloperidol.

904.   In November and December of 2013, as well as in January, February, March, April, June, July, August, September and October of 2014, Nesta (Mylan) and Kevin Green (who by then had left Teva and had begun working at Zydus) communicated by phone numerous times. Zydus also joined the Haloperidol price increases during this period.

905.   ████████████████████████████████████████████████████
████████████████████

906.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

907.   The agreement between Defendants Mylan, Sandoz, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Haloperidol Tablets (0.5, 1, 2, 5, 10, 20 mg).

### 59.   Hydrocodone Acetaminophen

908.   Hydrocodone Acetaminophen is a pain reliever and is available in tablet form in multiple strengths, including 5-325 mg and 10-325 mg Tablets. It has been available in the United States for over a decade in a generic form.

REDACTED – PUBLIC VERSION

909.    The market for Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets is mature.  At all relevant times, there have been multiple manufacturers.

910.    Amneal, Mallinckrodt, Par, and Teva dominated the sales of Hydrocodone Acetaminophen 5-325 mg and 10-325 mg Tablets in the relevant period with Mallinckrodt, Par, and Teva having roughly equal shares of the 5-325 mg Tablet market, and Amneal having a smaller share.  On the 10-325 mg Tablets, Mallinckrodt and Par had large shares of the market, Teva had a smaller but still significant share, and Amneal had a relatively small share of the market.

911.



REDACTED – PUBLIC VERSION



912. ███████████████

913.    The ability of Amneal, Mallinckrodt, Par, and Teva to reach agreements on Hydrocodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

914. ███████████████

915.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

916.    The agreement between Defendants Amneal, Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise

REDACTED – PUBLIC VERSION

prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocodone Acetaminophen Tablets (5-325, 10-325 mg).

**60.    Hydrocortisone Valerate**

917.    Hydrocortisone Valerate is a corticosteroid used to treat a variety of skin conditions such as eczema, dermatitis, psoriasis, and rash.  It has been available in the United States for decades in a generic form.

918.    The market for Hydrocortisone Valerate is mature.  At all relevant times, there have been multiple manufacturers of Hydrocortisone Valerate.

919.    Defendants G&W, Perrigo, and Taro dominate sales of Hydrocortisone Valerate Cream (0.2%).

920.

REDACTED – PUBLIC VERSION



921.    The GAO noted that the Hydrocortisone Valerate 0.2% Cream had an "extraordinary price increase" in the years 2013-2014.

922.

923.    The ability of G&W, Perrigo, and Taro to reach agreement regarding Hydrocortisone Valerate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

924.

925.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

926.    The agreement between Defendants G&W, Perrigo, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Hydrocortisone Valerate Cream (0.2%).

**61.    Irbesartan**

927.    Irbesartan, also known by the brand name Avapro, is a medication used in the treatment of hypertension. It has been available in the United States in a generic form for many years.

928.    The market for Irbesartan is mature. At all relevant times, there have been multiple manufacturers of Irbesartan.

929.    During the relevant time frame, Defendants Teva and Lupin were the primary manufacturers of Irbesartan.

930.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Irbesartan Tablets beginning at least as early as the late winter into spring of 2012.

931.    Teva received approval to manufacture generic Irbesartan in March 2012.

932.    On March 6, 2012, K.G., a Teva senior marketing executive, asked the sales team for information about competitors that were also making offers to supply Irbesartan.

933.    At 11:27 a.m., J.P., an account manager at Teva, responded: "Lupin is promising offers today." Less than twenty minutes later, Teva's Kevin Green called David Berthold at Lupin. They talked for seventeen (17) minutes. Shortly after the call, Green emailed his Teva colleagues with the information he obtained: "Lupin is looking for a 15% share. They already have ABC. Confirmed Zydus is out."

934.    That same day, Teva's David Rekenthaler informed the group that he still had not received "a call from any other manufacturer on Irbesartan." A senior commercial operations executive at Teva immediately responded: "Then work harder…." Rekenthaler followed that directive.

935.    The next morning, Green called Berthold again. He learned details regarding which competitors were launching or not launching the drug and the identities of customers who received offers. As a result of the coordination with Lupin, Teva was in a position to take up to a 40% market share when it launched Irbesartan without having to engage in price competition.

936.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

937.    The ability of Teva and Lupin to reach agreements on Irbesartan was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

938.    The coordination by Teva and Lupin is consistent with the Fair Share Agreement.

939.    The agreement between Defendants Teva and Lupin was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Irbesartan Tablets.

**62.    Isosorbide Dinitrate**

940.    Isosorbide Dinitrate is a commonly prescribed medication used to prevent chest pain (angina) in patients with coronary artery disease. It has been on the market for decades and is available in several dosages, including 5 mg, 10 mg, 20 mg, and 30 mg Tablets.

941.    The market for Isosorbide Dinitrate is mature. At all relevant times, there have been multiple manufacturers. Defendants Sandoz, Par, and West-Ward dominated sales of Isosorbide Dinitrate in the relevant period. Sandoz and West-Ward roughly split the market at

REDACTED – PUBLIC VERSION

the time of the price increase on the 5 mg, 10 mg, and 20 mg Tablets. Par re-entered the market later and regained a roughly equal share.  On the 30 mg Tablets, Par had approximately 90% of the market share, and West-Ward had approximately 10% of the market share during the relevant time period.

942.



943.

REDACTED – PUBLIC VERSION

944.     Pursuant to Defendants' agreement, their price increases had no significant impact of their respective market shares.

945.     Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Sandoz, and West-Ward. Co-Defendant Teva identified both Par and Sandoz as competitors willing to coordinate price increases under the Fair Share Agreement. Defendants' coordination included raising Isosorbide Dinitrate prices.

946.     The ability of Par, Sandoz, and West-Ward to reach agreement regarding Isosorbide Dinitrate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

947.     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

948.     The agreement between Defendants Par, Sandoz, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Isosorbide Dinitrate Tablets (5, 10, 20, 30 mg).

**63.     Ketoconazole**

949.     Ketoconazole is a commonly prescribed antifungal medication that has been available in the United States for decades as a generic. It is available as a Tablet to treat certain serious fungal infections in the body and as a Cream to treat fungal infections of the skin.

950.     The market for Ketoconazole is mature. At all relevant times, there have been multiple manufacturers of both Ketoconazole Tablets and Cream. Defendants G&W, Sandoz,

Taro, and Teva dominated sales of Ketoconazole Cream in the relevant period.  Defendants

Mylan, Taro, and Teva dominated sales of Ketoconazole Tablets in the relevant period.

951.



REDACTED – PUBLIC VERSION



952.    The GAO noted that it had "extraordinary price increases" for Ketoconazole in 2014-2015.

953.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including G&W, Mylan, Sandoz, Teva, and Taro.

954.    When Defendant Teva increased prices for Ketoconazole on April 4, 2014, it made sure to coordinate with all of its competitors in doing so.  Teva's price increases doubled its WAC price for Ketoconazole Cream and tripled its WAC price for 200 mg Tablets, which would leave it vulnerable to challenges unless it coordinated the price increases with its competitors.  In a practice that had now become routine at Teva, leading up to the price increase Patel and Rekenthaler both were communicating frequently with competitors, including in this case, Taro, and Sandoz.  For example, Patel called Taro's Aprahamian twice on March 10, 2014,

REDACTED – PUBLIC VERSION

before he returned her call at 10:46 am, at which time they spoke for five minutes. On March 17, 2014, she returned a call he had made two minutes earlier and they spoke for nine minutes. Patel also spoke with Sandoz's M.V. on March 31, 2014, when they spoke for fifteen minutes. On April 4, 2014 – the day of the Ketoconazole increases – Patel spoke separately with both Aprahamian of Taro and M.V. of Sandoz. During each call, she let them know that Teva was increasing the price of its Ketoconazole products. Patel's call with M.V. lasted over twenty-five minutes. Rekenthaler relayed the same message when he spoke to Nesta of Mylan that same day for six minutes.

955.   M.V. at Sandoz immediately told his colleagues not to bid on any new opportunities for the drugs, and instead put the products on "strict allocation" until Sandoz determined how to proceed. That same day, Aprahamian sent a similar internal email to his colleagues at Taro.

956.   Co-conspirators at Taro and Sandoz also communicated directly with each other to coordinate the price increases. On April 4, 2014, for example, Aprahamian spoke to C.B. at Sandoz for nineteen minutes. They discussed Teva's 2% cream price increase and the fact that Taro would match. C.B. then sent an email internally at Sandoz, alerting colleagues of the price increase and conveying information about Taro's price increase plans.

957.   Four days after Teva increased its Ketoconazole products, on April 8, 2014, Aprahamian called Patel and the two spoke for more than nineteen minutes. Later that same day, Aprahamian initiated a price increase for all of Taro's customers on Ketoconazole. Aprahamian directed that notice letters be sent to customers on April 16, 2014, with an effective date of April 17, 2014. Like Teva, Taro's WAC prices doubled for Ketoconazole Cream and tripled for Tablets.

958.     Previously, in anticipation of its own price increase, on April 7, 2014, Taro turned down an opportunity to bid on 200 mg Tablets.  After reviewing the request, a Taro sales executive sent an internal email stating: "we are not going to bid this product. . . . Taro has 27% share in a 4-player market."  In a follow-up email, E.G., a Director of Corporate Accounts at Taro, confirmed that Taro would decline to bid, but indicated that Taro would need to lie about the reason: "Yes, we are declining, but we need to advise its [sic] due to supply."

959.     Teva upheld its end of the deal on multiple occasions by not encroaching on its competitors' market share.  For example, on May 14, 2014, Patel directed Teva to decline to bid for Ketoconazole at AmerisourceBergen, citing the same logic Taro used: "unable to bid (strategic reasons, for internal purposes)."  Again on August 8, 2014, Teva turned down a Ketoconazole bid request from McKesson, reasoning in an internal email: "we just implemented the increase and we have very high share so whomever is challenging will continue to look elsewhere until they find their piece of the pie."  And again on April 14, 2014, in another internal email, it noted simply: "Ketoconazole. Decline to adjust. We have lead share."

960.     Although Sandoz immediately understood that it would match Teva and Taro's price increases for Ketoconazole Cream, it could not implement the price increase until October.  Sandoz's contracts with certain customers contained price protection terms, which would impose substantial penalties if Sandoz increased its prices at that time – and those penalties would have caused Sandoz to miss certain financial targets during the months after April 2014.  At Sandoz, senior management held monthly budget meetings where they analyzed whether it made financial sense to implement a particular price increase.  In the case of Ketoconazole, the ramifications of the price protection terms did not make sense for Sandoz to follow until October 2014.  When Sandoz ultimately matched the Teva and Taro increases for Ketoconazole Cream

REDACTED – PUBLIC VERSION

on October 10, 2014, Patel and M.V. at Sandoz spoke for more than three minutes. Sandoz's WACs matched Teva and Taro's and doubled its prior price.

961.    ███████████████████████████████████████████
███████████████████████████

962.    The agreement between Defendants G&W, Mylan, Sandoz, Taro, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ketoconazole Cream and Tablets.

**64.    Ketoprofen**

963.    Ketoprofen, also known by the brand name Dolobid, is a nonsteroidal anti-inflammatory drug (NSAID) used to treat mild to moderate pain, and to relieve symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain.  It has been available in the United States in a generic form for many years.

964.    The market for Ketoprofen Capsules was mature and at all relevant times had multiple manufacturers.

965.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Ketoprofen capsules.

966.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Ketoprofen beginning at least as early as September 2012.

967.    In the summer of 2013, Patel said she had heard "rumors of activity," i.e., a price increase, on Ketoprofen. "Rumors" was a term consistently used by Patel in emails to as a euphemism for communicating with competitors about future price increases.

REDACTED – PUBLIC VERSION

968.    On June 28, 2013, Teva's Green and Mylan's Nesta spoke on the phone.  Shortly thereafter, Patel sent an email internally at Teva stating that Mylan was announcing price increases that day, including for Ketoprofen.  In actuality, Mylan did not announce the price increases until July 1, 2013, with an effective date of July 2, 2013.  Teva followed on August 9, 2013.

969.    As Teva prepared to follow the Mylan increase, the companies were in frequent contact.  For example, on July 10, 2013, Green and Nesta spoke twice, and the next day, Nesta and Green exchanged several more calls.  In addition, Green spoke to Nesta on August 1 (two calls), 2, 6 (three calls), and 8 (three calls), 2013.

970.    The day before Teva officially followed Mylan's price increase – August 8, 2013 – Patel spoke directly to Nesta.

971.    On January 28, 2015, Teva again raised its price on Ketoprofen capsules.  Again, Teva's Patel and Rekenthaler communicated with Mylan before doing so.  For example, Rekenthaler spoke to Nesta of Mylan on January 14 (2 calls) and January 20, 2015.

972.    The ability of Teva and Mylan to reach agreements on Ketoprofen capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

973.    The coordination by Teva and Mylan is consistent with the Fair Share Agreement.

974.    The agreement between Defendants Teva and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ketoprofen Capsules.

**65.** **Ketorolac Tromethamine**

975.    Ketorolac Tromethamine is a medication used to treat pain.  It is available in a Tablet formulation.

976.    It has been available in the United States in a generic form for many years.

977.    The market for Ketorolac Tromethamine is mature.  At all relevant times, there have been multiple manufacturers of Ketorolac Tromethamine.

978.    During the relevant time frame, Defendants Mylan and Teva were the primary manufacturers of Ketorolac Tromethamine.

979.    For years, the prices of Ketorolac Tromethamine tablets were relatively low and stable.  As with numerous other drugs during manufactured by Teva and Mylan, things changed in mid-2012, when those manufacturers began to implement coordinated and sustained price increases.

REDACTED – PUBLIC VERSION



980.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

981.     The ability of Mylan and Teva to reach agreements on Ketorolac Tromethamine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

982.     Throughout 2012, 2013 and 2014, Teva and Mylan were also in regular communication for the purposes of fixing the prices of generic drugs, including Ketorolac Tromethamine.  For example, Teva's Green and Mylan's Nesta spoke many times by phone in 2012 and 2013. In 2014, Teva's Rekenthaler stepped in for Green and communicated directly with Nesta to work out pricing and Fair Share for Ketorolac Tromethamine and other drugs.

REDACTED – PUBLIC VERSION

983.    The coordination by Mylan and Teva is consistent with the Fair Share Agreement.

984.    The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Ketorolac Tromethamine.

**66.    Labetalol HCL**

985.    Labetalol HCL is a beta-blocker used to treat high blood pressure.  It has been in the United States market for years and is available in, for example, Tablets (100, 200, 300 mg).

986.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

987.    ██████████████████████████████████████████

██████████████████████████████:

REDACTED – PUBLIC VERSION



988.    The GAO observed "extraordinary price increases" for Labetalol in 2012-13.

989.    Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Sandoz, and Teva.

990.    Before raising its price, Teva coordinated with its competitors.  For example, Green spoke to a contact at Sandoz on July 29, 2012 (2 calls) and July 31, 2012.

991.    After Teva increased its pricing on Labetalol in the summer of 2012, it continued to coordinate with its competitors to maintain that supracompetitive pricing for that drug.  For example, on October 16, 2012, Green again spoke to his Sandoz contact two (2) times.  After those calls, Green emailed a Teva colleague: "Sandoz is back in good supply.  They took a 500% price increase several months back, and they are holding firm with their prices.  Stay the course and maintain our higher price."

REDACTED – PUBLIC VERSION

992. ████████████████████████████████████████████

████████████████

993.     No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

994.     The agreement between Defendants Par, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Labetalol HCL (100, 200, 300 mg)

### 67.     Lamivudine/Zidovudine

995.     Lamivudine/Zidovudine, also known by the brand name Combivir, is a combination of mediations used in the treatment of human immunodeficiency virus (HIV) infection.  It has been available in the United States in a generic form for many years.

996.     The market for generic Combivir is mature.  At all relevant times, there have been multiple manufacturers of generic Combivir

997.     During the relevant time frame, Defendants Teva, Lupin, Aurobindo, and Camber were the primary manufacturers of generic Combivir.

998.     Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of generic Combivir tablets beginning at least as early as April 2012.Teva launched its generic Combivir product in December 2011.  In mid-May, 2012, two competitors -- Lupin and Aurobindo -- received FDA approval for generic Combivir and were preparing to enter the market.

999.     Even before Lupin and Aurobindo obtained FDA approval, Teva was communicating with both about how to divvy up the market.  In late April 2014, Teva's Rekenthaler was speaking to the CEO at Aurobindo, who was a former colleague of

- 226 -

Rekenthaler's at Teva.  Meanwhile, Teva's Green was speaking to David Berthold, an executive

at Lupin, and Jim Grauso at Aurobindo.

1000.   In early May 2014, with the Lupin and Aurobindo launches just days away,

communications among all three competitors accelerated.  Between May 7 and 10, 2014, for

example, the three companies spoke at least 32 times. Green (Teva), Berthold (Lupin) and

Grauso (Aurobindo) discussed the specific customers that Teva would concede in order to ensure

that Lupin and Aurobindo gained a Fair Share of the market without eroding prices.

1001.   Similarly, when Camber received approval to market a generic form of Combivir,

Teva, again, coordinated the entry.  Konstantin Ostaficiuk, the President of Camber,

communicated with Rekenthaler of Teva and Berthold of Lupin to negotiate Camber's entry into

the market.   For example, on September 24, 2014, Ostaficiuk spoke to Rekenthaler three times

and to Berthold twice.  That same day, Berthold also spoke to a senior operations executive at

Aurobindo, to close the loop on generic Combivir communications.

1002.   By coordinating the entry of competitors into the generic Combivir market, Teva,

Lupin, Aurobindo and Camber were able to keep prices higher than they would have been in a

competitive market.

1003.   No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1004.   The ability of Teva, Lupin, Aurobindo, and Camber to reach agreements on

generic Combivir tablets was aided by the prevalence of trade association meetings and

conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association

Contacts as to the Named Generic Drugs).

1005.   The coordination by Teva, Lupin, Aurobindo, and Camber is consistent with the Fair Share Agreement.

1006.   The agreement between Defendants Teva, Lupin, Aurobindo, and Camber was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including generic Lamivudine/Zidovudine Tablets.

**68.   Latanoprost**

1007.   Latanoprost is used to treat glaucoma and high pressure in the eyes.  It has been available in the United States for many years in a generic form.

1008.   The market for Latanoprost Opthalmic Liquid Eye (0.005%) is mature.  At all relevant times, there have been multiple manufacturers.

1009.   █████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
████████████████

1010.   █████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

REDACTED – PUBLIC VERSION



1011.   The ability of Akorn, Bausch, Greenstone, and Sandoz to reach agreements on Latanoprost was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1012.   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

1013.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1014.   The agreement between Defendants Akorn, Bausch, Greenstone, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Latanoprost Opthalmic Liquid Eye (0.005%).

REDACTED – PUBLIC VERSION

**69.    Lidocaine HCL**

1015.   Lidocaine HCL is a local anesthetic used on the skin to stop itching and pain from certain skin conditions.  Some forms of this medication are also used to decrease discomfort or pain during certain medical procedures.  It is available in many forms including Topical formulations and Solutions for injection or infusion.  It is also available as a transdermal Patch applied directly to the skin.  Lidocaine HCL has been available in the United States for decades in a generic form.

1016.   The market for Lidocaine HCL is mature.  At all relevant times, there have been multiple manufacturers of Lidocaine HCL.

1017.   Defendants Akorn, Sandoz, and Taro dominate sales of Lidocaine HCL 5% Ointment.  During much of the relevant time period, Akorn, Sandoz, and Taro roughly split the market for Lidocaine HCL 5% Ointment in equal shares.

1018.

REDACTED – PUBLIC VERSION



1019. ███████████████████████████████████████

1020.    The ability of Akorn, Sandoz, and Taro to reach agreements regarding Lidocaine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1021. ██████████████████████████████████████████
████████████████████

1022.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1023.    The agreement between Defendants Akorn, Sandoz, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Lidocaine HCL Ointment (5%).

**70.      Loperamide HCL**

1024.    Loperamide HCL is a medication used to treat diarrhea.  It is available in a Capsule formulation.

1025.    It has been available in the United States in a generic form for many years.

1026.    The market for Loperamide HCL is mature.  At all relevant times, there have been multiple manufacturers of Loperamide HCL.

1027.    During the relevant time frame, Defendants Mylan and Teva were the primary manufacturers of Loperamide HCL.

1028.    After years of relatively low and stable pricing for Loperamide HCL capsules, Teva and Mylan began to coordinate and implement sustained price increases.

REDACTED – PUBLIC VERSION



1029.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1030.   The ability of Mylan and Teva to reach agreements on Loperamide HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1031.   Throughout this period, Teva and Mylan also communicated directly with each other in furtherance of their price-fixing agreements on Loperamide HCL capsules and other drugs.

REDACTED – PUBLIC VERSION

1032.   For example, in the weeks leading up to the first price increase for Loperamide, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012.

1033.   The two companies even went so far as to share internal documents and analyses on some occasions.  For example, on April 21, 2014, a national account executive at Teva forwarded to Patel two spreadsheets—that were created by Mylan personnel—that included information about Mylan's Loperamide price increases.

1034.   With Mylan's price increase information in hand, Teva began to plan how to follow those increases, and communicated directly with Mylan to work out the details. To that end, Teva's Rekenthaler spoke to Nesta at Mylan a number of times in May 2014 and a number of additional times in August 2014.

1035.   The coordination by Mylan and Teva is consistent with the Fair Share Agreement.

1036.   The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Loperamide HCL Capsules.

**71.    Metformin ER (F)**

1037.   Metformin ER (F) is a drug used to treat high blood sugar levels caused by type 2 diabetes.  It has been available in the United States for over a decade in a generic form.  Due to, among other things, its clinical efficacy and safety, Metformin has been designated as a model essential medicine by the World Health Organization.

1038.   The market for Metformin ER (F) is mature.  At all relevant times, there have been multiple manufacturers of Metformin ER (F).

REDACTED – PUBLIC VERSION

1039.   Defendants Actavis and Lupin dominate sales of Metformin ER (F) Tablets (500, 1000 mg). ███████████████████████████████

███████████████████████████████████████

███████████████████████

1040.   ███████████████████████████████

███████████████████████████████████████

███████████████████



REDACTED – PUBLIC VERSION



1041.   ███████████████████████████████████   Under the

Fair Share Agreement, Actavis and Lupin did not attempt to undercut competitors' prices in

order to gain additional market share

1042.   The ability of Actavis and Lupin to reach agreements regarding Metformin ER (F)

was aided by the prevalence of trade association meetings and conferences where the parties

were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic

Drugs).

1043.   ████████████████████████████████████████████
███████

1044.   No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1045.   The agreement between Defendants Actavis and Lupin was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Metformin ER (F) Tablets (500, 1000 mg).

**72.    Methadone HCL**

1046.   Methadone HCL is an opioid analgesic used to treat addiction to opioids.  It is available in Injectable, Tablet, and Oral Liquid formulations.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Methadone HCL has been designated as a model essential medicine by the World Health Organization.

1047.   The market for Methadone HCL is mature.  At all relevant times, there have been multiple manufacturers of Methadone HCL.

1048.   ███████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████

1049.   ████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION

1050.   The GAO noted that the Methadone HCL 5 mg Tablets had an "extraordinary price increase" in the years 2014-2015.

1051.   ███████████████████████████████████████████████████████

1052.   The ability of Mallinckrodt and West-Ward to reach agreement regarding Methadone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1053.   ████████████████████████████████████████████████████
████████████████████████

1054.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1055.   The agreement between Defendants Mallinckrodt and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Methadone HCL Tablets (5, 10 mg).

**73.   Methotrexate**

1056.   Methotrexate is an antimetabolite used to treat cancer by slowing the growth of cancer cells.  It is available in Tablet and Injection formulations.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Methotrexate has been designated as an essential medicine by the World Health Organization.

1057.   The market for Methotrexate is mature.  At all relevant times, there have been multiple manufacturers of Methotrexate.

1058. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

1059. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████



1060.   The GAO noted that Methotrexate 2.5 mg Tablets had an "extraordinary price increase" in the years 2013-2014.

1061.   Documentary evidence confirmed that these parallel price increases were the result of collusion among generic drug manufacturers Mylan, Par, Teva, and West-Ward.

REDACTED – PUBLIC VERSION

1062.   Immediately after she began working at Teva, Nisha Patel began to investigate Mylan drugs as a potential source for coordinated price increases.  In May 2013, Patel asked Kevin Green of Teva to look into certain drugs, including Methotrexate.  The next day, Green spoke to Jim Nesta at Mylan three times and then reported back to Patel.  Green and Nesta spoke a number of times over the next several days.  On May 29, 2013, after a discussion with Maureen Cavanaugh of Teva, Patel added four Mylan drugs to the Teva price increase list, including Methotrexate.  Discussions between Green and Nesta about specific drugs continued into June.

1063.   On July 2, 2013 – the day before Teva's price increases went into effect, including for Methotrexate– a colleague asked Patel how Teva's competitors' pricing compared with respect to Methotrexate.  Patel responded that Mylan's pricing was a little low on the drug, "but we are hearing rumors of them taking another increase," so Teva felt comfortable increasing the price of that drug on July 3, 2013.  These "rumors" – which were based on the direct communications between Green and Nesta noted above – again turned out to be accurate: Mylan increased its price of Methotrexate, pursuant to its agreement with Teva, on November 15, 2013.

1064.   There are some indications of supply issues on Methotrexate in spring 2013, around the time of the price increases, but the over 600% price increase went far beyond what market conditions required.  ████████████████████████████████████████████ ███████ far longer than what would be expected due to a temporary supply issue.

1065.   Under the Fair Share Agreement, Mylan, Par, Teva, and West-Ward did not attempt to undercut competitors' prices in order to gain additional market share.  For example, in May 2014, internal Teva emails show that Teva was seeking share from West-Ward to maintain fair share.  J.B. of Teva wrote to Nisha Patel of Teva, suggesting that they should look at Walmart as a possible share pickup because Walmart was with Teva.  Nisha Patel wrote back in

favor of pursuing a West-Ward customer, noting that "We are trying to be responsible and really need to pick up share."

1066.   The ability of Mylan, Par, Teva, and West-Ward to reach agreements on Methotrexate Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1067.   ████████████████████████████████████████
████████████████████████████

1068.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1069.   The agreement between Defendants Mylan, Par, Teva, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Methotrexate Tablets.

**74.   Methylphenidate**

1070.   Methylphenidate is a stimulant medication used to treat attention deficit hyperactivity disorder (ADHD).  It is available in Tablet, Chewable Tablet, Long-Acting Tablet, and Liquid formulations.  It has been available in the United States for decades in a generic form.

1071.   The market for Methylphenidate is mature.  At all relevant times, there have been multiple manufacturers of Methylphenidate.

1072.   Defendants Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun dominate sales of Methylphenidate Tablets.  ████████████████████████████████
████████████████████████████████████████████
████████████████████████████

REDACTED – PUBLIC VERSION

1073.



REDACTED – PUBLIC VERSION



1074.   The GAO noted that the Methylphenidate 5 mg, 10 mg, and 20 mg Tablets had "extraordinary price increases" in the years 2013-2014.

REDACTED – PUBLIC VERSION

1075.   ████████████████████████████████████████████████

██████████████████Under the Fair Share Agreement, Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun did not attempt to undercut competitors' prices in order to gain additional market share. For example, in an internal Sandoz email regarding a Methylphenidate price increase proposal, D.D. of Sandoz wrote to colleague R.T., "Any incremental supply would look to (best case) maintain our share of the market." Along similar lines, in an internal Sun email, D.V. of Sun wrote to colleague G.S., noting that on Methylphenidate, "We are at 2% market share (versus budget and fair of 17%)."

1076.   The ability of Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun to reach agreements regarding Methylphenidate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1077.   ████████████████████████████████████████████████

████████████████████████████

1078.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1079.   The agreement between Defendants Actavis, Impax, Mallinckrodt, Par, Sandoz, and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Methylphenidate Tablets (5, 10, 20 mg).

**75.   Methylprednisolone**

1080.   Methylprednisolone is an adrenocortical steroid used to treat inflammatory conditions like arthritis, lupus, psoriasis, and ulcerative colitis.  It is available in Tablet,

Suspension, and Injection formulations. It has been available in the United States for decades in a generic form.

1081. The market for Methylprednisolone is mature. At all relevant times, there have been multiple manufacturers of Methylprednisolone.

1082. Defendants Breckenridge, Cadista, Greenstone, Par, and Sandoz dominate sales of Methylprednisolone Tablets (4 mg). ███████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████

1083. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

REDACTED – PUBLIC VERSION

1084.   The GAO noted that the Methylprednisolone 4 mg Tablets had an "extraordinary price increase" in the years 2011-2012.

1085.   ███████████████████████████████████████████████████████

████████████████   Under the Fair Share Agreement, Breckenridge, Greenstone, Par, and Sandoz did not attempt to undercut competitors' prices in order to gain additional market share. For example, in December 2012, R.T. of Sandoz warned another colleague at Sandoz, "We should not go after Walgreens on Methylprednisolone Tabs" due to a "high risk of market disruption." Approximately one week later, Armando Kellum of Sandoz reiterated to R.T. that going after Methylprednisolone at Walgreens might "disrupt market." Then, in September 2013, S.G. of Sandoz wrote to Walgreens about the possibility of picking up additional market share. A few minutes later, Kellum (who was presumably blind carbon copied on the prior email) forwarded the email to S.G., asking "What is the deal here??? We were going to target one Cadista account?" Greenstein responded, "25% share [of Walgreens] would be the amount to get about 4-5% [market] SHARE." Kellum replied, "we really need to make sure we are coordinated. I think we can get share on this product in a non-disruptive way. I'm worried that we are just going bombs away." Greenstein reassures Kellum that they "can manage appropriately."

1086.   The ability of Breckenridge, Greenstone, Par, and Sandoz to reach agreements regarding Methylprednisolone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1087.   ███████████████████████████████████████████████████████

████████████████████████████████████

1088.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1089.   The agreement between Defendants Breckenridge, Greenstone, Par, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Methylprednisolone Tablets (4 mg).

**76.   Moexipril HCL and Moexipril HCL HCTZ**

1090.   Moexipril HCL (Moexipril), also known by the brand name Univasc, is part of a class of drugs called angiotensin-converting enzyme (ACE) inhibitors.  It is used to treat high blood pressure by reducing the tightening of blood vessels, allowing blood to flow more readily and the heart to pump more efficiently.  It has been available in the United States in a generic form for many years.

1091.   Moexipril HCL HCTZ (Moexipril HCTZ) is a combination of Moexipril and Hydrochlorothiazide (a diuretic).  This combination is used to treat high blood pressure.  It also has been available in the United States in a generic form for many years.

1092.   The markets for Moexipril and Moexipril HCTZ is mature.  At all relevant times, there have been multiple manufacturers of Moexipril and Moexipril HCTZ.

1093.   During the relevant time frame, Defendants Teva and Glenmark were the primary manufacturers of Moexipril and Moexipril HCTZ.

1094.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Moexipril and Moexipril HCTZ tablets beginning at least as early as May 2013.

1095.   As soon as Patel started at Teva, she began to identify price increase candidates through her conversations with various contacts at other drug manufacturers, including

Glenmark.  For example, Patel had four calls with an Executive Vice President of Glenmark on May 2, 2013.

1096.   Shortly after one of those calls, Patel sent an internal email where she identified six Glenmark drugs to add to the price increase list, including Moexipril and Moexipril HCTZ. Glenmark had not yet increased prices or announced price increases on any of those drugs.

1097.   Patel also made efforts to ensure that Teva abided by the Fair Share agreement. On May 15, 2013, in anticipation of the Glenmark price increases that were not yet public, Patel instructed her Teva colleagues to alert her of any requests by customers for pricing relating to a number of Glenmark drugs, including Moexipril and Moexipril HCTZ.  In accordance with the Fair Share agreement, Patel wanted to be careful to avoid obtaining any market share from Glenmark after the price increases.

1098.   Patel also spoke to the same Executive Vice President at Glenmark on May 16, 2013 – the day of the Glenmark price increases.  Effective that day, Glenmark increased prices on numerous drugs also sold by Teva, including Moexipril and Moexipril HCTZ. Patel again spoke to the EVP as well as to an Associate Director of Sales and Marketing at Glenmark multiple times on May 17, 2013.

1099.   After the Glenmark price increases, Teva was approached by several customers looking for lower prices.  Teva declined the invitations in order to maintain Fair Shares and avoid price erosion.  On occasions when it did provide a customer with a bid, Teva intentionally bid high so that it would not win the business.

1100.   Teva, as agreed, soon followed the Glenmark price increases for Moexipril and Moexipril HCTZ tablets; Teva's increases went into effect on July 3, 2013.  Thereafter, Teva and

REDACTED – PUBLIC VERSION

Glenmark monitored the Fair Share agreement and communicated as necessary to ensure that prices remained high.

1101.   For example, on August 5, 2013, Teva learned that it had been underbid by Glenmark at one of its largest wholesaler customers.  That same day, Patel called the Executive Vice President at Glenmark, to find out what was going on.  They spoke three times that day. The following day – August 6, 2013 – Patel spoke to Jim Brown, the Vice President of Sales at Glenmark, two times.  During these calls, Teva and Glenmark reaffirmed their prior agreement to maintain Fair Share and not to poach each other's customers after a price increase, and Glenmark withdrew its offer to Teva's customer.

1102.   The ability of Teva and Glenmark to reach agreements on Moexipril and Moexipril HCTZ tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1103.   The coordination by Teva and Glenmark is consistent with the Fair Share Agreement.

1104.   The agreement between Defendants Teva and Glenmark was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Moexipril and Moexipril HCTZ Tablets.

**77.   Nadolol**

1105.   Nadolol is a commonly prescribed medication for the treatment of high blood pressure, heart pain, and atrial fibrillation (abnormal heart rhythm) that has been available in the United States for decades in a generic form.  It is available in the United States in several dosage strengths, including 20mg, 40mg, and 80mg Tablets.

1106.   The market for Nadolol is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Greenstone, Mylan, Sandoz, and Teva dominated sales of Nadolol in the relevant period.

1107.   [REDACTED]

1108.   The GAO found that all four dosage strengths had "extraordinary price increases" in 2012-2013 or 2013-2014.  Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Greenstone, Mylan, Sandoz, and Teva.

1109.   Beginning in the summer of 2012, Defendants Greenstone, Mylan, Sandoz, and Teva became aware of the potential for coordinating price increases on Nadolol.  As explained

above, an anticompetitive understanding among these companies was firmly entrenched. Teva

considered Mylan its highest-ranked competitor by "quality." Teva also viewed Sandoz and

Greenstone as "high quality" competitors.

1110.   In 2012 and 2013, Mylan, Sandoz and Teva were the only manufacturers. All

three companies experienced supply problems of some sort during that time period, but they

remained in continuous communication to coordinate pricing and market allocation to maintain

market stability. Nadolol was a high-volume drug and one of the most profitable drugs, where

Teva, Mylan and Sandoz overlapped, so it was very important that they maintain their

coordination.

1111.   Defendants coordinated their price increases at every step. The day before the

August 27, 2012 Sandoz increase, Armando Kellum, then the Senior Director of Pricing and

Contracts at Sandoz, called Teva's Green. They had also spoken once earlier in the month.

P.K., then at Sandoz, also called Green twice on August 21, 2012 – the same day that Sandoz

requested approval from its Pricing Committee to raise the Nadolol price. Sandoz's price

increases for Nadolol resulted in a staggering 700% increase. The day after the Sandoz increase,

Green – acting as the conduit of information between Sandoz and Mylan – called Nesta of Mylan

twice, with one call lasting fourteen minutes.

1112.   Mylan, which returned to the market after a brief supply disruption, increased its

prices on January 4, 2013. In what had become a routine component of the scheme, the day

before the Mylan increase Nesta spoke to Green four times. The next day, Teva's Green

conveyed the information he had learned from Nesta directly to his counterpart Kellum at

Sandoz. On January 4, 2013 – the day of the Mylan increase – Green called Kellum twice in the

morning, including a six-minute call at 9:43 am. Shortly after hanging up with Green, Kellum

reported internally on what he had learned – but concealing the true source of the information – a convention that was frequently employed by many Sandoz executives to avoid documentation of their covert communications with competitors:

**From:** Kellum, Armando
**Sent:** Friday, January 04, 2013 11:28 AM
**To:** ███████████████████████████████████████████████████████
███████████████
**Subject:** Levothryoxine and nadolol

Just heard from a customer that

- Teva and Mylan raised have now raised price on Nadolol to our levels

and

Mylan took a significant price increase on Levothryoxine

Let's please be cautious on both of these products

Thanks

1113.   Being "cautious" on those products meant that Sandoz did not want to steal business away from its competitors by offering a lower price and taking their market share.

1114.   Kellum's phone records demonstrate that he did not speak with any customers during the morning of January 4, 2013.  At 11:50 am the same morning, Teva's Green also called P.K. at Sandoz and they spoke for fifteen (15) minutes.

1115.   Defendants Teva, Mylan and Sandoz continued to conspire about Nadolol and many other drugs throughout 2013 and thereafter.  On May 14, 2013, Teva's Patel asked Green and others at Teva to obtain "price points" on certain Mylan drugs including Nadolol in preparation for a potential price increase.  While Patel was waiting for their responses, she indicated internally to another Teva colleague that she was expecting "additional Mylan intel" and that she was expecting Mylan "to take an additional increase" on those items.  On May 17, 2013, Green spoke to Nesta six times, including calls lasting 11:50, 2:23, 4:25 and 16:02.

1116.   On May 29, 2013, after a discussion with Cavanaugh, Patel added four Mylan drugs, including Nadolol, to the Teva price increase list.  A month later, on July 2, 2013 and July 3, 2013 respectively, both Mylan and Teva increased the price of Nadolol to the point where their prices reached parity with Sandoz's prices.  Shortly after the increases, Sandoz's M.V. sent Patel a congratulatory message regarding the increase.  Internally, Sandoz calculated that the price increases justified Sandoz taking on an additional account at this "good price level," and explaining: "We want to target a Mylan account since they have 60% of the share."

1117.   Teva, which split the remaining 40% of the market with Sandoz viewed the matter in the same light.  When a large retail pharmacy asked Teva to bid on several drugs, Patel sent an internal email with "commentary" about the customer request, on July 31, 2013, stressing the need to take market share into consideration when considering adding to Teva's existing business, for example, "Nadolol: can pursue additional share (Mylan) for 3-player market."

1118.   Defendants were careful not to overstep.  In October 2013, M.V., a senior pricing executive at Sandoz, sent an internal email, including to Kellum, stating that Sandoz had decided not to bid on ██████████████████████ at a large retail customer.  M.V. explained his reasoning as follows: "We have been running up against Mylan a lot lately (Nadolol/Benaz/Hctz), and fear blowback if we take any more products at this moment.  Trying to be responsible in the sandbox."  These decisions were made by Sandoz executives as a direct result of communications between the companies, and in the context of an ongoing understanding among Defendants Sandoz, Mylan and others to fix prices and avoid competition on a number of different drugs, including Nadolol.

1119.   Similarly, when Greenstone entered the Nadolol market in mid-2014, rather than competing for market share, it priced its Nadolol Tablets at supracompetitive prices in coordinated fashion with Defendants Mylan, Teva, and Sandoz.

1120.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1121.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1122.   The agreement between Defendants Greenstone, Mylan, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nadolol Tablets.

**78.   Naproxen Sodium**

1123.   Naproxen Sodium is a nonsteroidal anti-inflammatory drug used to relieve pain from various conditions.  It has been available in the United States for decades in a generic form.

1124.   The market for Naproxen Sodium is mature.  At all relevant times, there have been multiple manufacturers of Naproxen Sodium.

1125.   Defendants Amneal and Glenmark dominate sales of Naproxen Sodium Tablets (275 mg and 550 mg).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮

1126. 

REDACTED – PUBLIC VERSION



1127. ████████████████████████████████████████████████████

1128.   The ability of Amneal and Glenmark to reach agreement regarding Naproxen Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1129. ████████████████████████████████████████████████████
████████████████████████████████████

1130.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1131.   The agreement between Defendants Amneal and Glenmark was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

REDACTED – PUBLIC VERSION

bids, and engage in market and customer allocation for generic drugs, including Naproxen Sodium Tablets (275, 550 mg).

**79.     Niacin**

1132.   Niacin is a medication used to treat high cholesterol.  It has been available in the United States in a generic form for many years.

1133.   The market for Niacin is mature.  At all relevant times, there have been multiple manufacturers of Niacin.

1134.   During the relevant time frame, Defendants Teva, Lupin, and Zydus were the primary manufacturers of Niacin Tablets ER.

1135.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Niacin Tablets ER beginning at least as early as March 2014.

1136.   Teva entered the market for Niacin ER on September 20, 2013 as the first-to-file generic manufacturer and was awarded 180 days of exclusivity.

1137.   Teva's exclusivity was set to expire on March 20, 2014.  Teva learned that Lupin planned to enter that day, and that Zydus planned to enter on June 28, 2014.

1138.   In order to facilitate the entry of Lupin and Zydus, and to maintain dollar revenue while ceding share to those new entrants, Teva increased prices on Niacin ER on March 7, 2014, before the new generics entered the market.  Yet again, the entrance of additional suppliers had the perverse effect of increasing prices, which was a hallmark feature of the Fair Share agreement.

1139.   Prior to Teva's price increase, Teva, Lupin and Zydus exchanged calls during which they discussed the pricing of Niacin ER and ensuring that Fair Share principles would be

REDACTED – PUBLIC VERSION

followed.  The calls were between Green of Zydus, Patel and Rekenthaler of Teva, and Berthold of Lupin.

1140.   Similarly, in the days leading up to the Lupin launch on March 20, 2014, all three competitors spoke again to discuss their plans for Niacin ER, with Teva agreeing to concede a Fair Share of the market to Lupin upon entry.

1141.   When Lupin entered the market for Niacin ER on March 20, 2014, it entered at the exact same list (WAC) prices as Teva. ██████████████████████████████, suggesting that it was not trying to lure away Teva's customers with better prices.

1142.   After Lupin's launch, Patel and Berthold continued to coordinate to make sure Lupin obtained the agreed-upon customers.  They coordinated a number of concessions by Teva that allowed Lupin to acquire large customers and its Fair Share without resorting to unfettered price competition.

1143.   In May 2014, Zydus was preparing to enter the Niacin ER market.  On May 6, 2014, Rekenthaler and Patel exchanged calls with Zydus's Green, after which Teva internally agreed to concede a large wholesaler customer, though it required a number of follow-up conversations with Zydus to hammer out the details.  On May 29, 2014, Rekenthaler again called Green, and they spoke twice that day.  Patel also called Green that day, and there were additional phone calls between Green and Rekenthaler and Patel on June 2, 2014.  After these communications, Teva committed to conceding a large wholesale customer to Zydus.

1144.   On June 28, 2014, Zydus launched Niacin ER and announced list (WAC) prices that matched Teva and Lupin. ███████████████████████████

1145.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

- 259 -

REDACTED – PUBLIC VERSION

1146.   The ability of Teva, Lupin, and Zydus to reach agreements on Niacin Tablets ER was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1147.   The coordination by Teva, Lupin, and Zydus is consistent with the Fair Share Agreement.

1148.   The agreement between Defendants Teva, Lupin, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Niacin Tablets ER.

**80.     Nitrofurantoin**

1149.   Nitrofurantoin is an antibiotic.  It is available in several forms and has been available in the United States for over a decade in a generic form.

1150.   The market for Nitrofurantoin is mature.  At all relevant times, there have been multiple manufacturers.

1151.   Defendants Alvogen, Mylan, and Teva dominate sales of Nitrofurantoin Macrocrystal (MAC) Capsules.

1152.   In late 2010, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

1153.   As summer 2011 approached, a new manufacturer, Alvogen, was planning to enter the market.  In anticipation of Alvogen's entry, Teva began to raise its NSP prices more aggressively.  And when Alvogen finally entered, it announced list (WAC) prices close to Mylan's already high prices, and its NSP prices were high as well.  Mylan responded by raising

its list (WAC) prices again, even higher than Alvogen's. Instead of driving prices down, Alvogen's entry into the market had the perverse effect of causing all manufacturers to raise prices, which was exactly what the Fair Share agreement was supposed to do.

1154.   Alvogen quickly gained market share, even with higher prices than Teva. Teva, for its part, continued to steadily raise prices. In July 2012, Teva announced a list (WAC) price increase that made its prices the highest in the market. Before implementing this large price increase, Teva coordinated with Mylan and Alvogen to ensure that fair share would be maintained. The NSP price chart below shows the large price increases imposed on Nitrofurantoin by Mylan and Teva, which were then matched by Alvogen when it entered the market.



REDACTED – PUBLIC VERSION

1155.   Throughout the relevant period, Mylan, Teva and Alvogen met at trade conferences and communicated directly in with each other in furtherance of their price-fixing agreement on Nitrofurantoin and of the Fair Share agreement.

1156.   For example, in the weeks before Teva raised its list (WAC) prices in 2012 to bring them more in line with Mylan's list prices, Teva's Green spoke to Nesta of Mylan on July 23, July 24 (2 calls); July 25; July 26; July 30 (2 calls); and July 31, 2012 (5 calls).

1157.   After some of the calls between Green and Nesta on July 31, 2012, Nesta called B.H., the Executive Vice President of Commercial Sales at Alvogen.

1158.   Teva, Mylan and Alvogen continued to coordinate and communicate in order to maintain Fair Shares.  For example, on October 10, 2012, a distributor customer approached Teva requesting a lower price for Nitrofurantoin MAC.  This prompted Teva's Green to reach out to both Nesta at Mylan and again to B.H. at Alvogen.  Nesta separately spoke to the same contact at Alvogen.  After coordinating with Mylan and Alvogen and re-confirming their price-fixing agreement on Nitrofurantoin MAC capsules, Teva did not lower its price.

1159.   ████████████████████████████████████████████
████████████████

1160.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1161.   The agreement between Defendants Teva, Mylan, and Alvogen was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nitrofurantoin Macrocrystal Capsules.

**81.    Neomycin Polymyxin Hydrocortisone**

1162.   Neomycin Polymyxin Hydrocortisone is a topical antibiotic used to treat outer ear infections caused by bacteria.  It is available in several forms, including a Solution and has been available in the United States for over a decade in a generic form.

1163.   The market for Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%) is mature.  At all relevant times, there have been multiple manufacturers.

1164.   Defendants Bausch and Sandoz dominate sales of Neomycin Polymyxin Hydrocortisone ███████████████████████████████████████

1165.   ██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████



REDACTED – PUBLIC VERSION

1166.   The ability of Bausch and Sandoz to reach agreements on Neomycin Polymyxin Hydrocortisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1167.   ██████████████████████████████████████████████████
████████████████

1168.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1169.   The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Neomycin Polymyxin Hydrocortisone Solution (3.5mg-10MU 1%).

**82.   Norethindrone/Ethinyl Estradiol**

1170.   Norethindrone/Ethinyl Estradiol is an oral contraceptive.  Teva markets its generic of this medication under the name Balziva.

1171.   Norethindrone/Ethinyl Estradiol has been available in the United States in a generic form for many years.

1172.   The market for Norethindrone/Ethinyl Estradiol is mature.  At all relevant times, there have been multiple manufacturers of Norethindrone/Ethinyl Estradiol.

1173.   During the relevant time frame, Teva and Lupin were the primary manufacturers of Norethindrone/Ethinyl Estradiol.

1174.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Norethindrone/Ethinyl Estradiol tablets beginning at least as early as January 2014.

REDACTED – PUBLIC VERSION

1175.   On January 23, 2014, a customer informed Teva that a new market entrant was seeking a share of its business on Norethindrone/Ethinyl Estradiol.  Teva employees surmised that the entrant was Lupin, as it had recently obtained approval to begin marketing the generic drug.

1176.   Teva employees discussed internally how to respond to the entrant, with at least one expressing concern that conceding business would cause Teva to lose its position as the Norethindrone/Ethinyl Estradiol market leader.

1177.   On January 24, 2014, Teva's Patel spoke to Berthold at Lupin twice by phone. Several days after that call, on January 29, 2014, Patel internally recommended conceding "part of the business" with the customer at issue to Lupin, in order "to be responsible in the market." Patel and Berthold spoke again on February 4, 2014 to further coordinate Lupin's entry into the market.

1178.   As a result of the agreement and anticompetitive coordination between Teva and Lupin, prices for Norethindrone/Ethinyl Estradiol tablets were higher than they would have been in a competitive market.

1179.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1180.   The ability of Teva and Lupin to reach agreements on Norethindrone/Ethinyl Estradiol tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1181.   The coordination by Teva and Lupin is consistent with the Fair Share Agreement.

REDACTED – PUBLIC VERSION

1182.   The agreement between Defendants Teva and Lupin was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Norethindrone/Ethinyl Estradiol Tablets.

**83.     Nortriptyline HCL**

1183.   Nortriptyline HCL, also known by the brand name Pamelor, is a medication used to treat depression.  It has been available in the United States in a generic form for many years.

1184.   The market for Nortriptyline HCL was mature and at all relevant times had multiple manufacturers.

1185.   During the relevant time frame, Defendants Teva, Taro, and Actavis were the primary manufacturers of Nortriptyline HCL Capsules.

1186.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Nortriptyline Hydrochloride capsules beginning at least as early as January 2011.

1187.   For years, the prices for Nortriptyline HCL capsules were low and relatively stable.  In the spring and summer of 2011, however, Teva and Actavis reached an agreement to impose significant price increases on all doses of Nortriptyline HCL capsules. Both manufacturers approximately ▮▮▮ their prices.  In late 2013, when Taro was preparing to enter the market, Teva and Actavis brought it into their price-fixing agreement and Taro entered the market at elevated prices.

1188.   The chart below shows the coordinated price increase by Actavis and Teva, as well as the market entry by Taro at elevated prices.

REDACTED – PUBLIC VERSION



1189.   Throughout this period, Actavis, Teva and Taro met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreements on Nortriptyline HCL and their Fair Share agreement.

1190.   For example, in late 2013, Teva, Actavis and Taro carefully orchestrated Taro's entry into the Nortriptyline HCL market.  In order to accommodate Taro's entry without disrupting prices, David Rekenthaler of Teva and Marc Falkin of Actavis spoke by phone on November 10, 14, 15 and 18, 2013.  Falkin also exchanged text messages with Maureen Cavanaugh of Teva on November 17 and 18.  Also during November, Ara Aprahamian of Taro spoke by telephone with Teva's Patel and Actavis's M.D. to hammer out their agreement.  Teva and Actavis both agreed to cede customers to Taro, and Taro was careful not to pursue more than its "fair share" from Teva or Actavis. Thereafter, Aprahamian (Taro), Falkin (Actavis) and

REDACTED – PUBLIC VERSION

Rekenthaler and Patel (Teva) continued to coordinate the pricing of Nortriptyline HCL, with numerous direct communications between them in 2014 and 2015.

1191.  No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1192.  The ability of Actavis, Teva and Taro to reach agreements on Nortriptyline HCL capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1193.  ███████████████████████████████████████████████████████████
███████████████████

1194.  The agreement between Defendants Actavis, Teva and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nortriptyline HCL Capsules.

**84.    Nystatin Triamcinolone**

1195.  Nystatin Triamcinolone is a steroid medication used to treat fungal infections.  It comes in a Cream and Ointment formulation, among others.

1196.  It has been available in the United States in a generic form for several years.

1197.  During the relevant time frame, Defendants Taro, Sandoz, and Teva were the primary manufacturers of Nystatin Triamcinolone.

1198.  Prior to certain Defendants launching Nystatin Triamcinolone, Defendants Taro, Sandoz, and Teva engaged in conversations about their launch.  These conversations involved discussions of market and customer allocations.

REDACTED – PUBLIC VERSION

1199.   The ability of Taro, Sandoz, and Teva to reach agreements on Nystatin Triamcinolone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1200.   The coordination by Taro, Sandoz, and Teva is consistent with the Fair Share Agreement.

1201.   The agreement between Defendants Taro, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Nystatin Triamcinolone Cream and Ointment.

## 85.   Omega-3-Acid Ethyl Esters

1202.   Omega-3-Acid Ethyl Esters, also known by the brand name Lovaza, is a medication used to lower high triglyceride levels in the blood.  It has been available in the United States in a generic form for many years.

1203.   The market for Omega-3 Acid Ethyl Esters is mature.  At all relevant times, there have been multiple manufacturers of Omega-3 Acid Ethyl Esters.

1204.   During the relevant time frame, Teva, Par and Apotex were the primary manufacturers of Omega-3-Acid Ethyl Esters Capsules.

1205.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Omega-3-Acid Ethyl Esters capsules beginning at least as early as the spring of 2014.

1206.   On April 8, 2014, Teva launched Omega-3 Acid Ethyl Esters.

REDACTED – PUBLIC VERSION

1207.   On the morning of June 26, 2014, Patel emailed a colleague at Teva relaying that Par had recently received FDA approval for this drug. Patel said that she would "snoop around" to see if Par had begun shipping product. That morning, Patel sent a message to T.P., Chief Commercial Officer at Par through LinkedIn. Later that day, they exchanged a number of text messages.

1208.   The next morning, Par's Chief Commercial Officer called Patel and they spoke for nearly 30 minutes. That same morning, Patel told colleagues that she now had "some more color" on Par's launch of Omega-3-Acid Ethyl Esters. Internally, Teva documents evidence a clear understanding of Par's confidential bidding and pricing plans.

1209.   Par launched Omega-3-Acid Ethyl Esters capsules on June 30, 2014. Teva proceeded to concede business to Par to ensure Par's smooth entry into the market.

1210.   As new competitors entered the market, Teva coordinated with them to avoid competition and keep prices high, including phone calls between Rekenthaler and a Senior Vice President and General Manager of U.S. Sales at Apotex on September 25 and 27, 2014.

1211.   Due to supply limitations, Par was not able to pursue a full Fair Share of the market until late November 2014. On November 10, 2014, Patel and Par's Chief Commercial Officer exchanged five (5) text messages.

1212.   By mid-February 2015, Teva had conceded several large customers to Par. During this time, Rekenthaler was speaking frequently with M.B., a senior national account executive at Par, to coordinate.

1213.   By April 2015, Apotex had officially entered the market, and consistent with the Fair Share understanding, Teva conceded customers to accommodate the new entrant. During this period, Rekenthaler spoke multiple times with J.H., Senior VP at Apotex.

REDACTED – PUBLIC VERSION

1214.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1215.   The ability of Teva, Par and Apotex to reach agreements on Omega-3 Acid Ethyl Esters capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1216.   The coordination by Teva, Par, and Apotex is consistent with the Fair Share Agreement.

1217.   The agreement between Defendants Teva, Par and Apotex was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Omega-3 Acid Ethyl Esters Capsules.

**86.   Oxaprozin**

1218.   Oxaprozin is a commonly prescribed nonsteroidal anti-inflammatory drug (NSAID) to relieve the inflammation, swelling, stiffness, and joint pain associated with osteoarthritis and rheumatoid arthritis.  It has been in the United States market for decades and is available in Tablets (600 mg).

1219.

1220.

REDACTED – PUBLIC VERSION



1221. The GAO observed "extraordinary price increases" for Oxaprozin in 2012-13. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Dr. Reddy's, Greenstone, Sandoz, and Teva.

1222. Defendants coordinated their price increases. Teva initiated the price increase on July 31, 2012, resulting in an increase of more than six times its prior WAC price for Oxaprozin. Sandoz matched on November 5, 2012 with WAC prices that also were severalfold increase in its prior WAC price. Following a routine and systematic pattern, Teva's Green was in frequent communication with executives at Sandoz and other Teva competitors to implement these and other drug price increases. For example, communications between Teva's Green and Sandoz executives include 84 texts and calls with P.K. from April 26, 2010 to January 14, 2013, 14 calls with Kellum from March 21, 2012 to August 14, 2013, and four calls or texts with R.T. from May 23, 2010 to May 15, 2013.

REDACTED – PUBLIC VERSION

1223.   Sandoz observed its agreement with Teva and did not bid when Teva's customer, Walgreens, requested a bid on Oxaprozin. Kellum responded internally: "Let's hold tight. Teva did the right thing here, our supply is tight and we are making good money on it."

1224.   Defendants also coordinated Greenstone's entry into the market on March 27, 2013, where Greenstone entered with the same WACs as Teva and Sandoz. For example, when Sandoz's customer, Optisource, informed it in early March 2013 that it had received a much lower offer from Greenstone on Oxaprozin, Sandoz decided to concede its business, rather than risk lower market prices. As one Sandoz executive put it: "My hope is Greenstone understands the market, stays away from RAD and ABC, and goes after Teva. Also, we do not need ABC seeing Opti with Sandoz product so low in the market."

1225.   In the days and weeks leading up to Greenstone's entry into the market, Green of Teva and R.H. of Greenstone were in frequent communication by phone and text to coordinate the entry, including one call for almost eleven minutes on March 6, 2013; two calls on March 11, 2013; three calls on the evening of March 18, 2013, and seven calls and a text message between March 20, 2013 and March 22, 2013. During these communications, Teva agreed to concede specific customers to Greenstone in order to avoid competition and price erosion resulting from Greenstone's entry.

1226.   Part of their understanding required Teva to cede two large customers, CVS and Cardinal Health, to Greenstone, while Teva would retain Walmart. However, on March 27, 2013, Teva learned from Walmart that Greenstone had also bid on Walmart's business. This infuriated Teva. In an internal email, Rekenthaler lamented: "They should not have gone to WalMart. Poor strategy on their part for sure." Another Teva executive agreed that Greenstone

was not keeping its part of the bargain: "I thought they said they were done after cardainl [sic].. I am pissed."

1227.   Teva took immediate steps to enforce the agreement.  On March 27, 2013, Green called R.H. at Greenstone at 5:25 pm but she did not answer.  The next day there were seven calls, and nine text messages between Green and R.H.  During those conversations, Greenstone agreed to withdraw the offer to Walmart and honor the agreement with Teva.  True to its word, Greenstone withdrew its offer to Walmart by that afternoon.  Walmart informed Teva: "I just received word from Greenstone that they have met their market share and the proposal has expired.  Please see what you can do with pricing."  Teva's internal response ("Funny") indicated that it had no intention of lowering its price for Walmart, now that Greenstone had stepped down.

1228.   The Defendants were also ready when Dr. Reddy's re-launched its Oxaprozin Tablets on June 27, 2013.  Indeed, Dr. Reddy's had advance knowledge of Teva's concessions to Greenstone, as reflected by a May 10, 2013 internal email, remarking: "Cardinal switched to Greenstone. Teva was 'fine' with it! Pricing still high."

1229.   Consistent with their agreement, Dr. Reddy's entered the market with the same WAC prices as the other Defendants and almost immediately got two customers, Keysource and Premier.  But when Dr. Reddy's competed for Teva's Oxaprozin business at Walgreens, that triggered a nearly five-minute call between Teva's Green and J.A. of Dr. Reddy's– the only one ever between these two individuals that is identified in the phone records.  Eager to avoid price erosion, Teva considered the possibility of keeping the Walgreens business, but conceding Teva's next largest customer for Oxaprozin – Econdisc – to Dr. Reddy's.

1230.   Patel asked a colleague to "run the customer volume and profitability analysis for Oxaprozin." It was typical at Teva to run this type of report before negotiating market share with a competitor.  At 2:20 pm, that colleague provided the information to Patel, copying Rekenthaler and K.G. of Teva.  With this information in hand, less than an hour later Rekenthaler placed a call to T.W., a Senior Director of National Accounts at Dr. Reddy's.  The call lasted two minutes and was their only telephone conversation in 2013.

1231.   After this conversation, Teva decided to maintain the Walgreens business, but concede the Econdisc business to Dr. Reddy's, which Teva conceded on August 7, 2013.  Green listed "Strategic Market Conditions" in Teva's Delphi database as the reason for conceding the business to Dr. Reddy's.  By September 10, 2013, Dr. Reddy's had achieved its goal of obtaining a 20% market share.

1232.   ███████████████████████████████████████████████████████████
████████████████████████████████████

1233.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1234.   The agreement between Defendants Dr. Reddy's, Greenstone, Sandoz, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxaprozin Tablets (600 mg).

### 87.   Oxybutynin Chloride

1235.   Oxybutynin Chloride is a commonly prescribed antispasmodic and anticholinergic agent used to treat symptoms of overactive bladder.  It has been in the United States market for years and is available in Tablets.

1236. ███████████████████████████████████

██████████████████████████████████████

████████████████████████

1237. ███████████████████████████████████

██████████████████:



1238. The GAO observed "extraordinary price increases" for Oxybutynin Chloride in 2013-14. Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers including Par, Teva, and Upsher-Smith.

1239. In 2013, Teva, Par and Upsher-Smith coordinated their pricing actions. For example, Teva's Patel spoke to B.L. at Upsher-Smtih on April 29, 2013 for nearly twenty (20) minutes reached an understanding that Teva and Upsher-Smith would follow each other's price increases. On June 15, 2013, after Teva, Upsher-Smith and Par had begun to radically raise

REDACTED – PUBLIC VERSION

prices, Patel exchanged six (6) text messages with B.L. Also in June, K.O, VP of National

Accounts at Par, spoke multiple times to B.P., National Account Manager at Upsher-Smith.

1240. ████████████████████████████████████████████████████

████████████████████

1241. No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1242. The agreement between Defendants Par, Teva, and Upsher-Smith was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Oxybutynin

Chloride Tablets.

**88.   Oxycodone Acetaminophen**

1243. Oxycodone Acetaminophen is a pain reliever that has been available in the United

States for decades. It is available in Capsule, Tablet, and Oral Solution formulations.

1244. The market for Oxycodone Acetaminophen is mature. At all relevant times, there

have been multiple manufacturers of Oxycodone Acetaminophen.

1245. Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par

dominate the sale of Oxycodone Acetaminophen, which comes in several dosage strengths

including 5-325, 7.5-325, 10-325 mg Tablets.

1246. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

REDACTED – PUBLIC VERSION

1247.



1248. ███████████████████████████████████████████

████████████████████████████████████████

1249.   The ability of Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par to reach agreement regarding Oxycodone Acetaminophen was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1250.   ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████

1251.   No non-collusive market factors (e.g., product shortages) can explain the artificially inflated prices.

- 279 -

REDACTED – PUBLIC VERSION

1252.   The agreement between Defendants Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, and Par was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone Acetaminophen Tablets (5-325, 7.5-325, 10-325 mg).

### 89.   Oxycodone HCL

1253.   Oxycodone HCL is an opioid agonist indicated for the management of moderate to severe acute and chronic pain where the use of an opioid analgesic is appropriate.  It is available in several forms, including Tablet and Oral Solution, and has been available in the United States for over a decade in generic form.

1254.   The market for Oxycodone HCL is mature.  At all relevant times, there have been multiple manufacturers of Oxycodone HCL.

1255.



1256.   The GAO noted that Oxycodone HCL had "extraordinary price increases" in the years 2010-2011.

1257.   ████████████████████████████████████████████████

1258.   The ability of Glenmark and Lannett to reach agreements on Oxycodone HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1259.   ████████████████████████████████████████████████████
████████████████

1260.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

1261.   The agreement between Defendants Glenmark and Lannett was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Oral Solution (20mg/ml).

1262. 

REDACTED – PUBLIC VERSION



1263.   The ability of Mallinckrodt, Par and Teva to reach agreements on Oxycodone HCL Tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1264.   ████████████████████████████████████████████
████████████████

1265.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1266.   The agreement between Defendants Mallinckrodt, Par, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Oxycodone HCL Tablets (15 mg and 30 mg).

**90. Paricalcitol**

1267.   Paricalcitol, also known by the brand name Zemplar, is a medication used to treat and prevent high levels of parathyroid hormone in patients with chronic kidney disease.  It has been available in the United States in a generic form for many years.

1268.   The market for Paricalcitol is mature.  At all relevant times, there have been multiple manufacturers of Paricalcitol.

1269.   During the relevant time frame, Defendants Teva, Dr. Reddy's, and Zydus were the primary manufacturers of Paricalcitol Capsules.

1270.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Paricalcitol capsules beginning at least as early as the beginning of 2014.

1271.   Teva was the first generic manufacturer to enter the market for Paricalcitol and thus had 180 days of exclusivity.  In March 2014, as the end of the exclusivity period was approaching, Teva began to plan for the ceding of Fair Shares to new market entrants.

1272.   Zydus was one of the new market entrants.  Before Zydus launched its product, Patel and Rekenthaler of Teva spoke with Green of Zydus and discussed which Paricalcitol customers Teva would retain and which customers it would concede to Zydus.  Rekenthaler and Green spoke on February 28 and March 3, 2014, and Green and Patel spoke at least five times over the course of two days (March 3 and March 4, 2014).

1273.   Throughout March and April, Patel, Rekenthaler, and Green continued to coordinate closely about divvying up the market. Representatives of the two companies spoke on March 14 (Patel called Green, and Rekenthaler called Patel), March 17 (three calls between Patel and Green), March 27 (Patel to Green), April 1-2 (voicemail and call between Patel and Green),

REDACTED – PUBLIC VERSION

and April 17, 2014 (Green and Patel spoke). In close proximity to these communications, Teva strategically conceded several Paricalcitol customers to Zydus.

1274.    By May 2014, Dr. Reddy's was preparing to enter the Paricalcitol market.

1275.    On May 1, 2014, a Senior Director of National Accounts at Dr. Reddy's spoke with Rekenthaler of Teva. On June 10, 2014, Patel spoke with the Vice President of Sales for North American Generics at Dr. Reddy's.

1276.    As Dr. Reddy's solicited business from Teva customers, Teva conceded them to Dr. Reddy's as agreed. For example, a large grocery chain informed Teva that it had received a competing offer for Paricalcitol from Dr. Reddy's. Internally, Patel recommended that Teva concede the business, and it did.

1277.    On July 10, 2014, another grocery chain informed Teva that it had received a Paricalcitol offer. That day, the Head of National Accounts at Dr. Reddy's called Patel. The next day, Teva conceded the customer to Dr. Reddy's.

1278.    In July, after Teva conceded yet another grocery customer to Dr. Reddy's, a large wholesaler informed Teva that it had received a competing bid for Paricalcitol. On July 18, 2014, Patel called the Head of National Accounts at Dr. Reddy's and left a message. On July 21, they spoke, and again on the following day. During these calls, Patel and the Head of National Accounts at Dr. Reddy's agreed that Dr. Reddy's would stop soliciting Teva customers if Teva conceded the large wholesaler to Dr. Reddy's. Dr. Reddy's confirmed to Teva that it "would be done after this." The next day, Teva conceded the wholesale customer to Dr. Reddy's.

1279.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

1280.   The ability of Teva, Dr. Reddy's, and Zydus to reach agreements on Paricalcitol capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1281.   The coordination by Teva, Dr. Reddy's, and Zydus is consistent with the Fair Share Agreement.

1282.   The agreement between Defendants Teva, Dr. Reddy's, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Paricalcitol Capsules.

**91.    Permethrin**

1283.   Permethrin is a medication used to treat scabies.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Permethrin has been designated as a model essential medicine by the World Health Organization.

1284.   The market for Permethrin is mature.  At all relevant times, there have been multiple manufacturers of Permethrin.

1285.   Defendants Actavis and Perrigo dominate sales of Permethrin 5% Cream.

1286.

REDACTED – PUBLIC VERSION



1287.   The GAO noted that the Permethrin 5% Cream had an "extraordinary price increase" in the years 2011-2012.

1288.   ███████████████████████████████████

███████████████████████████████████████████

1289.   The ability of Actavis, Mylan, and Perrigo to reach agreement regarding Permethrin was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1290.   ███████████████████████████████████

██████████████████████████

REDACTED – PUBLIC VERSION

1291.  No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1292.  The agreement between Defendants Actavis, Mylan, and Perrigo was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Permethrin Cream (5%).

**92.    Perphenazine**

1293.  Perphenazine is a psychiatric medication used to treat mental or mood disorders such as schizophrenia.  It has been available in the United States for decades in a generic form.

1294.  The market for Perphenazine is mature.  At all relevant times, there have been multiple manufacturers of Perphenazine.

1295.  Defendants Par and Sandoz dominate sales of Perphenazine 2 mg, 4 mg, 8 mg, and 16 mg tablets.  During the early part of the relevant time period, Par and Sandoz divided the market for Perphenazine Tablets in a roughly 10/90 split.  Over the course of the time period, the market share grew closer to a 30/70 split.

1296.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

- 288 -





REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION

[REDACTED]

[REDACTED]

[REDACTED]

1298.   The ability of Par and Sandoz to reach agreement regarding Perphenazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1299.   [REDACTED]

[REDACTED]

1300.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1301.   The agreement between Defendants Par and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Perphenazine Tablets (2, 4, 8, and 16 mg).

**93.   Phenytoin Sodium**

1302.   Phenytoin Sodium is an antiepileptic drug used to prevent and treat seizures.  It has been available in the United States for decades in a generic form.  Due to, among other things, its clinical efficacy and safety, Phenytoin Sodium has been designated as an essential medicine by the World Health Organization.

1303.   The market for Phenytoin Sodium is mature.  At all relevant times, there have been multiple manufacturers of Phenytoin Sodium.

REDACTED – PUBLIC VERSION

1304.   Defendants Amneal, Mylan, Sun, and Taro dominate sales of Phenytoin Sodium 100 mg Capsules.[30]  During the relevant time period, Taro held about 50% of the market share, while Amneal, Mylan, and Sun split the rest of the market.

1305.



1306.   The GAO noted that Phenytoin Sodium 100 mg Capsules had an "extraordinary price increase" around this time.

1307.   Documentary evidence confirms that these parallel price increases were the result of collusion among Amneal, Mylan, Sun, and Taro.

---

[30] Although Phenytoin Sodium extended release is also sold in dosage strengths of 200 mg and 300 mg, only Sun sells those dosage strengths.

REDACTED -- PUBLIC VERSION

1308.   By early-2014, Amneal, Mylan, Sun, and Taro became aware of the potential for price increases on Phenytoin Sodium.  For example, on April 21, 2014, R.C. of Sun sent an internal email to colleagues asking about multiple drugs including Phenytoin Sodium stating, "I am starting to hear some rumblings in the marketplace about potential price increases on Phenytoin 100mg caps. . . . Could you please let me know what you are hearing on these products?"  W.F. of Sun responded, "No price increase yet on Phenytoin but I have heard one might be coming."

1309.   By mid-summer of 2014, prices on Phenytoin Sodium had begun to rise.

1310.   On July 11, 2014, C.W. of Mylan wrote to her Mylan colleagues, "Walmart has submitted an opportunity for Ext Phenytoin due to a price increase from their incumbent.  This is a future price increase item.  Taro increased in June, Amneal increase is rumored but not confirmed, and Upsher Smith posted pricing 6/26/14.  Walgreens and CVS both approached us for a bid last month and we did not pursue. . . . P&C is suggested NOT to give Walmart an offer but need management's weigh in."  C.W.'s email also included relative market share for each of the manufacturers on Phenytoin Sodium and a spreadsheet attachment noting that it was an upcoming price increase product for Mylan.  Based on the foregoing, Mylan declined to bid for the Walmart business as to not disrupt the Phenytoin Sodium pricing and market shares that were in place.

1311.   After Mylan's refusal, Walmart turned to Taro for a bid.  Taro also refused to bid due to their high market share, in consideration of the existing market shares and elevated pricing that was being put in place among the manufacturers.  On August 4, 2014, T.I. of Taro wrote to colleagues, "Base[d] on current market share, not sure this is something we want."  A.L. of Taro

agreed, saying, "While we would be happy to give them a one time buy to get them to full stock level we are not currently in position to pick up additional share."

1312.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share.  They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share.  For example, in July 2015, roughly one year after the dramatic price increases, D.S. of Taro reported to colleagues about a response to a request for a bid from Meijer.  D.S. stated, "I chose not to bid on Extended Phenytoin Sodium Capsules, USP 100 mg 100, due to Taro having enough market share…64% in 5 player market."  Similarly, by way of another example, on August 6, 2015, M.L. of Taro wrote to colleague A.L., "Spoke to Lisa yesterday and she is still looking for an offer to be sent to R&S for the phenytoin 1000's.  When we first took a look at this product we said no since we had enough Market Share."  A.L. responded, "The answer on Phenytoin is still the same, we have our share.  We don't need anymore."

1313.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1314.  The ability of Amneal, Mylan, Sun, and Taro to reach agreement regarding Phenytoin Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1315.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

REDACTED – PUBLIC VERSION

1316.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1317.   The agreement between Defendants Amneal, Mylan, Sun, and Taro was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Phenytoin Sodium Capsules (100 mg).

**94.    Pilocarpine HCL**

1318.   Pilocarpine HCL is a drug used to reduce pressure inside the eye and treat dry mouth.  It is available in Tablet and Oral Liquid formulations.  It has been available in the United States for over a decade in a generic form.

1319.   The market for Pilocarpine HCL is mature.  At all relevant times, there have been multiple manufacturers of Pilocarpine HCL.

1320.   Defendants Actavis, Impax, and Lannett dominate sales of Pilocarpine HCL Tablets (5 mg).  During much of the relevant time period, Lannett held approximately 80% of the market share and Actavis held most of the remaining 20%.  Impax had a relatively small market share.

1321.   ████████████████████████████████████████████████
████████████████████████████████████████████████

REDACTED – PUBLIC VERSION



1322. ████████████████████████████████████████

1323.   The ability of Actavis, Impax, and Lannett to reach agreement regarding

Pilocarpine HCL was aided by the prevalence of trade association meetings and conferences

where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to

the Named Generic Drugs).

1324. ████████████████████████████████████████████████████████

████████████████████████████

1325.   No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1326.   The agreement between Defendants Actavis, Impax, and Lannett was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

bids, and engage in market and customer allocation for generic drugs, including Pilocarpine HCL Tablets (5 mg).

**95.    Piroxicam**

1327.    Piroxicam, also known by the brand name Feldene, is a nonsteroidal anti-inflammatory drug (NSAID).  Piroxicam is used to treat rheumatoid arthritis, osteoarthritis, and juvenile rheumatoid arthritis.  It has been available in the United States in a generic form for many years.

1328.    The market for Piroxicam was mature and at all relevant times had multiple manufacturers.

1329.    During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Piroxicam Capsules (10, 20 mg).  Defendant Greenstone joined the Piroxicam market and the Piroxicam conspiracy in 2014.

1330.    Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Piroxicam capsules beginning at least as early as the spring of 2010.

1331.    Piroxicam capsule prices were relatively low and stable for years, but in the spring of 2010, prices skyrocketed and have remained elevated above competitive levels ever since.  Teva and Mylan announced identical list (WAC) prices that were more than 30 times higher than the former list prices.  NSP prices ███████████████████████.  When Greenstone later joined the market, it matched those inflated WAC prices and its NSP prices ████████████████████████.

1332.    The list (WAC) price chart and ███████████████████ in the spring of 2010, and Greenstone matched Teva and Mylan's high prices when it joined the market in 2014.

REDACTED – PUBLIC VERSION

1333.   Throughout this period, Teva, Mylan and Greenstone met at trade conferences and communicated directly with each other in furtherance of their price-fixing agreement on Piroxicam and of their Fair Share agreement.

1334.   For example, in the period immediately preceding Teva's announcement of list (WAC) price increases on May 12, 2010, Teva's Rekenthaler communicated directly with Mylan via telephone.  He spoke with J.K., Mylan's Vice President and Executive Director of Sales shortly before the increase, on April 27, 2010, and then again right after the increase, on May 14, 2010.

1335.   When Teva and Mylan learned that Greenstone would be entering the Piroxicam market in the spring of 2014, they quickly moved to bring Greenstone into their Piroxicam price-fixing agreement and the broader Fair Share agreement.  First, on March 3, 2014, Teva's Rekenthaler and Nesta connected by phone for nearly 10 minutes.  Then, over the ensuing days, Teva's Patel reached out to Greenstone.  On March 5, 6, 12 and 17, 2014—within days of Greenstone's entrance to the market—Teva's Nisha Patel had multiple phone conversations with Jill Nailor and R.H., the Director of National Accounts at Greenstone, during which Teva and Greenstone reached agreement that Teva would cede a Fair Share of the Piroxicam market to Greenstone.

1336.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1337.   The ability of Teva, Mylan and Greenstone to reach agreements on Piroxicam capsules was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1338.   ███████████████████████████████████

████████████████████

1339.   The agreement between Defendants Teva, Mylan and Greenstone was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Piroxicam Capsules.

**96.    Potassium Chloride**

1340.   Potassium Chloride is a metal halide salt used to treat low levels of potassium. It is available in different formulations including Tablets LA. It has been available in the United States for decades in a generic form. Due to, among other things, its clinical efficacy and safety, Potassium Chloride has been designated as an essential medicine by the World Health Organization.

1341.   The market for Potassium Chloride is mature. At all relevant times, there have been multiple manufacturers of Potassium Chloride.

1342.   Defendants Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus dominate sales of Potassium Chloride 8MEQ, 10MEQ, and 20MEQ Long-Acting Tablets. ██████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

1343.   ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



1344.   The GAO noted that Potassium Chloride had an "extraordinary price increase" in the years 2010-2011.

1345.   Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus's Potassium Chloride prices remained elevated.

1346.   The ability of Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus to reach agreements regarding Potassium Chloride was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1347.   ████████████████████████████████████████████████
█████████████████████████████████████

1348.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

1349.   The agreement between Defendants Actavis, Mylan, Sandoz, Upsher-Smith, and Zydus was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Potassium Chloride Tablets LA (8MEQ, 10MEQ, and 20MEQ).

**97.    Prazosin HCL**

1350.   Prazosin HCL is a widely prescribed medication to treat high blood pressure and prostate enlargement.  It has been available in the United States for decades.  It is available in the United States in 1 mg, 2 mg, and 5 mg Capsules.

1351.   The market for Prazosin HCL Capsules is mature.  At all relevant times, there have been multiple manufacturers. ████████████████████████████████████████████
████████████████████████████████████████████

1352.   ████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████:

REDACTED – PUBLIC VERSION



REDACTED – PUBLIC VERSION



1353.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Mylan, and Teva.

1354.   Effective July 3, 2013, Teva increased pricing on a number of drugs, including roughly doubling its WAC prices for Prazosin HCL.  The day before the price increases, Patel scheduled an internal conference call to discuss those increases with members of Teva's sales and pricing departments.

1355.   In the days and weeks leading up to its announced price increases, Teva privately spoke with every important competitor to coordinate its increases and reiterate the understanding already in place with those competitors.  To coordinate the prices of Prazosin HCL and other drugs that overlapped with Mylan, Teva's Green and Mylan's Nesta spoke on the June 26, 2013 for one hour, and again on June 27, 2013, when they had one-minute and four-minute calls. After the second call, Green immediately called his colleague Patel and spoke with her for eight

REDACTED – PUBLIC VERSION

minutes.  In furtherance of the conspiracy, on June 28, 2013, Green again attempted to reach

Nesta, who returned his call on July 3, the day of the price increase, when they spoke for

fourteen minutes.

1356.   Consistent with their Fair Share Agreement, Defendants' agreed market share

limited their willingness to compete for customers.  For example, in July 31, 2013, when Teva

received a request from Walgreens to bid on drugs that Mylan and others supplied, Teva

circulated "the most recent market share reports for each [drug] family."  Within that list, Patel

identified Prazosin HCL as a market that Teva "shared with Mylan," but Teva could bid on it

because "[we] do not have our fair share."

1357.   Mylan matched Teva by roughly doubling its own WACs for Prazosin HCL and

raising prices on many other drugs.  Mylan's increase lead to slightly higher WAC prices for

Prazosin HCL than Teva's. Rather than competing for market share, Teva quickly determined to

adjust its WAC.

1358.   In furtherance of Defendants' price coordination scheme, T.S., Patel's colleague

at Teva, sent her spreadsheets, which Mylan personnel had created, that listed all the price

increases Mylan had taken.  After reviewing the spreadsheets, Patel forwarded the list to the

Teva sales team, informing them: "Our intention is to follow Mylan on this increase.  Below, you

will see the list of increase items where Teva overlaps with Mylan.  Please share any pricing

intelligence you are able to obtain. Thank you in advance!"  The list included Prazosin HCL.

1359.   Within days, Teva began receiving requests from potential customers for bids due

to the Mylan price increases.  On April 24, 2014, Patel began to formulate a "Mylan Increase

Strategy" in order to respond to those requests, but noted that Teva was "still awaiting intel"

about the Mylan customer contract price points, which were not publicly available.  The delay in

Teva's collection of "intel," *i.e.*, its active coordination with Mylan, placed pressure on Teva, which was trying to gain market share for Prazosin HCL—within the Defendants' agreed limits. Patel continued to push Teva employees for specific contract price points from Mylan. For example, on April 28, 2014, she emailed the Teva sales team: "To date, we have no intel on Mylan's recent increases. I realize there is a lot of travel going on, but whatever you can gather and share would be greatly appreciated." And again on May 9, 2014, she reiterated: "Sorry to be so persistent, but we have not received any Mylan price increase intelligence yet . . . . In fact, I cannot see Teva being able to follow in the next round of mass price changes (without any price points) at this point. Of course we can always follow by guessing, but it could cause needless price disruption in the market." In other words, to eliminate uncertainty, Teva wanted direct coordination with other manufacturers before raising its prices. After receiving Patel's email – at 11:15 am that morning – Rekenthaler immediately called Nesta at Mylan and left a message. Nesta returned the call moments later at 11:23 am, and the two spoke for nearly eight minutes.

1360.   Separately, and before Rekenthaler was able to convey any information he had obtained, Patel forwarded a bid request from AmerisourceBergen to a Teva accounts manager and again requested intel on Mylan's contract prices:

> I am in a really tough spot on these. Please help! There are several requests open for offers, but I have ZERO intel. A little frustrating/discouraging, as we are bound to hear complaints on how long it took to close the Delphi request. Is there anything you are able to get to help when you are back? (I know you're in the process of transitioning accounts, but I figured I would give it a shot. At some point, I know I'll have to find another source of magic :)).

1361.   Teva ultimately matched Mylan's WAC increases on Prazosin HCL on August 28, 2014, when it raised prices on Prazosin HCL and numerous other overlapping drugs. Following the normal pattern, Teva's Rekenthaler and Mylan's Nesta had numerous calls leading

REDACTED – PUBLIC VERSION

up to and in furtherance of coordinating the August 28, 2014 increases: three calls on August 11, two calls on August 18, 2014 and a final call on August 21, 2014.

1362.   On March 4, 2015, Mylan again increased Prazosin HCL WAC prices in coordination with Teva, who would match its WACs a few months later.  Again, Nesta and Rekenthaler engaged in multiple phone calls to coordinate the increase of Prazosin HCL capsules prices—along with other drugs that overlapped with Teva's: two calls on February 18, 2015 and one call on February 19, 2015.

1363.   In furtherance of the scheme, Teva matched Mylan's WAC prices in July 2015. In the interim, Teva "strategically concede[d]" an "opportunity in April" 2015 to bid on a contract to supply Walgreens with Prazosin HCL capsules and other drugs "because we were waiting to follow[] a Mylan price increase."  Although Teva initially planned to announce price increases in the fall of 2015, Teva fast-tracked its WAC price increases for Prazosin HCL capsules because its supply contracts closely tracked its existing WAC prices and "[i]t might" have been "a challenge to follow Mylan's price increase without implementing a price increase on [Teva's] end."

1364.   ██████████████████████████████████████████████████████
████████████████

1365.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1366.   The agreement between Defendants Mylan and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prazosin HCL Capsules (1, 2, 5 mg).

**98.** **Prednisolone Acetate**

1367.   Prednisolone Acetate is a corticosteroid used to treat certain eye conditions due to inflammation or injury.  It has been available in the United States for decades in a generic form. It is available in an Ophthalmic Solution and in Opthalmic Liquid Eye formulations.  Due to, among other things, its clinical efficacy and safety, Prednisolone has been designated as an essential medicine by the World Health Organization.

1368.   The market for Prednisolone Acetate Opthalmic Liquid Eye is mature.  At all relevant times, there have been multiple manufacturers of Prednisolone Acetate Opthalmic Liquid Eye.

1369.   Defendants Greenstone and Sandoz dominate sales of Prednisolone Acetate Opthalmic Liquid Eye (1%).  For much of the relevant time period, Sandoz had approximately two thirds of the market, and Greenstone had approximately one third of the market.

1370.   ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████

REDACTED – PUBLIC VERSION



1371.   The GAO noted that Prednisolone Acetate Opthalmic Liquid Eye had "extraordinary price increases" in the years 2013-2014.

1372.   Documentary evidence confirms that these parallel price increases were the result of collusion among Greenstone and Sandoz.

1373.   ███████████████████████████████████████████████████

█████ Because of the ongoing understanding of the Fair Share Agreement between the companies, they did not worry about their ostensible competitors cutting prices to gain market share.  They also did not attempt to undercut their ostensible competitors' prices in order to gain additional market share.  For example, in January 2014, several months after the dramatic price increase, C.B. of Sandoz reported to colleagues that OptiSource was looking for a bid on Prednisolone Acetate.  Kellum of Sandoz responded, "Why are they asking???  I think we should leave this alone as Pacific raised price etc… to match ours."  D.H. of Sandoz wrote back, "I have

REDACTED – PUBLIC VERSION

a suspicion that Pacific cannot supply or at least cannot supply consistently.  Also, Pacific has likely raised contract pricing in-line with Sandoz contract pricing; so [OptiSource] is likely seeking a better deal.  I could be wrong, but based on market intelligence & knowing Rick [Meehan, President of OptiSource] this is likely the situation."  Kellum confirmed, "Agree- I don't want to bid right now and I think we just blame supply for now."  By way of another example, a Sandoz November 2015 "Key Customers Monthly Business Review" states that Sandoz "lost" $29,000,000 worth of sales of Prednisolone Acetate because Sandoz "[r]elinquish[ed] [it] to Pacific."

1374.    The ability of Greenstone and Sandoz to reach agreement regarding Prednisolone Acetate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1375.    ████████████████████████████████████████████

████████████████

1376.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1377.    The agreement between Defendants Greenstone and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prednisolone Acetate Opthalmic Liquid Eye (1%).

**99.    Prednisone**

1378.    Prednisone is a corticosteroid used to treat conditions such as arthritis, blood disorders, breathing problems, and immune system disorders.  It is available in Tablet and Oral

REDACTED – PUBLIC VERSION

Solution formulations.  It has been available in the United States for over a decade in a generic form.

1379.   The market for Prednisone is mature.  At all relevant times, there have been multiple manufacturers of Prednisone.

1380.   Defendants Actavis, Cadista, Par, and West-Ward dominate sales of Prednisone Tablets.

1381.

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION





1382.   The GAO noted that Prednisone had "extraordinary price increases" in the years 2013-2014.

1383.   ████████████████████████████████████████████████

REDACTED – PUBLIC VERSION

1384. The ability of Actavis, Cadista, Par, and West-Ward to reach agreements on Prednisone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1385. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1386. No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1387. The agreement between Defendants Actavis, Cadista, Par, and West-Ward was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Prednisone Tablets (1, 2.5, 5, 10, 20 mg).

**100. Raloxifene HCL**

1388. Raloxifene HCL, also known by the brand name Evista, is a medication used to combat the effects of osteoporosis in postmenopausal women.

1389. During the relevant time frame, Defendants Teva and Camber were the primary manufacturers of Raloxifene HCL Tablets.

1390. In March 2014, Teva began marketing Raloxifene HCL. Actavis had received approval to begin marketing Raloxifene HCL in 2014 as well, but, by September 2014, had not entered the market. Camber entered the market in September 2014.

1391. With anticipated product launches approaching, the market entrants discussed an allocation scheme in September 2014: On September 9, 2014, Teva's Rekenthaler had a twenty-six (26) minute phone call with the Senior Vice President of U.S. Sales at Actavis, and, over the

course of the following week, Rekenthaler spoke with multiple Actavis employees, including the SVP of U.S. Sales again, on September 16, 2014, for over half an hour.

1392.   On September 17, 2014, Camber sent an offer for Raloxifene HCL to a large Teva customer.  That day, Rekenthaler shared internally the information he had gathered from other manufacturers, including that Actavis would be "late" to the market, and that he would learn more about Camber's plan following an upcoming trip.

1393.   Rekenthaler and Kon Ostaficiuk, the President of Camber Pharmaceuticals, spent the next three days playing golf during the day and socializing at night at an industry outing in Kentucky.  On September 21 and 22, 2014, Ostaficiuk had a series of five phone calls with Rekenthaler.  After those calls, Camber sent a revised offer to a potential customer that same afternoon, containing modified prices for Raloxifene HCL.

1394.   On September 24, Patel discussed a Raloxifene HCL market strategy with her Teva colleagues in light of Camber's offer to the large Teva customer.  Later that morning, Rekenthaler called Ostaficiuk and the two spoke for 2 minutes.  They spoke two more times that day.

1395.   On September 25, after discussing with his colleagues which customers Teva should concede to give Camber its Fair Share of the Raloxifene HCL market, and armed with the information Rekenthaler had gathered from Ostaficiuk, Teva decided to concede certain additional, smaller customers. Rekenthaler and Ostaficiuk spoke again twice that day.

1396.   On Friday, September 26, 2014, Camber announced that it was launching Raloxifene HCL.  Rekenthaler called Ostaficiuk that day to convey that Teva did not want Camber taking any more of its Raloxifene HCL customers.  Camber agreed, and on September 29, 2014, Ostaficiuk sent an email to colleagues at Camber warning them not to "offer anything

to any Teva customers...Not even a 'bad price'! Please acknowledge....We do not want to upset

them more!" The Director of Sales and Operations at Camber, replied, "We have not made any

offers to any Teva Raloxifene accounts.... Both Sales and Contracts are aware, & requesting

incumbent detail for all offers, if Teva, no offer."

1397.   About a week later, on October 7, 2014, a large Teva customer informed a Teva

sales representative that Camber had made an unsolicited bid for its Raloxifene HCL business.

A Director of National Accounts at Teva sent an internal email at Teva, expressing surprise

given the agreement that Teva had previously reached with Camber: "I thought they were done

after securing [our large customer]?" Rekenthaler doubted that Camber made an offer to another

Teva customer, stating, "You're positive they sent them an offer?" The Teva Director of

National Accounts then "relayed 'the message'" to the customer that "the market should be

stable at this point" and Teva doubted that Camber intended to make an offer on Raloxifene

HCL. After further discussion with the customer, Teva learned that it was a misunderstanding.

Camber never actually made the offer; it complied with the Fair Share agreement with Teva.

1398.   No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1399.   The ability of Teva, Camber, and Actavis to reach agreements on Raloxifene HCL

was aided by the prevalence of trade association meetings and conferences where the parties

were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic

Drugs).

1400.   The coordination by Teva, Camber, and Actavis is consistent with the Fair Share

Agreement.

REDACTED – PUBLIC VERSION

1401.   The agreement between Defendants Teva, Camber, and Actavis was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Raloxifene HCL Tablets.

**101.   Ranitidine HCL**

1402.   Ranitidine HCL is a commonly prescribed medication used to prevent and treat heartburn and other symptoms caused by too much acid in the stomach.  It has been designated as an essential medicine by the World Health Organization and has been available in the United States for decades.  Ranitidine HCL comes in many forms, including 75 mg, 150 mg, 300 mg Tablets, and 150 mg and 300 mg Capsules.

1403.   The market for Ranitidine HCL Capsules and Tablets is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Dr. Reddy's and Sandoz dominated the sales of Ranitidine HCL Capsules and Defendants Amneal, Glenmark, Par, and Teva dominated the sales of Ranitidine HCL Tablets in the relevant period.

1404.

- 317 -

REDACTED – PUBLIC VERSION



1405. ███████████████████████████████████████████

████████████████████████████:

REDACTED – PUBLIC VERSION



1406.  The GAO reported that 300 mg Ranitidine HCL Capsules experienced "an extraordinary price increase" in 2012-2013.

1407.  WAC pricing also rose in a coordinated fashion.  Sandoz substantially raised its WAC prices for Ranitidine HCL on January 13, 2012, a decision it would not have made unless it had pre-existing knowledge that Dr. Reddy's would quickly match its prices, as it did on February 1, 2012.  Glenmark introduced WAC prices on May 16, 2013, which approximately doubled existing prices, a decision it would not have made unless it had pre-existing knowledge that Teva would quickly match its prices, as it did on July 3, 2013, even though it doubled its prior WAC prices.  Defendants Amneal and Par benefited from these increases.

1408.  ████████████████████████████████████

1409.  Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period.  For example, as illustrated in the 150 mg

Capsule chart, ███████████████████████████████████████

██████████████████████████████████████



1410.  Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz.  Teva considered all of these companies to be "quality competitors," with whom it was easy to facilitate price coordination.

1411.  For example, in a June 7, 2013 email, Dr. Reddy's internally discussed its strategy of supporting Sandoz's price increase and not exploiting Sandoz's temporary absence to gain market share: "Sandoz did a price adjustment (Jan'12) and we followed.  Then they went on back order.  As a result, we picked up their business temporarily (May'12 – July'12 qtr) from them since we did not want to upset the market post this price adjustment."

1412.   Teva and Glenmark's coordination is also well documented.  As soon as she arrived at Teva, Patel began identifying price increase candidates, including drugs, where it ostensibly competed with Glenmark.  On May 2, 2013, in a 6:49 am email, Patel informed a colleague that she expected to have some new drugs to add to the price increase list imminently. Not fifteen minutes later, she received a call from a senior executive at Glenmark, with whom she spoke for five minutes.  At 7:44 am that day, Patel sent a follow-up email to her subordinate, directing him to add six different "high priority" Glenmark drugs to the price increase list, including Ranitidine HCL.  Glenmark increased its WAC prices on all of these drugs two weeks later, on May 16, 2013, and Teva initiated price increases in July, when Teva and Glenmark exchanged six more telephone calls or texts to coordinate Teva's price increases.  Although Glenmark increased its prices first, on May 6, 2013, Teva internally considered itself to be the leader on the Defendants' price increase.

1413.   The ability of Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz to reach agreement regarding Ranitidine HCL was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1414.   ████████████████████████████████████████████████
████████████████████████████

1415.   The agreement between Defendants Amneal, Glenmark, Par, Teva, Dr. Reddy's and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including for Ranitidine HCL Capsules and Tablets.

REDACTED – PUBLIC VERSION

**102.    Silver Sulfadiazine**

1416.   Silver Sulfadiazine is an antibiotic used to treat second and third-degree burns. It has been available in the United States for many years in a generic form.  It is available in a Cream formulation.

1417.   The market for Silver Sulfadiazine 1% Cream is mature.  At all relevant times there have been multiple manufacturers.

1418.   Defendants Ascend and Teva dominate sales of Silver Sulfadiazine Cream (1% )

1419.



REDACTED – PUBLIC VERSION

1420.   The ability of Ascend and Teva to reach agreements on Silver Sulfadiazine was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person. *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1421.   ███████████████████████████████████████████████████████

████████████

1422.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1423.   The agreement between Defendants Ascend and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Silver Sulfadiazine Cream (1%).

**103.   Spironolactone HCTZ**

1424.   Spironolactone Hydrochlorothiazide (HCTZ) is a commonly prescribed medication used to treat high blood pressure. It has been on the market for decades and is available in 25-25mg Tablets.

1425.   The market for Spironolactone HCTZ Tablets is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Greenstone, Mylan, and Sun dominated sales of for 25-25mg Spironolactone HCTZ Tablets in the relevant period.

1426.   ███████████████████████████████████████████████████████

█████████████████████████████████████████████:

REDACTED – PUBLIC VERSION



1427.   The GAO reported that 25-25mg Spironolactone HCTZ Tablets experienced "an extraordinary price increase" in 2013-2014.  There were no reported shortages of these products in the relevant period.

1428.   WAC pricing also rose in a coordinated fashion.  Mylan raised its prices on March 6, 2013, roughly five times its prior WAC price, a decision it would not have made unless it had pre-existing knowledge that the others would quickly match, as they did.  Greenstone and Sun essentially matched Mylan's price on April 2, 2013 and April 15, 2013 respectively, causing a more than fourfold increase of their prior WAC prices.

1429.   ███████████████████████████████████

████████

REDACTED – PUBLIC VERSION

1430.   Pursuant to Defendants' agreement, their price increases did not result in significant market share losses in the relevant period.  Mylan held the dominant share, while Greenstone and Sun maintained small, but steady market shares.

1431.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Greenstone, Mylan, and Sun.  Co-Defendant Teva considered Mylan and Greenstone to be "quality competitors," with whom it was easy to facilitate price coordination.  Greenstone's R.H. and Mylan's Nesta exchanged *2,310* telephone calls or texts from 2011 through 2015, through which their companies facilitated price coordination on many products, including Spironolactone HCTZ.  Nesta also exchanged 40 phone calls or texts with Greenstone's Nailor between December 2012 and November 2015 to coordinate prices.

1432.   The ability of Greenstone, Mylan, and Sun to reach agreement regarding for Spironolactone HCTZ was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1433.   ███████████████████████████████████████████
███████████████████████

1434.   The agreement between Defendants Greenstone, Mylan, and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including for Spironolactone HCTZ Tablets (25-25mg).

**104.   Tamoxifen Citrate**

1435.   Tamoxifen Citrate Tablets are commonly prescribed to treat breast cancer and have been available in the United States for decades.  The World Health Organization includes

Tamoxifen on its List of Essential Medicines. It is available in the United States in 10 mg and 20 mg Tablets.

1436. The market for Tamoxifen Citrate Tablets is mature. At all relevant times, there have been multiple manufacturers. Defendants Actavis, Mylan, and Teva dominated sales of Tamoxifen Citrate 10 mg and 20 mg Tablets in the relevant period.

1437.



REDACTED – PUBLIC VERSION



1438.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Actavis, Mylan, and Teva.

1439.   Effective July 31, 2012, Teva increased pricing on a number of drugs, including Tamoxifen Citrate, where it had the dominant share, followed by "Mylan (22.2%); Watson [Actavis] (10.3%)." Teva coordinated each of these price increases with other manufacturers through numerous calls in July 2012 in the days and weeks leading up to the price increase. For example, Teva's Green spoke to Mylan's Nesta on July 23, 2012 (seven minutes); July 24, 2012 (four minute and eight minute calls), July 25 (four minutes); July 26 (four minutes); July 30 (two calls, one for eight minutes); and July 31 (six minute, two minute, four minute, seven minute and two minute calls). Meanwhile, Teva's Rekenthaler spoke to A.S. at Actavis on July 11, 2012 (one minute and nine minute calls).

REDACTED – PUBLIC VERSION

1440.   Defendants orchestrated a second price increase in April 2014.  The plan originated with Teva's advance knowledge that Actavis would increase its price, an increase ultimately implemented on April 15, 2014.  Following a now very familiar pattern, at 9:54 am on March 14, 2014 Actavis's Rogerson called Patel and left a message.  Patel called Rogerson back at 10:31 am, and the two spoke for more than twelve minutes.  Within minutes after hanging up with Rogerson, Patel informed others at Teva about the Actavis increase.  Within half an hour of sending that email, Patel instructed colleagues to add the Actavis drugs to the Teva price increase list.  She added: "We intend to follow where we can."  Less than two hours later, at 12:37 pm, Patel called Rogerson again.  They spoke for more than five minutes.  Shortly after hanging up the phone, at 12:51 pm, Patel wrote another email to her colleagues at Teva, stating: "Actavis took an increase.  We will follow.  We need to review price per my alert list.  Let's wait to see what intel we can get and discuss Monday."

1441.   That Monday, March 17, 2014, Patel forwarded the "PI Candidates" list to K.G. at Teva.  The list included both Tamoxifen Citrate.  Later that morning, Patel called Actavis's Rogerson.  After quickly exchanging voicemails, they spoke for more than nineteen minutes.  Rekenthaler of Teva and Falkin of Actavis also exchanged four text messages that day and had one call lasting more than six minutes.

1442.   In the days leading up to Teva's price increase for Tamoxifen Citrate, Rekenthaler asked Patel for a list of drugs and competitors associated with each of the increase items so that he could confirm that Teva had successfully coordinated increases with everyone.  On April 1, 2014, Patel responded by providing a list of only those drugs where Teva was leading the price increase – *i.e.*, the drugs with the most risk if Teva did not secure an agreement beforehand with other manufacturers before raising its own price.  Again, on April 4, 2014, the day of Teva's

price increase, Patel and Rogerson spoke twice by phone and Rekenthaler and Falkin also spoke

by phone that day.  Satisfied that Patel and Rekenthaler had confirmed agreement with all the

appropriate competitors, Teva announced the price in increase on Tamoxifen Citrate and other

drugs.  Because Teva was able to institute Actavis's planned price increase so quickly, Teva's

increase became effective even before Actavis implemented its increases.

1443.   After their price increases became effective, Teva took consistent steps not to

disrupt the market or steal market share from Actavis.  For example, on May 14, Patel declined

to bid at AmerisourceBergen on both Tamoxifen Citrate and Estazolam, stating: "unable to bid

(strategic reasons, for internal purposes)."  When Patel and her other conspirators at Teva used

the term "strategic" in this context, it was code for the fact that there was an understanding in

place with a supposed competitor.

1444.   Similarly, on May 21, 2014, Teva received a request from Wal-Mart for a bid on

Tamoxifen Citrate.  As of that date, Teva had 58.4% of the market, and Actavis had 40.7%.  A

Teva analyst forwarded the request to Patel and others, recommending (pursuant to the fair share

understanding in the industry) that Teva not bid "as we are first in a two-player market with good

share already." Patel responded: "Agree.  We should decline to bid."

1445.   Meanwhile Mylan's internal emails show that it temporarily discontinued

Tamoxifen Citrate sales on October 15, 2013 due to "technical issues" and that it planned to

relaunch in June 2014.  Mylan listed its target market share as 25%.  Under the Fair Share

Agreement, Defendants willingly conceded market share to Mylan in order to maintain

supracompetitive prices for Tamoxifen Citrate.  For example, on June 6, 2014, a Teva employee

emailed Patel and K.G.: "Since Mylan is coming into the market and we will need to give up

some share, I propose conceding Cardinal." K.G. countered that Teva had considered giving up

CVS instead in order to keep Cardinal Health and Econdisc: "Let's match Cardinal for now. Hopefully they go to CVS." In another email, Teva employees considered holding off on bidding on Walmart because Mylan was reentering the market: "My assumption is that we will not want to pick up Wal-Mart, as we will most likely have to concede some of our current business with Mylan re-entering."

1446. ████████████████████████████████████████████ ████████████████

1447. No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1448. The agreement between Defendants Actavis, Mylan, and Teva was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tamoxifen Citrate Tablets.

**105. Temozolomide**

1449. Temozolomide, also known by the brand name Temodar, is a medication used to treat glioblastoma multiforme and refractory anaplastic astrocytoma, both cancers of the brain. It has been available in the United States in a generic form for many years.

1450. The market for Temozolomide is mature. At all relevant times, there have been multiple manufacturers of Temozolomide.

1451. During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Temozolomide Capsules.

1452. Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Temozolomide capsules beginning at least as early as the summer of 2013

REDACTED – PUBLIC VERSION

1453.  Teva and Sandoz had each gained the right to launch on Temozolomide in August 2013.  In preparation for the launch, Teva coordinated with Sandoz to divide up the market.  For example, when Sandoz received an RFP from a large retail pharmacy customer on July 18, 2013, and after another large customer contacted Teva asking for an offer on Temozolomide on July 30, 2013, Teva and Sandoz communicated with each other to coordinate responses.

1454.  For example, Patel of Teva called the Associate Director of Pricing at Sandoz on July 29.  Also on July 29, 2013, Green of Teva spoke to Director of National Accounts at Sandoz twice, and then again on July 31, 2013.  A different Sandoz Director of National Accounts also coordinated with a National Account Manager at Teva via phone.

1455.  Sandoz and Teva continued to monitor and coordinate the price fixing and Fair Share agreement on Temozolomide.  For example, on August 12, 2013, the day of Teva's launch, a Sandoz Director of National Accounts met in person with Rekenthaler at the Grand Lux Cafe in Las Vegas during the NACDS Total Store Expo Conference.  There, Rekenthaler discussed, among other things, Temozolomide and informed the Sandoz Director that Teva had officially launched and shipped all formulations of the drug.

1456.  The Sandoz Associate Director of Pricing spoke to Patel both before and after Sandoz sent out offers regarding Temozolomide in an effort to ensure that each had a Fair Share of the market.

1457.  No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1458.  The ability of Teva and Sandoz to reach agreements on Temozolomide capsules was aided by the prevalence of trade association meetings and conferences where the parties

were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic

Drugs).

1459.   The coordination by Teva and Sandoz is consistent with the Fair Share

Agreement.

1460.   The agreement between Defendants Teva and Sandoz was part of an overarching

conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and

engage in market and customer allocation for generic drugs, including Temozolomide Capsules.

**106.   Timolol Maleate**

1461.   Timolol Maleate is a beta blocker drug, which is used to treat, for example, high

pressure inside the eye due to glaucoma or other eye diseases.  It has been available in the United

States for decades in a generic form.  It is available in Opthalmic Gel, Opthalmic Liquid Eye,

and Tablet formulations.  Due to, among other things, its clinical efficacy and safety, it has been

designated as an essential medicine by the World Health Organization.

1462.   The market for Timolol Maleate is mature.  At all relevant times, there have been

multiple manufacturers of Timolol Maleate.

1463.   Defendants Bausch and Sandoz dominate sales of Timolol Maleate Opthalmic

Gel, which is available in dosage strengths of 0.25% and 0.5%.  For much of the relevant time

period, Bausch and Sandoz divided the market for Timolol Maleate Opthalmic Gel in close to a

50/50 split.

1464.   ███████████████████████████████████████████████

██████████████████████████████

1465.   Documentary evidence confirms that this ███████████████████ was

the result of collusion among Bausch and Sandoz.

1466.   A product sales and market share performance spreadsheet from Sandoz from May 2013 asks, "Do we want more share on this product?" for Timolol Maleate Opthalmic Gel. The spreadsheet indicates that the response is "No" because "Sandoz has fair share."  Several months after this spreadsheet was circulated, Sandoz and Bausch engaged in a parallel price increase on Timolol Maleate.

1467.



REDACTED – PUBLIC VERSION



1468.    The GAO noted that Timolol Maleate Ophthalmic Gel had an "extraordinary price increase" in the years 2014-15.

1469.    Beauch's and Sandoz's Timolol Maleate Opthalmic Gel prices remained elevated and parallel.  As shown above, their ███████████████████████████████████

1470.    The ability of Bausch and Sandoz to reach agreement regarding Timolol Maleate was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1471.    ████████████████████████████████████████████████████
████████████████

1472.    No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

REDACTED – PUBLIC VERSION

1473.   The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Timolol Maleate Ophthalmic Gel (0.25%, 0.5%).

**107.   Tizanidine HCL**

1474.   Tizanidine HCL is a commonly prescribed muscle relaxer that has been available in the United States for decades and is one of the top 200 most prescribed drugs in the United States.  It is available in the United States in 2 mg and 4 mg Tablets.

1475.   The market for Tizanidine Tablets is mature.  At all relevant times, there have been multiple manufacturers.  Defendants Apotex, Dr. Reddy's, Mylan, Sandoz, and Sun dominated sales of Tizanidine 2 mg and 4 mg Tablets in the relevant period.

1476.   ████████████████████████████████████████

████████████████████████████████████████, as illustrated by the following example of 2 mg Tablets:

REDACTED -- PUBLIC VERSION



1477.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Apotex, Dr. Reddy's, Mylan, Sandoz, and Sun.

1478.   In May 2013, Dr. Reddy's estimated that it had 59% market share and Mylan and Sandoz had 24% and 17% respectively.  Tizanidine had been on the market for many years and its price had eroded as many competitors entered and exited the market depending on the profitability of the drug.  As Dr. Reddy's explained in an internal presentation, "Price needs to be adjusted to incentivize current manufacturers to stay in this product" and stated that Dr. Reddy's assumes "Mylan and Sandoz are responsible players, and they may not be able to pick up the large volumes we currently service."

REDACTED – PUBLIC VERSION

1479.   Sandoz was thrilled when it learned about Dr. Reddy's anticipated price increase. For example, on May 10, 2013, S.G., a national account executive at Sandoz, sent an internal email stating that "Giant Eagle just let me know that Dr. Reddy just took a price increase on Tizanidine! Pricing on the 2 & 4mg 150ct went from $4.50 to $45.00. . . . We should secure confirmation but if this is true it would be very positive . . ." Kellum responded, "Wow! Thank you." Kellum then quickly sent out a directive to the team to "[p]lease put the product on strict allocation to forecast. Pricing Team – no new offers."

1480.   Defendants coordinated their price increases at every step.  For example, on May 13, 2013, when Dr. Reddy's published its new WAC pricing for Tizanidine, Mylan's Jim Nesta called D.L. at Sandoz and they spoke for 4 minutes.  Two days later in an internal Sandoz email, M.V. at Sandoz emailed Kellum, "Let's discuss" regarding "Tizanidine."

1481.   Sandoz raised its WAC pricing on par with Dr. Reddy's on May 24, 2013, causing Sandoz's WAC prices for Tizanidine Tablets to triple.  In the days leading up to the Sandoz increase, Nesta of Mylan exchanged phone calls with both D.L. of Sandoz and J.A., a national account executive at Dr. Reddy's, to coordinate the Tizanidine price increases.  At least some of those calls are set forth in the table below:

| Date | Call Type | Target Name | Direction | Contact Name | Duration |
|---|---|---|---|---|---|
| 5/20/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:06 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/21/2013 | Voice | Nesta, Jim (Mylan) | Incoming | J.A. (Dr. Reddy's) | 0:00:42 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Incoming | CW-4 (Sandoz) | 0:00:37 |
| 5/23/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | CW-4 (Sandoz) | 0:01:25 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/23/2013 | Text | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:00 |
| 5/24/2013 | Voice | Nesta, Jim (Mylan) | Outgoing | J.A. (Dr. Reddy's) | 0:00:20 |

REDACTED – PUBLIC VERSION

1482.   The frequent calls and texts between Mylan's Nesta and Sandoz's J.A. in the four-day period on or before Sandoz's price increase are notable because the two did not call or text each other again for the next three months.

1483.   Consistent with the Defendants' price scheme, both Apotex and Sun raised their WAC prices in May and June of 2013 despite having largely abandoned the Tizanidine Tablet market at that time.  And upon return both maintained high prices so as not to disrupt the Tizanidine price coordination scheme.

1484.   Defendants maintained this price scheme in part by raising WACs and in part by refusing to bid on their competitors' customers if it would noticeably disrupt the Defendants' market allocation.  For example, on May 29, 2013, customer Omnicare emailed Sandoz and asked whether it wanted to submit a bid for Tizanidine.  C.B. of Sandoz forwarded the request internally to M.V. and Kellum asking "[a]re we considering additional Tizanidine market share? I'm assuming are[ sic] intent is not to be disruptive at this time."  A few minutes later, Nesta called D.L. at Sandoz and they spoke for nearly thirteen minutes.  Later that day, M.V. replied to C.B.'s email stating, "[w]e will sit tight for now."  C.B. then responded to Omnicare, stating that "[a]lthough we are not in a back order situation we cannot assume additional usage at this time. If this were to change I will let you know."

1485.   On June 14, 2013, Anda, Inc.—now a subsidiary of Teva[31]—emailed J.A. of Dr. Reddy's asking "[d]id mylan follow your increase?"  J.A. responded, "We've heard they did." J.A. had learned of Mylan's intent to follow the price increase through his prior communications

---

[31] Anda, Inc. was acquired by Teva from Allergan around the same time as the larger Allergan/Actavis acquisition in August 2016.

REDACTED -- PUBLIC VERSION

with Nesta. ████████████████████████████████████████
████████████████████████████████

1486.   On June 26, 2013, Meijer, a supermarket chain customer, emailed Dr. Reddy's requesting a bid for Tizanidine.  J.A. forwarded the request to N.M., a marketing executive at Dr. Reddy's, stating: "I'm assuming they got a price increase."  N.M. responded: "I think, given the market situation and us leading the price adjustment, I think, we should not go behind additional market share since it will erode the market even further."  J.A. replied, "[y]eah, I was just sending it as an FYI, no intention to bid."  A few weeks later, Meijer forwarded the same request to Sandoz.  Sandoz's response was similar: "[w]e cannot supply unfortunately."

1487.   ████████████████████████████████████████████████████
████████████████████████████

1488.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1489.   The agreement between Defendants Apotex, Dr. Reddy's, Mylan, Sandoz, and Sun was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tizanidine HCL Tablets (2, 4 mg).

**108.   Tobramycin**

1490.   Tobramycin, also known by the brand name Tobi, is a medication used to treat eye infections.  It has been available in the United States in a generic form for many years.

1491.   The market for Tobramycin is mature.  At all relevant times, there have been multiple manufacturers of Tobramycin eye drops.

1492.   During the relevant time frame, Defendants Teva and Sandoz were the primary manufacturers of Tobramycin Eye Drops.

1493.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Tobramycin eye drops beginning at least as early as the fall of 2013.

1494.   Beginning in October 2013, Sandoz began making plans to enter the Tobramycin market, where Teva was the sole supplier.  To facilitate Sandoz's entry into the market and to allow it to gain a Fair Share, Teva and Sandoz began sharing information and coordinating to divide up the market for Tobramycin.

1495.   Patel of Teva exchanged seven calls with the Associate Director of Pricing at Sandoz on July 1, 2014, five calls on July 7, 2014, and one call on July 9, 2014.  During these calls, Sandoz and Teva discussed how to coordinate Fair Shares of the market for Tobramycin, including specific accounts that each would maintain or concede.

1496.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1497.   The ability of Teva and Sandoz to reach agreements on Tobramycin eye drops was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1498.   The coordination by Teva and Sandoz are consistent with the Fair Share Agreement.

1499.   The agreement between Defendants Teva and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tobramycin Eye Drops.

REDACTED – PUBLIC VERSION

**109.    Tobramycin Dexamethasone**

1500.    Tobramycin Dexamethasone is an antibiotic used to treat bacterial eye infections. It has been available in the United States for over a decade in a generic form.

1501.    The market for Tobramycin Dexamethasone is mature.  At all relevant times, there have been multiple manufacturers.

1502.    Defendants Bausch and Sandoz dominate sales of Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%) ██████████████████████████████████████████████.

1503.    ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████

1504.    The ability of Bausch and Sandoz to reach agreements on Tobramycin Dexamethasone was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1505.    ██████████████████████████████████████████████████
████████████████████

REDACTED – PUBLIC VERSION



1506.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1507.   The agreement between Defendants Bausch and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tobramycin Dexamethasone Ophthalmic Liquid (0.3-0.1%).

**110.   Tolmetin Sodium**

1508.   Tolmetin Sodium, also known by the brand name Tolectin, is a medication used to reduce pain, swelling, and joint stiffness from rheumatoid arthritis and osteoarthritis.

1509.   It has been available in the United States in a generic form for many years.

1510.   The market for Tolmetin Sodium is mature.  At all relevant times, there have been multiple manufacturers of Tolmetin Sodium.

REDACTED -- PUBLIC VERSION

1511.   During the relevant time frame, Defendants Teva and Mylan were the primary manufacturers of Tolmetin Sodium Capsules.

1512.   On August 9, 2013, Teva raised prices on a number of drugs, including Tolmetin Sodium.  Leading up to these price increases, Teva coordinated via direct communication with other drug manufacturers, including Mylan.

1513.   For example, on July 10, 2013, Teva's Green and Mylan's Nesta spoke twice. The next day, July 11, Nesta and Green exchanged several more calls.

1514.   On August 1, 2013, Green again spoke to Nesta (Mylan) 2 times; shortly after the second call, Green called Patel to update her.  On August 2, 2013, Patel called Green, after which Green immediately called Nesta.  Green spoke to Nesta three more times on August 6 and three times on August 8, 2013.  Patel also spoke to Nesta twice on August 8, 2013.

1515.   The day before the price increase went into effect – August 8, 2013 –Patel and Nesta spoke again.  Price increases followed the next day.

1516.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1517.   The ability of Teva and Mylan to reach agreements on Tolmetin Sodium was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1518.   The coordination by Teva and Mylan is consistent with the Fair Share Agreement.

1519.   The agreement between Defendants Teva and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and

engage in market and customer allocation for generic drugs, including Tolmetin Sodium
Capsules.

**111.   Tolterodine**

1520.   Tolterodine, also known by the brand name Detrol, is a medication used for the
treatment of an overactive bladder.  It has been available in the United States in a generic form
for many years.

1521.   The market for Tolterodine is mature.  At all relevant times, there have been
multiple manufacturers of Tolterodine.

1522.   During the relevant time frame, Defendants Teva, Mylan and Greenstone were the
primary manufacturers of Tolterodine Tablets and Tablets ER.

1523.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired
to fix, raise, maintain or stabilize the prices of Tolterodine Tartrate Tablets and Tablets ER
beginning at least as early as June 2012.

1524.   Between June 2012 and January 2013, Teva and Mylan were among the first
manufacturers to enter the market for generic Tolterodine tablets.  Greenstone joined the tablet
market in January 2014.  Around the same time that Greenstone entered the tablet market in
January 2014, Teva and Mylan were the first manufacturers to launch Tolterodine.

1525.   Throughout this period, Teva, Mylan and Greenstone met at trade events and
communicated directly in order to keep Tolterodine prices higher than they would have been in a
competitive market.

1526.   For example, in the second half of 2012, Teva and Mylan regularly communicated
on the telephone.  Teva's Green spoke to Mylan's Nesta numerous times between May and July
of 2012, the period during which Teva was launching Tolterodine tablets.  Green and Nesta
spoke again in January 2013, around the time that Mylan was launching its Tolterodine.

1527.   Similarly, in the days leading up to Greenstone's entry to the Tolterodine tablet market, Jill Nailor and a colleague at Greenstone were speaking frequently to Teva's Patel and Rekenthaler to coordinate.  For example, on January 21, 2014, Nailor called Patel twice, and on January 22, 2014, Patel called Nailor twice, Nailor called Patel once, and the two exchanged multiple text messages.  During these communications, Teva and Greenstone agreed that Teva would concede business to Greenstone in order to avoid significant price erosion in the market. And when Greenstone finally entered the market, it announced the exact same list (WAC) prices as Teva.

1528.   Teva and Greenstone continued to communicate over the following months to ensure that Greenstone was able to obtain a Fair Share of the market.  For example, in late January and early February, Teva's Patel and a contact at Greenstone communicated a number of times to coordinate Teva's concession of a large pharmacy customer to Greenstone on Tolterodine tablets.

1529.   During this period, Teva and Mylan planned to launch generic Tolterodine ER.  In order to coordinate market share and pricing, Teva and Mylan were in regular contact.  For example, on December 23 and 24, 2013, Teva's Rekenthaler and Mylan's Nesta had a series of calls during which they agreed to allocate Tolterodine on launch day so that Teva and Mylan could each get a Fair Share without eroding pricing.

1530.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1531.   The ability of Teva, Greenstone, and Mylan to reach agreements on Tolterodine ER was aided by the prevalence of trade association meetings and conferences where the parties

REDACTED – PUBLIC VERSION

were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1532.   The coordination by Teva, Greenstone, and Mylan is consistent with the Fair Share Agreement.

1533.   The agreement between Defendants Teva, Mylan and Greenstone was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Tolterodine Tablets and Tablets ER.

**112.   Trazodone HCL**

1534.   Trazodone HCL is a serotonin uptake inhibitor that is used to treat depression.  It is available in tablet form in several strengths, including 100 mg Tablets.  It has been available in the United States for over a decade in a generic form.

1535.   The market for Trazodone HCL is mature.  At all relevant times, there have been multiple manufacturers of Trazodone HCL.  Defendants Teva and Par dominated the market for Trazodone HCL 100mg Tablets, with Teva holding about 70% of the market and Par holding about 15% within that timeframe.  Apotex and Sun each held smaller shares.

1536.   ████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

REDACTED – PUBLIC VERSION



1537.   The ability of Apotex, Par, Sun, and Teva to reach agreements on Trazodone HCL

was aided by the prevalence of trade association meetings and conferences where the parties

were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic

Drugs).

1538.   ████████████████████████████████████████████████████

████████████████

1539.   No non-collusive market factors (*e.g.*, product shortages) can explain the

artificially inflated prices.

1540.   The agreement between Defendants Apotex, Par, Sun, and Teva was part of an

overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig

REDACTED -- PUBLIC VERSION

bids, and engage in market and customer allocation for generic drugs, including 100mg Trazodone HCL Tablets (100 mg).

### 113.    Triamcinolone Acetonide

1541.    Triamcinolone Acetonide is a corticosteroid used to treat a variety of skin conditions such as eczema, dermatitis, allergies, and rashes.  It has been available in the United States for decades in a generic form.  It is available in, for example, Cream and Ointment.

1542.    The market for Triamcinolone Acetonide is mature.  At all relevant times, there have been multiple manufacturers of Triamcinolone Acetonide.

1543.    Defendants Ascend, Par, Perrigo, Sandoz, and Taro dominate sales of Triamcinolone Acetonide Cream and Ointment.  For much of the relevant period, Sandoz and Perrigo held most of the market share for the 0.025% Ointment, 0.025% Cream, 0.5% Cream, 0.1% Cream, 0.1% Ointment, and 0.5% Ointment with other defendants (Ascend, Par, and Taro) having a small share at certain times.

1544.

- 348 -





REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION



1545.   The GAO noted that Triamcinolone Acetonide 0.025% Cream, 0.025% Cream, 0.1% Ointment, 0.1% Cream, and 0.5% Cream had "extraordinary price increases" in the years 2010-2011.

1546.   Documentary evidence confirms that these parallel price increases were the result of collusion among Ascend, Par, Perrigo, Sandoz, and Taro.

1547.   ███████████████████████████████████████████████████████

███████████ Under the Fair Share Agreement, they expected that their ostensible competitors would not undercut their prices in order to gain additional market share.  When ostensible competitors did seek additional market share, defendants showed surprise and dismay that one would not expect in a competitive market.  For instance, in September 2012, Sandoz received a rebid request from Rite Aid on Triamcinolone Acetonide 0.1% Lotion due to a bid from a competitor.  R.T. of Sandoz asked colleague D.L. to find out if this was Par (Qualitest) or

REDACTED – PUBLIC VERSION

another competitor.  D.L. confirmed that it was Par.  R.T. asked, "Why in the heck would they be coming after our share?"  C.B. of Sandoz responded, "Low IQ and a lack of understanding the market."

1548.   The ability of Ascend, Par, Perrigo, Sandoz, and Taro to reach agreement regarding Triamcinolone Acetonide was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1549.   ████████████████████████████████████████████████████████
████████████████████████████

1550.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1551.   The agreement between Defendants Ascend, Par, Perrigo, Sandoz, and Taro, was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Triamcinolone Acetonide Cream and Ointment.

### 114.   Triamterene HCTZ

1552.   Triamterene HCTZ is a commonly prescribed medication used to treat fluid retention and high blood pressure.  It has been on the market for decades and is available in multiple forms and dosages, including Capsules (37.5-25 mg ) and Tablets (37.5-25 mg and 75-50 mg).

1553.   The market for Triamterene HCTZ 37.5-25mg Capsules and 37.5-25 mg and 75-50 mg Tablets is mature.  At all relevant times, there have been multiple manufacturers: Defendants Lannett, Mylan, and Sandoz dominated the sales of 37.5-25 mg Capsules and

Defendants Actavis, Apotex, Mylan, and Sandoz dominated the sales of 37.5-25 mg and 75-50mg Tablets.

1554.   For many years the price of Triamterene HCTZ remained stable.  However, prices began to rise dramatically ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

REDACTED – PUBLIC VERSION





REDACTED – PUBLIC VERSION

1555.   The GAO reported that Triamterene HCTZ 50-75 mg Tablets experienced "an extraordinary price increase" in 2013-2014.

1556.   WAC pricing also rose in a coordinated fashion in the Tablets market.  Mylan substantially raised its WAC prices on November 18, 2011, a decision it would not have made unless it had pre-existing knowledge that the others would soon match, as they did.  Sandoz matched Mylan's WAC prices on January 13, 2012, even though it meant increasing its prior WAC prices sevenfold.  Actavis and Apotex also matched Mylan and Sandoz's prices on March 9, 2012 and August 28, 2012 respectively, thereby significantly increasing their prior WAC prices.

1557.   ███████████████████████████████

1558.   ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

1559.   Documentary evidence confirms that these parallel price increases were the result of collusion among generic drug manufacturers, including Actavis, Apotex, Lannett, Mylan, and Sandoz.  Co-Defendant Teva considered all four to be "quality competitors," with whom it was easy to facilitate price coordination.

1560.   The ability of Actavis, Apotex, Lannett, Mylan, and Sandoz to reach agreements regarding Triamterene HCTZ prices was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

REDACTED – PUBLIC VERSION

1561. ███████████████████████████████████████████████
███████████████████████████████

1562.   The agreement between Defendants Actavis, Apotex, Lannett, Mylan, and Sandoz was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including for Triamterene HCTZ Capsules (37.5-25 mg) and Tablets (37.5-25 mg and 75-50 mg).

**115.   Trifluoperazine HCL**

1563.   Trifluoperazine HCL, also known by the brand name Stelazine, is a medication used to treat disorders such as schizophrenia and Tourette syndrome.  It has been available in the United States in a generic form for many years.

1564.   The market for Trifluoperazine HCL was mature and at all relevant times had multiple manufacturers.

1565.   During the relevant time frame, Defendants Mylan and Sandoz were the primary manufacturers of Trifluoperazine HCL Tablets.  Defendant Upsher-Smith joined Trifluoperazine HCL and the conspiracy in March 2015.

1566.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Trifluoperazine HCL tablets (1, 2, 5 and 10 mg) beginning at least as early as July, 2013.

1567.   For years, the prices for Trifluoperazine HCL tablets were relatively low and stable.  In the summer of 2013, Mylan and Sandoz coordinated large price increases for their Trifluoperazine tablets.  Within a small window of time, Mylan and Sandoz approximately doubled their list (WAC) prices to identical levels, ████████████████████████.

REDACTED – PUBLIC VERSION

1568.   When Upsher-Smith joined the market in spring of 2015, rather than offer better pricing to win customers, it announced identical list (WAC) prices to Mylan and Sandoz, ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

1569.   The list (WAC) price chart and the NSP price chart below highlight the abrupt and parallel price increases by Mylan and Sandoz, and the elevated prices at which Upsher-Smith joined the market for Trifluoperazine HCL tablets.





1570.   Throughout this period, Mylan, Sandoz and Upsher-Smith met at trade conferences and communicated directly with each other in furtherance of their price fixing agreement on Trifluoperazine HCL tablets and of the Fair Share agreement.

1571.   For example, on August 6, 2013—just a few days prior to Mylan's price increases—Nesta (Mylan) was in phone contact with a Sandoz Director of National Accounts.

1572.   Once the Mylan price increases were imposed, Sandoz was careful not to take Mylan's customers and to maintain Fair Shares.

1573.   Sandoz and Mylan were in contact by phone on numerous occasions in October, and on October 25, 2013, Sandoz announced identical list (WAC) prices to Mylan.

1574.   In January, February and March of 2015, Sandoz's Kellum was in phone contact with S.H., Senior VP of Global Sales, and J.H., Senior Director of Marketing, at Upsher-Smith. In February 2015, M.A., National Account Director at Mylan, communicated by text message

REDACTED – PUBLIC VERSION

with D.Z., National Accounts Senior Director at Upsher-Smith.  On March 17, Upsher-Smith announced identical list prices to Sandoz and Mylan.

1575.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1576.   The ability of Mylan, Sandoz and Upsher-Smith to reach agreements on Trifluoperazine tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1577.   The coordination by Mylan, Sandoz, and Upsher-Smith is consistent with the Fair Share Agreement.

1578.   The agreement between Defendants Mylan, Sandoz and Upsher-Smith was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Trifluoperazine Tablets.

**116.   Valsartan HCTZ**

1579.   Valsartan HCTZ, also known by the brand name Diovan, is a medication used to treat high blood pressure.  It has been available in the United States in a generic form for many years.

1580.   The market for Valsartan HCTZ tablets was mature and at all relevant times had multiple manufacturers.

1581.   During the relevant time frame, Defendants Sandoz and Mylan were the primary manufacturers of Valsartan HCTZ Tablets.

1582.   Plaintiffs allege that as part of Defendants' Fair Share Agreement, they conspired to fix, raise, maintain or stabilize the prices of Valsartan HCTZ tablets beginning at least as early as September 2012

1583.   Mylan was the first to file an ANDA to market the generic Valsartan HCTZ – which, if approved, would give Mylan 180 days of generic exclusivity.  Sandoz manufactured the authorized generic.  This meant that Sandoz and Mylan would be the only two manufacturers of the generic version of the drug for six months.

1584.   Mylan and Sandoz both launched Valsartan HCTZ on September 21, 2012.  Prior to the launch, D.L., a Director of National Accounts at Sandoz, and Nesta of Mylan spoke numerous times by phone and discussed, among other things, avoiding price competition for customers in the Valsartan HCTZ market.  They agreed to split the market 50/50.

1585.   Sandoz's Kellum was kept in the loop about the agreement with Nesta.

1586.   On September 21, 2012, a Sandoz employee remarked in an email on news of Mylan's FDA approval for Valsartan HCTZ: "Fyi, good news, Mylan has 180 days as expected." A Sandoz executive in Germany responded, ". . . sometimes a little help from our competition is welcome as well." D.D., the President and CEO of Sandoz North America replied: **"I guess this what they call co-opetition."**

1587.   Shortly after Mylan entered the market, a large wholesaler contacted Sandoz to ask for better prices on Valsartan HCTZ.  Sandoz refused.  Kellum at Sandoz continued to monitor the agreement and to make sure that Sandoz was not taking more than its Fair Share.  He explained to colleagues: "I'm concerned we are going to disrupt the market.  I understand the need for additional sales but we need to be thoughtful here."  A directive went out to the Sandoz sales personnel: "Do not approach new customers" without prior approval from the executives.

REDACTED – PUBLIC VERSION

1588.   No non-collusive market factors (*e.g.*, product shortages) can explain the artificially inflated prices.

1589.   The ability of Sandoz and Mylan to reach agreements on Valsartan HCTZ tablets was aided by the prevalence of trade association meetings and conferences where the parties were able to meet in person.  *See* Exhibit E (Trade Association Contacts as to the Named Generic Drugs).

1590.   The coordination by Sandoz and Mylan is consistent with the Fair Share Agreement.

1591.   The agreement between Defendants Sandoz and Mylan was part of an overarching conspiracy between generic drug manufacturers to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation for generic drugs, including Valsartan HCTZ Tablets.

**D.   Defendants' Anticompetitive Conduct Relating to the Other Named Generic Drugs Further Demonstrates Defendants' Overarching Fair Share Agreement**

1592.   All the individual drug allegations set forth above are in addition to the individual drug allegations and overarching conspiracy allegations described in DPPs' individual drug complaints and the DPPs' complaint filed in December 2018.  *See* Exhibit A (DPP Named Generic Drugs in MDL 2724 as of February 2020); Exhibit B (Timeline of DPP Named Generic Drugs in MDL 2724).

**E.   The Existence of the Fair Share Agreement within the Generic Drug Industry and as to All of the Named Generic Drugs Is Supported by Other Factors.**

1593.   In addition to the data analysis and conspiracy evidence set forth herein, the existence of the Fair Share Agreement is supported by other factors:

- The many generic drugs that DPP have sued on in MDL 2724.  *See* Exhibit A (DPP Named Generic Drugs in MDL 2724 as of February 2020); Exhibit B (Timeline of DPP Named Generic Drugs in MDL 2724).

- Public revelations to date in the ongoing government investigations and other public reports indicating collusion. *See* Exhibit C (History of Government Investigations and Other Public Reports Concerning Anticompetitive Conduct in the Generic Drug Industry); Exhibit D (List of Generic Drug Manufacturers Known to Have Received a DOJ Subpoena and/or CID Relating to Anticompetitive Conduct in the Generic Drug Industry).

- The extensive contacts among generic drug manufacturers including almost constant trade association meetings. *See, e.g.*, Exhibit E (Trade Association Contacts as to the Named Generic Drugs); Exhibit F (Generic Pharmaceutical Association Board of Directors 2010 to 2017); Exhibit I (Sample Telephone Record Summary.

- Economic factors relating to the generic drug industry. Exhibit G (Summary of Economic Factors Indicating Collusion in the Generic Drug Industry).

- Defendants' public communications to investors. Exhibit H (Sample of Defendants' Investor Communications).

## VI.    CLASS ACTION ALLEGATIONS

1594.    Pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), Plaintiffs bring this action on behalf of a Class defined as:

> All persons or entities that purchased one or more of the Named Generic Drugs in the United States and its territories and possessions, at any time during the period from July 2009 until the effects of the conspiracy cease (the Class Period), (a) directly from one or more of Defendants, or (b) directly from one or more of Defendants' direct customers to the extent that the claim in this litigation of any such direct customer(s) for such purchase(s) is extinguished by operation of applicable law, *i.e.,* the direct customer is determined to be a "Completely Involved Co-Conspirator."

> Excluded from the Class are Defendants and their officers, directors, management, employees, subsidiaries, or affiliates, judicial officers and their personnel, all governmental entities and any Completely Involved Co-Conspirator.

1595.    Members of the Class are so numerous that joinder is impracticable.  There are scores of Class members, geographically dispersed throughout the United States, such that

REDACTED – PUBLIC VERSION

joinder of all Class members is impracticable.  Further, the Class members are readily identifiable from information and records maintained by Defendants.

1596.   Plaintiffs' claims are typical of, and not antagonistic to, the claims of the other Class members, and there are no material conflicts with any other member of the Class that would make class certification inappropriate.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

1597.   Plaintiffs will fairly and adequately protect and represent the interests of the Class and Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

1598.   Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation.

1599.   Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the Class.  Thus, determining damages with respect to the Class as a whole is appropriate.  The common applicability of the relevant facts to claims of Plaintiffs and the proposed Class is inherent in Defendants' wrongful conduct, because the overcharge injuries incurred by Plaintiffs and each member of the proposed Class arose from the same collusive conduct alleged herein.

1600.   The common legal and factual questions do not vary among Class members and may be determined without reference to individual circumstances, and include, but are not limited to, the following:

(a)     Whether Defendants and their generic manufacturer co-conspirators engaged in a contract, combination, or conspiracy to eliminate competition and thereby increase prices of the drugs identified in the DPPs' Complaint in the United States and in its territories and possessions;

(b)     The duration and extent of the alleged contract, combination, or conspiracy between and among Defendants and their generic manufacturer co-conspirators;

- 363 -

REDACTED – PUBLIC VERSION

(c)     Whether Defendants and their generic manufacturer co-conspirators were participants in the contract, combination, or conspiracy alleged herein;

(d)     The effect of the contract, combination, or conspiracy on prices of the drugs identified in the DPPs' Complaint in the United States and in its territories and possessions during the Class Period;

(e)     Whether Defendants' conduct caused supracompetitive prices for the generic drugs named in this case;

(f)     Whether, and to what extent, the conduct of Defendants and their generic manufacturer co-conspirators caused injury to Plaintiffs and other members of the Class; and

(g)     Whether the alleged contract, combination, or conspiracy violated Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3.

1601.    Treatment as a class action is the superior method for the fair and efficient adjudication of this controversy, as it will permit numerous similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, avoiding unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding as a class action, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs any potential difficulties in management of this class action.

1602.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## VII.    ANTITRUST INJURY

1603.    During the Class Period, DPPs and Class members directly purchased the drugs identified in the DPPs' Complaint from Defendants. Because of Defendants' anticompetitive conduct, Plaintiffs and Class members were forced to pay more for these drugs than they otherwise would have, and thus have suffered substantial overcharge damages at the hands of

REDACTED – PUBLIC VERSION

Defendants. This is a cognizable antitrust injury and constitutes harm to competition under the federal antitrust laws.

1604.   Defendants' unlawful conduct has successfully eliminated or suppressed competition in the market, and Plaintiffs and Class members have sustained, and continue to sustain, significant losses in the form of artificially inflated prices paid to Defendants. The full amount of such overcharge damages will be calculated after discovery and upon proof at trial.

1605.   Defendants, through their unlawful conduct alleged herein, reduced competition in the generic drug market, increased prices, reduced choice for purchasers, and caused antitrust injury to purchasers in the form of overcharges.

1606.   Because Defendants' anticompetitive conduct is ongoing, DPPs and the proposed Class continue to pay supracompetitive prices for the drugs named in this case through the present.

### VIII.   TOLLING OF THE STATUTE OF LIMITATIONS

1607.   The statute of limitations, as it applies to the alleged Sherman Act Sections 1 and 3 antitrust violations carried out by Defendants and any generic manufacturer co-conspirators, were tolled due to one or more events. These include, but are not limited to, the following reasons.

1608.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) Defendants' disclosures of the existence of the government investigations and subpoenas.[32]  Prior

---

[32] On December 12, 2016, the United States DOJ charged Glazer with a criminal violation of U.S. Antitrust laws. The resulting criminal proceedings against Glazer toll the statute of limitations on Plaintiffs' claims, according to 15 U.S.C. § 16(i). However, the charges against Glazer related to only Doxycycline and Glyburide. The DOJ publicly stated that the charges against Glazer were part of an ongoing federal antitrust investigation into price fixing, bid

REDACTED – PUBLIC VERSION

to that time, no information in the public domain or available to Plaintiffs suggested that any Defendant was involved in a criminal conspiracy to fix prices for generic drugs.

1609.   Plaintiffs had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth against these Defendants, until (at the earliest) the filing of the States' May 2019 Complaint.

1610.   No information evidencing antitrust violations was available in the public domain prior to the public announcements of the government investigations that revealed sufficient information to suggest that any of the Defendants was involved in a criminal conspiracy to fix prices for generic drugs.

1611.   Many of the Defendants and their generic manufacturer co-conspirators repeatedly and expressly stated throughout the Class Period, including on their public Internet websites, that they maintained antitrust/fair competition policies, which prohibited the type of collusion alleged herein.  It was reasonable for members of the Class to believe that Defendants were complying with their own antitrust policies.

1612.   In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations on the claims asserted by Plaintiffs.

1613.   Conspiracies, by their nature, must be concealed.  Defendants and their generic manufacturer co-conspirators maintained their conspiracy through surreptitious meetings and communications.  Defendants' and generic manufacturer co-conspirators' affirmative and fraudulent concealment of their conspiratorial acts prevented Plaintiffs from discovering their

---

rigging, and other anticompetitive conduct in the generic pharmaceutical industry.  In other words, the charges against Glazer only put plaintiffs on notice as to a small portion of the overarching conspiracy.

REDACTED – PUBLIC VERSION

causes of action and thereby tolled the statute of limitations on Plaintiffs' claims. Such acts

included, without limitation:

(i)    Defendants made consistent efforts to avoid communicating with each other in writing, or to delete written electronic communications after they were made, because they were aware that their conduct was illegal;

(ii)    Instructions were communicated among Defendants that they should not communicate through email, but should instead call or meet in person if they had information to convey;

(iii)    The Defendants destroyed emails, text messages, and other documents to avoid detection of their collusive conduct.

(iv)    Defendants made materially false and/or misleading public statements, including financial results, during earnings calls with shareholders and in SEC filings which had the effect of concealing, and/or failed to disclose, that they colluded to fix, stabilize, and raise prices, rig bids, and engage in market and customer allocation of generic drugs, and, consequently, their revenues during the Class Period were in part the result of anti-competitive conduct; and

(v)    As Defendants became more aware that they were under state and federal investigation, they failed to produce certain documents, including emails, in response to, for example, Connecticut's subpoena, even though the subpoena sought all such documents.

1614.    The coordinated nature of Defendants' pricing, bids and market allocation was

hidden and not easily discernable to Plaintiffs and members of the class, acting with reasonable

diligence. For example, Defendants' supply agreements with Plaintiffs and class members for

the Named Generic Drugs are confidential and a review of Plaintiffs' own, individual contracts

for Named Generic Drugs would not in themselves or in connection with publicly available

information have given them reason to suspect an antitrust conspiracy. To the extent Defendants

provided public pretextual reasons for their price increases, *e.g.*, shortages or increased costs of

raw materials, Plaintiffs and class members had limited access to information that would have

revealed the fraud. Because of Defendants' affirmative concealment, and the fact that antitrust

REDACTED – PUBLIC VERSION

conspiracies such as this one are inherently self-concealing, Plaintiffs could not have learned about the conspiracy any earlier, despite the exercise of reasonable diligence.

1615.   The filing and pendency of DPPs' class action complaints against Defendants and generic manufacturer co-conspirators tolled the statute of limitations on Plaintiffs' claims.

1616.   For these reasons, DPPs' claims are timely.

1617.   Further, even if the Court were to find that a statute of limitations had been triggered, at a minimum, DPPs can still recover at least four years of overcharges.  This Complaint alleges a continuing course of conduct.  Thus, Plaintiffs and the members of the Class can recover for damages they suffered during any applicable limitations period.

## IX.   CLAIM FOR RELIEF
### Conspiracy in Restraint of Trade in Violation of Sherman Act Sections 1 and 3

1618.   Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein.

1619.   This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Named Generic Drugs.

1620.

1621.   Defendants and their unnamed generic manufacturer co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

1622.   During the Class Period, Defendants and their generic manufacturer co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for Named Generic Drugs, thereby creating anticompetitive effects.

1623.   This count is also brought against Defendant-participants in each of the drug specific conspiracies alleged above, which include the following:

(1)     Adapalene: Glenmark, Taro, Teva

(2)     Alclometasone Dipropionate: Glenmark, Sandoz, Taro

(3)     Allopurinol: Actavis, Dr. Reddy's, Mylan, Par

(4)     Amantadine HCL: Lannett, Sandoz, Upsher-Smith

(5)     Amiloride HCL/HCTZ: Mylan, Teva

(6)     Amoxicillin/Clavulanate: Sandoz, Teva

(7)     Amphetamine/Dextroamphetamine (MAS) [Adderall]: Actavis, Aurobindo, Impax, Mallinckrodt, Sandoz, Teva

(8)     Atenolol Chlorthalidone: Actavis, Mylan

(9)     Atropine Sulfate: Bausch, Sandoz

(10)    Balsalazide Disodium: Apotex, West-Ward

(11)    Betamethasone Dipropionate: Actavis, Perrigo, Sandoz, Taro

(12)    Betamethasone Dipropionate Augmented: Sandoz, Taro

(13)    Betamethasone Dipropionate Clotrimazole: Actavis, Sandoz, Taro

(14)    Betamethasone Valerate: Actavis, Sandoz, Taro

(15)    Bethanechol Chloride: Amneal, Teva, Upsher-Smith

(16)    Bromocriptine Mesylate: Mylan, Perrigo, Sandoz

(17)    Budesonide: Actavis, Mylan, Par, Sandoz, Teva

(18)    Buspirone HCL: Actavis, Mylan, Teva

(19)    Butorphanol Tartrate: Apotex, Mylan, West-Ward

(20)    Capecitabine: Mylan, Teva

(21)    Captopril: Mylan, West-Ward, Wockhardt

(22)    Carbamazepine: Apotex, Sandoz, Taro, Teva, Torrent

REDACTED – PUBLIC VERSION

(23)  Carisoprodol: Par, Teva

(24)  Cefdinir: Lupin, Sandoz, Teva

(25)  Cefprozil: Lupin, Sandoz, Teva

(26)  Cefuroxime Axetil: Aurobindo, Citron, Lupin

(27)  Celecoxib: Actavis, Teva

(28)  Cephalexin (Cefalexin): Lupin, Teva

(29)  Chlorpromazine HCL: Sandoz, Upsher-Smith

(30)  Cholestyramine: Par, Sandoz, Upsher-Smith

(31)  Ciclopirox: Akorn, G&W, Perrigo

(32)  Cimetidine: Mylan, Teva

(33)  Clarithromycin: Actavis, Teva

(34)  Clindamycin Phosphate: Actavis, Greenstone, Perrigo, Sandoz, Taro

(35)  Clonidine TTS: Actavis, Mylan, Teva

(36)  Clotrimazole: Taro, Teva

(37)  Dexmethylphenidate HCL [Focalin]: Par, Sandoz, Teva

(38)  Dextroamphetamine Sulfate (Dex Sulfate): Actavis, Aurobindo, Impax, Mallinckrodt, Teva

(39)  Desmopressin Acetate: Actavis, Teva

(40)  Diclofenac Potassium: Mylan, Sandoz, Teva

(41)  Diltiazem HCL: Mylan, Teva

(42)  Diphenoxylate Atropine HCL: Greenstone, Mylan

(43)  Doxazosin Mesylate: Apotex, Greenstone, Mylan, Par, Teva

(44)  Drospirenone and Ethinyl Estradiol: Actavis, Lupin, Teva

(45)  Enalapril Maleate: Bausch, Mylan, Taro, Teva, Wockhardt

(46)  Entecavir: Par, Teva

REDACTED – PUBLIC VERSION

(47)   Estradiol: Actavis, Mylan, Teva

(48)   Estradiol and Norethindrone Acetate: Breckenridge, Teva

(49)   Ethinyl Estradiol and Levonorgestrel [Portia and Jolessa]: Sandoz, Teva

(50)   Etodolac: Apotex, Sandoz, Taro, Teva, Zydus

(51)   Exemestane: Greenstone, West-Ward

(52)   Fenofibrate: Lupin, Mylan, Perrigo, Teva, Zydus

(53)   Fluconazole: Citron, Dr. Reddy's, Glenmark, Greenstone, Teva

(54)   Fluocinolone Acetonide: G&W, Sandoz, Taro, Teligent

(55)   Fluoxetine HCL: Mylan, Teva

(56)   Fluticasone Propionate: Akorn, Apotex, West-Ward

(57)   Gabapentin: Aurobindo, Glenmark, Teva

(58)   Glimepiride: Dr. Reddy's, Teva

(59)   Griseofulvin: Actavis, Teva

(60)   Halobetasol Propionate: G&W, Perrigo, Sandoz, Taro

(61)   Haloperidol: Sandoz, Mylan, Zydus

(62)   Hydrocodone Acetaminophen: Amneal, Mallinckrodt, Par, Teva

(63)   Hydrocortisone Valerate: G&W, Perrigo, Taro

(64)   Irbesartan: Lupin, Teva

(65)   Isosorbide Dinitrate: Sandoz, Par, West-Ward

(66)   Ketoconazole: G&W, Mylan, Sandoz, Taro, Teva

(67)   Ketoprofen: Mylan, Teva

(68)   Ketorolac Tromethamine : Mylan, Teva

(69)   Labetalol HCL: Par, Sandoz, Teva

(70)   Lamivudine/Zidovudine [Combivir]: Aurobindo, Camber, Lupin, Teva

REDACTED – PUBLIC VERSION

(71)   <u>Latanoprost</u>: Akorn, Bausch, Greenstone, Sandoz

(72)   <u>Lidocaine HCL</u>: Akorn, Sandoz, Taro

(73)   <u>Loperamide HCL</u>: Mylan, Teva

(74)   <u>Metformin ER (F)</u>: Actavis, Lupin

(75)   <u>Methadone HCL</u>: Mallinckrodt, West-Ward

(76)   <u>Methotrexate</u>: Mylan, Par, Teva, West-Ward

(77)   <u>Methylphenidate</u>: Actavis, Impax, Mallinckrodt, Par, Sandoz, Sun

(78)   <u>Methylprednisolone</u>: Breckenridge, Cadista, Greenstone, Par, Sandoz

(79)   <u>Moexipril HCL</u>: Glenmark, Teva

(80)   <u>Moexipril HCL HCTZ</u>: Glenmark, Teva

(81)   <u>Nadolol</u>: Greenstone, Mylan, Sandoz, Teva

(82)   <u>Naproxen Sodium</u>: Amneal, Glenmark

(83)   <u>Neomycin Polymyxin Hydrocortisone</u>: Bausch, Sandoz

(84)   <u>Niacin</u>: Lupin, Teva, Zydus

(85)   <u>Nitrofurantoin</u>: Alvogen, Mylan, Teva

(86)   <u>Norethindrone/Ethinyl Estradiol [Balziva]</u>: Lupin, Teva

(87)   <u>Nortriptyline HCL</u>: Actavis, Taro, Teva

(88)   <u>Nystatin Triamcinolone</u>: Sandoz, Taro, Teva

(89)   <u>Omega-3-Acid Ethyl Esters</u>:  Apotex, Par, Teva

(90)   <u>Oxaprozin</u>: Dr. Reddy's, Greenstone, Sandoz, Teva

(91)   <u>Oxybutynin Chloride</u>: Par, Teva, Upsher-Smith

(92)   <u>Oxycodone Acetaminophen</u>:  Actavis, Alvogen, Amneal, Aurobindo, Mallinckrodt, Par

(93)   <u>Oxycodone HCL</u>: Glenmark, Lannett, Mallinckrodt, Par, Teva

(94)   <u>Paricalcitol</u>: Dr. Reddy's, Teva, Zydus

REDACTED – PUBLIC VERSION

(95)   <u>Permethrin</u>: Actavis, Mylan, Perrigo

(96)   <u>Perphenazine</u>: Par, Sandoz

(97)   <u>Phenytoin Sodium</u>: Amneal, Mylan, Sun, Taro

(98)   <u>Pilocarpine HCL</u>: Actavis, Impax, Lannett

(99)   <u>Piroxicam</u>: Greenstone, Mylan Teva

(100)  <u>Potassium Chloride</u>: Actavis, Mylan, Sandoz, Upsher-Smith, Zydus

(101)  <u>Prazosin HCL</u>: Mylan, Teva

(102)  <u>Prednisolone Acetate</u>: Greenstone, Sandoz

(103)  <u>Prednisone</u>: Actavis, Cadista, Par, West-Ward

(104)  <u>Raloxifene HCL</u>: Camber, Teva

(105)  <u>Ranitidine HCL</u>: Amneal, Dr. Reddy's, Glenmark, Par, Sandoz, Teva

(106)  <u>Silver Sulfadiazine</u>: Ascend, Teva

(107)  <u>Spironolactone HCTZ</u>: Greenstone, Mylan, Sun

(108)  <u>Tamoxifen Citrate</u>: Actavis, Mylan, Teva

(109)  <u>Temozolomide</u>: Sandoz, Teva

(110)  <u>Timolol Maleate</u>: Bausch, Sandoz

(111)  <u>Tizanidine HCL</u>: Apotex, Dr. Reddy's, Mylan, Sandoz, Sun, Taro

(112)  <u>Tobramycin</u>: Sandoz, Teva

(113)  <u>Tobramycin Dexamethasone</u>: Bausch, Sandoz

(114)  <u>Tolmetin Sodium</u>: Mylan, Teva

(115)  <u>Tolterodine</u>: Greenstone, Mylan, Teva

(116)  <u>Trazodone</u>: Apotex, Par, Sun, Teva

(117)  <u>Triamcinolone Acetonide</u>: Ascend, Par, Perrigo, Sandoz, Taro

(118)  <u>Triamterene HCTZ</u>: Actavis, Apotex, Lannett, Mylan, Sandoz

(119)  <u>Trifluoperazine HCL</u>: Mylan, Sandoz, Upsher-Smith

REDACTED – PUBLIC VERSION

(120)   <u>Valsartan HCTZ</u>: Mylan, Sandoz

(121)   <u>Warfarin Sodium</u>: Amneal, Taro, Teva, Zydus

1624.   The conspiratorial acts and combinations have caused unreasonable restraints in the market for Named Generic Drugs.

1625.   As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class who purchased Named Generic Drugs have been harmed by being forced to pay inflated, supracompetitive prices for Named Generic Drugs.

1626.   In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their generic manufacturer co-conspirators did those things that they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth herein.

1627.   Defendants' conspiracy had the following effects, among others:

(a)   Price competition in the market for Named Generic Drugs has been restrained, suppressed, and/or eliminated in the United States;

(b)   Prices for Named Generic Drugs provided by Defendants and their generic manufacturer co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)   Plaintiffs and members of the proposed Class who purchased Named Generic Drugs directly from Defendants and their generic manufacturer co-conspirators have been deprived of the benefits of free and open competition.

1628.   As a direct and proximate result of Defendants' and generic manufacturer co-conspirators' unlawful conduct, Plaintiffs and members of the proposed Class have been injured in their business and property in that they have paid more for these drugs than they otherwise

REDACTED – PUBLIC VERSION

would have paid in the absence of Defendants' and generic manufacturer co-conspirators' unlawful conduct. The full amount of such damages is presently unknown and will be determined after discovery and upon proof at trial.

1629.   All Defendants and generic manufacturer co-conspirators are *per se* liable under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, for the injuries and damages caused by their contract, combination, and conspiracy in restraint of trade as alleged herein.

1630.   There is no legitimate, non-pretextual, procompetitive business justification for Defendants' and generic manufacturer co-conspirators' conspiracy that outweighs its harmful effect. Even if there were some conceivable justification, the conspiracy is broader than necessary to achieve such a purpose.

1631.   Defendants' and generic manufacturer co-conspirators' unlawful conduct as alleged herein poses a significant and continuing threat of antitrust injury.

## X.    PRAYER FOR RELIEF

WHEREFORE, DPPs and members of the proposed Class pray for relief from this Court and request:

A.    Certification as a class action pursuant to Federal Rule of Civil Procedure 23, and appointment of DPPs as Class representatives and their counsel of record as Class counsel;

B.    Adjudication that the acts alleged herein constitute unlawful restraints of trade in violation of the Sherman Act;

C.    A judgment against Defendants and generic manufacturer co-conspirators, jointly and severally, for the damages sustained by DPPs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages;

REDACTED – PUBLIC VERSION

D.     An award to DPPs and Class members of pre-judgment and post-judgment interest at the highest legal rate provided by law from and after the date of service of the first-filed complaint in this action;

E.     An award to DPPs and Class members of the costs of this suit, including reasonable attorney fees; and

F.     An award of any further relief as the Court deems just and proper.

### XI.     JURY TRIAL DEMANDED

DPPs hereby request a jury trial on all claims so triable.

Dated:  February 7, 2020

NASTLAW LLC

Dianne M. Nast
Joseph N. Roda
Michael D. Ford
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
(215) 923-9300
(215) 923-9302 (fax)
dnast@nastlaw.com
jnroda@nastlaw.com
mford@nastlaw.com

*Lead and Liaison Counsel for Direct
Purchaser Plaintiffs*

- 376 -

REDACTED – PUBLIC VERSION

BERGER MONTAGUE PC
David F. Sorensen
Candice J. Enders
Zachary D. Caplan
Christina M. Black
1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 875-3000
dsorensen@bm.net
cenders@bm.net
zcaplan@bm.net
cblack@bm.net

HAGENS BERMAN SOBOL SHAPIRO LLP
Thomas M. Sobol
David S. Nalven
55 Cambridge Parkway, Suite 301
Cambridge, Massachusetts 02142
(617) 482-3700
tom@hbsslaw.com
davidn@hbsslaw.com

Barbara A. Mahoney
1918 8th Avenue, Suite 3300
Seattle, Washington 98101
(206) 623-7292
barbaram@habsslaw.com

KAPLAN FOX & KILSHEIMER LLP
Robert N. Kaplan
Elana Katcher
850 Third Avenue
New York, New York 10022
(212) 687-1980
rkaplan@kaplanfox.com
ekatcher@kaplanfox.com

NUSSBAUM LAW GROUP, PC
Linda P. Nussbaum
1211 Avenue of the Americas, 40th Floor
New York, New York 10036
(917) 438-9189
lnussbaum@nussbaumpc.com

ROBERTS LAW FIRM P.A.
Michael L. Roberts
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575
mikeroberts@robertslawfirm.us

*Direct Purchaser Plaintiffs' Steering Committee*

REDACTED – PUBLIC VERSION

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CÉSAR CASTILLO, INC., et al.

**DEFENDANTS**

ACTAVIS HOLDCO, U.S., INC., et al.

**(b)** County of Residence of First Listed Plaintiff    San Juan, Puerto Rico
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Morris County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Dianne M. Nast, NastLaw LLC, 1101 Market Street, Suite 2801, Philadelphia, PA 19107, 215-923-9300

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question *(U.S. Government Not a Party)*

☐ 2 U.S. Government Defendant

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☒ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☒ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15

Brief description of cause:
Claim for antitrust damages arising from antitrust violations in the market for generic drugs

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
1,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE    Hon. Cynthia M. Rufe

DOCKET NUMBER    2:16-md-2724-CMR (PAED)

DATE
02/07/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ Bo. Quebradas Arena, Rd. #1 KM. 26.0, Rio Piedras, PR. 00926 _____

Address of Defendant: _____ see attached _____

Place of Accident, Incident or Transaction: _____ Nationwide _____

---

*RELATED CASE, IF ANY:*

Case Number: _____ 2:16-md-02724 _____  Judge: _____ Hon. Cynthia M. Rufe _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

| | | Yes | No |
|---|---|---|---|
| 1. | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | ☐ | ☑ |
| 2. | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | ☑ | ☐ |
| 3. | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | ☐ | ☑ |
| 4. | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | ☐ | ☑ |

I certify that, to my knowledge, the within case ☑ is / ☐ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____ 02/07/2020 _____       _Attorney-at-Law / Pro Se Plaintiff_       _____ 24424 _____
                                                                        _Attorney I.D. # (if applicable)_

---

**CIVIL: (Place a √ in one category only)**

**A.**  *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☑ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.**  *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Dianne M. Nast _____, counsel of record or pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: _____ 02/07/2020 _____       _Attorney-at-Law / Pro Se Plaintiff_       _____ 24424 _____
                                                                        _Attorney I.D. # (if applicable)_

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**<u>Defendant Addresses</u>**

Actavis Holdco U.S., Inc.
400 Interpace Parkway
Parsippany, New Jersey 07054

Actavis Pharma, Inc.
400 Interpace Parkway
Parsippany, New Jersey 07054

Actavis Elizabeth LLC
200 Elmora Avenue
Elizabeth, New Jersey 07202

Akorn, Inc.
1925 West Field Court, Suite 300
Lake Forest, Illinois 60045

Alvogen, Inc.
44 Whippany Road, Suite 300
Morristown, New Jersey 07960

Amneal Pharmaceuticals, Inc.
400 Crossing Boulevard, 3rd Floor
Bridgewater, New Jersey 08807

Amneal Pharmaceuticals, LLC
400 Crossing Boulevard, 3rd Floor
Bridgewater, New Jersey 08807

Apotex Corp.
2400 North Commerce Parkway
Suite 400
Weston, Florida 33326

Aurobindo Pharma USA, Inc.
279 Princeton Hightstown Road
East Windsor, New Jersey 08520

Bausch Health Americas, Inc.
400 Somerset Corporate Blvd.
Bridgewater, New Jersey 08807

Bausch Health US, LLC
400 Somerset Corporate Blvd.

Bridgewater, New Jersey 08807

Breckenridge Pharmaceutical, Inc.
15 Massirio Drive, Suite 201
Berlin, Connecticut 06037

Camber Pharmaceuticals Inc.
1031 Centennial Avenue
Piscataway, New Jersey 08854

Citron Pharma LLC
2 Tower Center Boulevard, Suite 1101
East Brunswick, New Jersey 08816

DAVA Pharmaceuticals, LLC
c/o Endo Pharmaceuticals Inc.
1400 Atwater Drive
Malvern, Pennsylvania 19355

Dr. Reddy's Laboratories
107 College Road East
Princeton, New Jersey 08540

Fougera Pharmaceuticals Inc.
60 Baylis Road
Melville, New York 11747

G&W Laboratories, Inc.
301 Helen Street
South Plainfield, New Jersey 07080

Generics Bidco I LLC
130 Vintage Drive NE
Huntsville, Alabama 35811

Glenmark Pharmaceuticals, Inc.
750 Corporate Drive
Mahwah, New Jersey 07430

Greenstone LLC
100 Route 106 North
Peapack, New Jersey 07977
Heritage Pharmaceuticals, Inc.
One Tower Center Boulevard
Suite 1700
East Brunswick, New Jersey 08816

Hikma Labs, Inc.
246 Industrial Way West,
Eatontown, New Jersey 07724

Hikma Pharmaceuticals USA, Inc.
246 Industrial Way West,
Eatontown, New Jersey 07724

Impax Laboratories, LLC
c/o Amneal Pharmaceuticals
400 Crossing Boulevard, 3rd Floor
Bridgewater, New Jersey 08807

Jubilant Cadista Pharmaceuticals Inc.
207 Kiley Drive
Salisbury, Maryland 21801

Lannett Company, Inc.
9000 State Road
Philadelphia, Pennsylvania 19136

Lupin Pharmaceuticals, Inc.
Harborplace Tower
111 S. Calvert Street, 21st Floor
Baltimore, Maryland 21202

Mallinckrodt Inc.
385 Marshall Avenue
Webster Groves, Missouri 63119

Mayne Pharma Inc.
3301 Benson Drive, Suite 401
Raleigh, North Carolina 27609

Morton Grove Pharmaceuticals, Inc.
6451 Main Street
Morton Grove, Illinois 60053

Mylan Inc.
Robert J. Coury Global Center
1000 Mylan Boulevard
Canonsburg, Pennsylvania 15317

Mylan Pharmaceuticals Inc.

781 Chestnut Ridge Road
Morgantown, West Virginia 26505

Oceanside Pharmaceuticals, Inc.
One Enterprise
Aliso Viejo, California 92656

Par Pharmaceutical, Inc.
One Ram Ridge Road
Chestnut Ridge, New York 10977

Perrigo New York, Inc.
515 Eastern Avenue
Allegan, Michigan 49010

Pfizer, Inc.
235 East 42nd Street
New York, New York 10017

Sandoz, Inc.
100 College Road West
Princeton, New Jersey 08540

Sun Pharmaceutical Industries, Inc.
1 Commerce Drive
Cranbury, New Jersey 08512

Taro Pharmaceuticals U.S.A., Inc.
3 Skyline Drive
Hawthorne, New York 10532

Teligent, Inc.
105 Lincoln Avenue
Buena, New Jersey 08310

Teva Pharmaceuticals USA, Inc.
1090 Horsham Road
North Wales, Pennsylvania 19454

Torrent Pharma Inc.
150 Allen Road, Suite 102
Basking Ridge, New Jersey 07920

Upsher-Smith Laboratories, Inc.
6701 Evenstad Drive
Maple Grove, Minnesota 55369

VersaPharm, Inc.
c/o Akorn, Inc.
1925 West Field Court, Suite 300
Lake Forest, Illinois 60045

West-Ward Pharmaceuticals Inc.
c/o Hikma Pharmaceuticals USA, Inc.
246 Industrial Way West,
Eatontown, New Jersey 07724

Wockhardt USA LLC
20 Waterview Boulevard, 3rd Floor
Parsippany, New Jersey 07054

Zydus Pharmaceuticals (USA), Inc.
73 Route 31 North
Pennington, New Jersey 08534

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| César Castillo, Inc., et al. | : | CIVIL ACTION |
| v. | : | |
| Actavis Holdco U.S., INC., et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.　　　　　( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.　　　　　( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.　( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.　　　　　( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)　　　　　(X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.　　( )

| 02/07/2020 | _(signature)_ | Plaintiffs |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-923-9300 | 215-923-9302 | dnast@nastlaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02